**ECF**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
New Jersey Carpenters Health Fund, On Behalf of
Itself and All Others Similarly Situated

                       Plaintiffs,

         -against-

Home Equity Mortgage Trust 2006-5, Credit Suisse
First Boston Mortgage Securities Corporation,
Andrew A. Kimura, Thomas Zingalli, Jeffrey A.
Altabef, Michael A. Marriott, Evelyn Echevarria,
Credit Suisse Group, Credit Suisse (USA), LLC,
Credit Suisse Securities (USA), LLC, Moody's
Investors Service, Inc., The McGraw-Hill
Companies, Inc., and DBRS, Inc.

                       Defendants.
-----------------------------------------------------------X

**1:08-CV-05653-PAC**

**SUPPLEMENTAL**
**NOTICE OF REMOVAL**

        Defendants Credit Suisse First Boston Mortgage Securities Corporation, Andrew A. Kimura, Thomas Zingalli, Jeffrey A. Altabef, Michael Marriott, Evelyn Echevarria, and Credit Suisse Securities (USA) LLC (together, the "Credit Suisse Defendants"),[1] by their undersigned attorneys, hereby remove the above-captioned case pending in the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York.[2] This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005 ("CAFA"), and the claims may be removed to this Court under 28 U.S.C. § 1453. Alternatively, this Court has jurisdiction

---

[1]     Although named as a defendant, Credit Suisse (USA), LLC is not the name of any existing Credit Suisse entity and therefore does not (and cannot) appear.

[2]     By removing this matter, the Credit Suisse Defendants do not waive and expressly preserve any and all defenses they may have including, but not limited to, lack of personal jurisdiction and service of process.

pursuant to 28 U.S.C. §§ 1452(a) and 1334(b) (bankruptcy removal) and 28 U.S.C. §§ 1332 and 1441 (diversity).

As grounds for removal, the Credit Suisse Defendants state as follows:

1.    On June 3, 2008, plaintiff New Jersey Carpenters Health Fund ("Plaintiff") filed this putative state court class action (the "State Court Action") by filing a complaint entitled *New Jersey Carpenters Health Fund v. Home Equity Mortgage Trust 2006-5*, *et al.* (the "Class Action Complaint") in the Supreme Court of the State of New York, County of New York on behalf of purchasers of certain Home Equity Mortgage Pass-Through Certificates (the "HEMT Bonds").  This case was assigned index number of 601670/08.

2.    This case was removed to this Court on June 23, 2005 by Defendants The McGraw-Hill Companies, Inc., DBRS, Inc. and Moody's Investors Service, Inc on the ground that this Court has jurisdiction over this action under CAFA.  The Credit Suisse Defendants are filing this Supplemental Notice of Removal in order to set forth additional and alternative grounds for removal and federal jurisdiction, although the Credit Suisse Defendants respectfully submit that the Court need not reach those grounds because removal is proper under CAFA.

3.    The Class Action Complaint alleges, among other things, that certain registration statements and prospectuses filed in connection with the HEMT Bonds contained misstatements and omissions in violation of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, and 77o.

4.    Pursuant to 28 U.S.C. § 1446(a) and (b), this Supplemental Notice of Removal is being filed in the United States District Court for the Southern District of New York within thirty days after June 4, 2008, which is the earliest date that any of the Credit Suisse

Defendants received, through service or otherwise, a copy of the Summons and Complaint. All properly-served defendants[3] consent to the removal of this action.

**CAFA**

5.      Pursuant to 28 U.S.C. §§ 1332(d)(2) and 1453, a putative "class action" commenced after February 18, 2005 may be removed to the appropriate United States District Court if: (a) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and (b) any member of the putative class is a citizen of a state different from any defendant. 28 U.S.C. § 1332(d)(2)(A).

6.      CAFA is applicable to the State Court Action because it was commenced on or about June 3, 2008, which is after the effective date of CAFA. 28 U.S.C. §§ 1332, 1453.

7.      The State Court Action is a "class action" within the meaning of CAFA because Plaintiff seeks to represent a class of persons in a "civil action filed under" Article 9 of the New York Civil Practice Law and Rules, *i.e.,* a "State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. §§ 1332(d)(1)(B), 1453(a).

8.      The State Court Action satisfies CAFA's amount in controversy requirement. Under 28 U.S.C. § 1332(d)(6), the amount in controversy in a putative class action is determined by aggregating the amount at issue in the claims of all members of the putative class. Here, the Class Action Complaint alleges that the defendants made false and misleading statements in connection with the issuance of over $784 million in home equity mortgage pass-through certificates, and that the value of these certificates has declined substantially due to the defendants' alleged violations. *See* Class Action Complaint ¶¶ 1 & 3. While the Credit Suisse

---

[3]      Credit Suisse Group and Home Equity Mortgage Trust 2006-5, upon and information and belief, have not been served and therefore their consent is not required. As noted above, Credit Suisse (USA), LLC does not exist as a legal entity.

Defendants deny that Plaintiff or any putative class member is entitled to recover any amount or the other relief sought, these allegations plainly make the aggregate amount in controversy in this State Court Action more than $5,000,000, exclusive of interest and costs.    28 U.S.C. § 1332(d)(2).

9.    The State Court Action satisfies CAFA's diversity of citizenship requirement.  To establish diversity jurisdiction under CAFA, it is sufficient that any one member of the putative class is a citizen of a state different from any one defendant.  28 U.S.C. § 1332(d)(2)(A).  Plaintiff asserts that it is a benefit fund with offices located in the State of New Jersey.  *See* Class Action Complaint ¶ 7.  The Credit Suisse Defendants are citizens of Delaware, New York and North Carolina.  Other defendants, upon information and belief, are citizens of Delaware, New York and Switzerland.

10.    No exceptions to CAFA's applicability apply in this case.

**Alternative Grounds for Removal**

11.    Alternatively, removal is proper under 28 U.S.C. §§ 1452(a) and 1334(b) and Bankruptcy Rule 9027.  On April 2, 2007, New Century Mortgage Corporation and certain affiliates ("New Century"), which originated over 33% of the initial mortgage loans at issue in the State Court Action, filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (Case No. 07-10419) in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Action").  One or more of the Credit Suisse Defendants may have indemnity, contribution and other claims against DLJ Mortgage Capital, Inc. ("DLJ"), which served as "Sponsor" and "Seller" for the transaction and which purchased loans from New Century.  DLJ has filed proofs of claim in the Bankruptcy Action seeking, among other things, indemnity and contribution from New Century.  Such claims may have a

conceivable effect on the bankruptcy estate and, therefore, the State Court Action is "related to" the Bankruptcy Action and removal is proper.

12.    This Court also has jurisdiction under 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

**Other Procedural Requirements**

13.    In accordance with 28 U.S.C. § 1446(a), attached hereto as <u>Exhibit A</u> are file-stamped copies of all process, pleadings and orders served upon the Credit Suisse Defendants in the State Court Action, namely the Summons and Complaint.

14.    The Credit Suisse Defendants will promptly serve a copy of this Supplemental Notice of Removal on Plaintiff's counsel and file with the Clerk of the Supreme Court of the State of New York, County of New York, a Notice of Filing of Supplemental Notice of Removal pursuant to 28 U.S.C. § 1446(d).

15.    This Supplemental Notice of Removal is signed pursuant to Fed. R. Civ. P. 11.  *See* 28 U.S.C. § 1446(a).

**WHEREFORE**, this action should proceed in the United States District Court for the Southern District of New York, as an action properly removed thereto.

Dated:   June 26, 2008                              Respectfully submitted,

                                                    /s Jeffrey Q. Smith_____
                                                    Jeffrey Q. Smith (JS-7435)
                                                    JQSmith@McKeeNelson.com
                                                    Scott E. Eckas (SE-7479)
                                                    SEckas@MckeeNelson.com
                                                    Jennifer Hurley McGay (JHM-7487)
                                                    JHurleyMcGay@McKeeNelson.com
                                                    MCKEE NELSON LLP
                                                    One Battery Park Plaza
                                                    New York, NY 10004
                                                    Telephone:  (917) 777-4200
                                                    Facsimile:  (917) 777-4299

                                                    *Attorneys for Defendants*
                                                        *Credit Suisse First Boston Mortgage Securities*
                                                        *Corporation, Andrew A. Kimura, Thomas*
                                                        *Zingalli, Jeffrey A. Altabef, Michael A. Marriott,*
                                                        *Evelyn Echevarria, and Credit Suisse Securities*
                                                        *(USA) LLC*

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

————————————————————— X

New Jersey Carpenters Health Fund, On Behalf      :
of Itself and All Others Similarly Situated,       :

                  Plaintiff,       :

      v.       :

Home Equity Mortgage Trust 2006-5, Credit          :
Suisse First Boston Mortgage Securities            :
Corporation, Andrew A. Kimura, Thomas Zingalli,    :
Jeffrey A. Altabef, Michael A. Marriott, Evelyn    :
Echevarria, Credit Suisse Group, Credit Suisse     :
(USA), LLC, Credit Suisse Securities (USA),        :
LLC, Moody's Investors Service, Inc., The          :
McGraw-Hill Companies, Inc. and DBRS, Inc.         :

           Defendants.       :

————————————————————— X

**Index No.**

0 8 6 0 1 6 7 0

**SUMMONS**

To the above named Defendants:

    **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorneys a Verified Answer to the Verified Complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: June 3, 2008

                        Daniel B. Rehns, Esq.
                        Schoengold Sporn Laitman & Lometti, PC
                        19 Fulton Street, Suite 406
                        New York, New York 10036
                        Tel: (212) 964-0046
                        *Counsel for Plaintiff and*
                                *the Proposed Class*

Trial is desired in the County of New York.

The basis of venue designated above is that Defendants maintain and/or conduct their business in the County of New York.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

——————————————————————X

New Jersey Carpenters Health Fund, On Behalf :
of Itself and All Others Similarly Situated, :

             Plaintiff, :

      v. :

Home Equity Mortgage Trust 2006-5, Credit :
Suisse First Boston Mortgage Securities :
Corporation, Andrew A. Kimura, Thomas Zingalli, :
Jeffrey A. Altabef, Michael A. Marriott, Evelyn :
Echevarria, Credit Suisse Group, Credit Suisse :
(USA), LLC, Credit Suisse Securities (USA), :
LLC, Moody's Investors Service, Inc., The :
McGraw-Hill Companies, Inc. and DBRS, Inc. :

           Defendants. :

——————————————————————X

Index No.      08601670

**CLASS ACTION**

**VERIFIED COMPLAINT FOR
VIOLATION OF SECTIONS 11,
12 and 15 OF THE SECURITIES
ACT OF 1933**

FILED

COUNTY CLERKS OFFICE
JUN 03 2008
NEW YORK

Plaintiff alleges the following based upon the investigation of counsel, Schoengold Sporn

Laitman & Lometti, P.C., which included a review of United States Securities and Exchange

Commission ("SEC") filings by Credit Suisse First Boston Mortgage Securities Corporation

("CSFBMS") and Home Equity Mortgage Trust 2006-5 (the "Issuer", "Home Equity" or

"HEMT"), as well as regulatory filings and reports, ratings agency reports and advisories about

Home Equity, press releases and other public statements issued by the ratings agencies about

Home Equity, and their own internal investigation. Plaintiff believes that substantial additional

evidentiary support will exist for the allegations set forth herein after reasonable opportunity for

discovery. The claims asserted herein do not sound in or arise from allegations of fraud.

### NATURE OF THE ACTION

1.    This is a class action brought by New Jersey Carpenters Health Fund (the "Carpenters Health Fund") alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("Securities Act"), on behalf of purchasers of Home Equity Mortgage Pass-Through Certificates (the "Certificates" or the "HEMT Certificates") who purchased the Certificates, backed by a pool of primarily fixed-rate subprime second-lien residential mortgage loans, pursuant to or traceable to the $784,000,100 Offering of Series 2006-5 Pass-Through Certificates on or about October 30, 2006 issued by Defendant Home Equity Mortgage Trust 2006-5 (the "October 2006 Offering").

2.    The Certificates were issued pursuant to a common Registration Statement filed with the Securities Exchange Commission on or about October 30, 2006 (the "Registration Statement"). The Offering also occurred in this venue. The Certificates herein are Mortgage Pass-Through Certificates ("PTCs") collateralized by mortgages originated by New Century Mortgage Corporation ("NCM" or "New Century") and DLJ Mortgage Capital, Inc. ("DLJ"), both of which at all relevant times were commercial and residential lenders. The mortgages and liens on the mortgaged properties constituting the Certificates collateral were, as set forth in the Registration Statement, to be the principal source by which Certificate purchasers were to obtain repayment of their investment plus interest. As also set forth in the Registration Statement, the Certificate collateral was purportedly originated by NCM and DLJ pursuant to specific underwriting procedures and guidelines. The Underwriter of the Offering was Defendant Credit Suisse Securities (USA), LLC ("CSS" or the "Underwriter"). The Underwriter was obligated to conduct meaningful due diligence to ensure that the Registration Statement contained no material misstatements and omissions including as related to the stated manner in which the mortgages

2

had been originated. The Underwriter received massive fees for their work in connection with the Offering. Based on, *inter alia*, the Underwriter's due diligence and the representations in the Registration Statement relating the underwriting of the Certificate collateral, rating agencies such as Defendants Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's ("S&P") and DBRS, Inc. ("DBRS") (collectively, the "Ratings Agencies" or "Rating Agency Defendants") assigned the Certificates among the highest ratings applicable to such debt issues. At the time of the Offering, the Certificates were issued at approximately par or $1000.00 per Certificate.

3.    Following the issuance of the Certificates, disclosures began to emerge revealing that NCM and DLJ routinely disregarded the underwriting guidelines in originating mortgage collateral. These disclosures were confirmed by substantially higher rates of delinquencies and foreclosures on collateral for such highly-rated debt issues. These disclosures and the poor performance of the collateral caused the defendant Rating Agencies to recognize that the true nature of the collateral had not been properly assessed at the time of the Offering. The Defendant Rating Agencies thus applied new "methodologies" to reflect the actual "aggressive underwriting" which had been used to originate the Certificate collateral. As a result, the rating agencies dramatically downgraded the Certificates. The revelations regarding the true underwriting practices used to originate the collateral and the true value and quality of the Certificate collateral caused the value of the Certificates to substantially collapse. Plaintiff purchased Certificates at par for $160,000 at the time of the October 2006 Offering, but now, at the commencement of the action herein, they are valued at $59,200 – a *64%* decline in value. The claims asserted herein under the Securities Act do not sound in or arise from allegations of fraud.

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

5.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

6.      Venue is proper in this County pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of many of the material misstatements and omissions contained in the Registration Statement and Prospectus filed in connection with the Offering, occurred in substantial part in this County. Additionally, the Certificates were actively marketed and sold in this County. In addition, Defendants HEMT, CSFBMS, CSS, Moody's, S&P and DBRS maintain offices in this County.

## PARTIES

7.      Plaintiff, the New Jersey Carpenters Health Fund, is a Taft-Hartley benefit fund with offices located in Edison, New Jersey. The New Jersey Carpenters Health Fund purchased $160,000.00 face value of the Home Equity Mortgage Trust Certificates, Series 2006-5, Class A1 Certificates at par value on the offering on or about October 1, 2006. Plaintiff and the Class purchased pursuant to the Registration Statement and Prospectus which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. Plaintiff relied on the misstatements in the Prospectus and has suffered damages pursuant to Sections 11 and 12 of the Securities Act.

8.      Defendant Home Equity Mortgage Trust 2006-5 was the issuing entity for the October 2006 Offering. Per its filings with the SEC, HEMT 2006-5 has listed 11 Madison

4

Avenue, Fourth Floor, New York, New York 10010 as its principal office location. Defendant HEMT 2006-5 is a trust formed under the laws of the State of New York.

9.      Defendant Credit Suisse First Boston Mortgage Securities Corporation is the Depositor for the Offering, and the Parent Company of Issuers. According to its SEC filings, CSFBMS is a Delaware Corporation and maintains its principal offices located at 11 Madison Avenue, Fourth Floor, New York, New York 10010. The ultimate parent company of CSFBMS is Credit Suisse First Boston Management, LLC, otherwise known as Credit Suisse Management, LLC ("CSFBM"), a wholly owned subsidiary of Credit Suisse Holdings (USA), LLC, which, in turn, is a subsidiary of Defendant Credit Suisse Group.

10.     Defendant Jeffrey A. Altabef ("Altabef") was, at all relevant times, the Vice President and a Director of CSFBMS. Altabef signed the Registration Statement for the Offering on behalf of himself and as Attorney-In-Fact.

11.     Defendant Michael A. Marriott ("Marriott") was, at all relevant times, a Director of CSFBMS.

12.     Defendant Andrew A. Kimura ("Kimura") was, at all relevant times, the President and a Director of CSFBMS.

13.     Defendant Evelyn Echevarria ("Echevarria") was, at all relevant times, a Director of CSFBMS.

14.     Defendant Thomas Zingalli ("Zingalli") was, at all relevant times, Controller, Vice President and Principal Accounting Officer of CSFBMS.

15.     Defendant Altabef, Marriott, Kimura, Echevarria and Zingalli are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with CSFBMS, possessed the power and authority to control the contents of

CSFBMS' submissions to the SEC and the market, and participated in the drafting and editing of the Prospectus. The Individual Defendants all conducted business and had business residences at 11 Madison Avenue, Fourth Floor, New York, New York 10010.

16.     The Individual Defendants were officers and/or directors of CSFBMS at the time the Registration Statement and Prospectus for the Offering became effective, and with their consent were identified as such in the Registration Statement. In addition, they signed the Registration Statement or authorized it to be signed on their behalf.

17.     The Individual Defendants, as officers and/or directors each had a duty to promptly disseminate accurate and truthful information with respect to HEMT and CSFBMS, and to correct any previously issued statements issued by, or on behalf of HEMT and CSFBMS that had become materially misleading. The Individual Defendants' misrepresentations and omissions in the Prospectus violated these specific requirements and obligations. The Individual Defendants were signatories to the Registration Statement filed with the SEC and incorporated by reference in the Prospectus.

18.     The Defendants are all liable, jointly and severally, as participants in the issuance of the HEMT Certificates, including issuing, causing, or making materially misleading statements in the Prospectus and omitting material facts necessary to make the statements contained therein not misleading.

19.     Defendant Credit Suisse Group ("CSG") is Swiss company located at 8070 Switzerland, PO Box A, Zurich V8,00000. CSG is a global financial services company providing a comprehensive range of banking, investment banking, asset management and insurance products and services. CSG is a public company and its common stock ADR trades on the New York Stock Exchange under ticker symbol "CS". CSG conducts significant business in

the United States and in this county specifically, and as such maintains an office at 11 Madison Avenue, New York, New York 10010.

20.     Defendant Credit Suisse (USA), LLC ("CSUSA"), formerly Credit Suisse First Boston (USA), Inc., is located at 11 Madison Avenue, 7th Floor, New York, New York 10010. CSUSA is a Delaware corporation that delivers integrated investment banking and financial services throughout the United States. CSUSA is the parent and sole owner of Credit Suisse Securities (USA), LLC. CSUSA is an indirect and wholly owned subsidiary of CSG.

21.     Defendant Credit Suisse Securities (USA), LLC ("CSS"), formerly Credit Suisse First Boston, LLC, is an investment banking firm principally located at 11 Madison Avenue, 7th Floor, New York, New York 10010. Defendant CSS served as the Underwriter and lead Manager and Book-Runner for the Offering. Defendant CSS was intimately involved in the HEMT Offering. Defendant CSS failed to perform the requisite level of due diligence in connection with the HEMT Offering complained of herein. The Prospectus disseminated in connection with the Offering contained material misstatements and omissions of material fact relating to the "Underwriting Practices" employed in originating the underlying subprime mortgage loans. CSS is one of the leading underwriters in mortgage- and asset-backed securities in the United States. According to industry research for 2004-2005, Credit Suisse was the number three U.S.-collateralized mortgage backed securities loan contributor and master servicer. CSS, as an essential part of its investment banking business, maintains its principal offices in New York County. CSS is a subsidiary affiliate of CSFB, the parent company of the loan underwriter and the depositor for the HEMT Certificate Offering. Moreover, DLJ, the originator of over 20 percent of the loans which make up the pool of collateral for the HEMT Offering, is also a wholly-owned affiliate of CSFB.

22.     Defendants CSG, CSUSA, CSFB and CSS are referred to collectively herein as "CS" or the "CS Defendants."

23.     Defenant Moody's Investors Services ("Moody's") is a credit rating agency with its principal offices located at 7 World Trade Center at 250 Greenwich Street, New York, New York 10007.    Moody's performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market.  As a condition to the issuance of the HEMT Certificates, Moody's purportedly analyzed the Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned appropriate credit ratings for each tranche of the Offering, which was integral in establishing pricing, interest rates and a market for the HEMT Certificates.

24.     Defendant The McGraw-Hill Companies, Inc. maintains a business division d/b/a "Standard & Poors' Ratings Services" ("S&P" shall refer to The McGraw-Hill Companies and its business division Standard & Poors' Ratings Services).  Defendant S&P is a credit rating agency with its headquarters located at 55 Water Street, New York, New York 10041.  S&P performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market.  As a condition to the issuance of the HEMT Certificates, S&P purportedly analyzed the Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned appropriate credit ratings for each tranche of the Offering, which was integral in establishing pricing, interest rates and a market for the HEMT Certificates.

25.     Defendant DBRS, Inc. ("DBRS") a credit rating agency with its corporate headquarters located at 181 University Avenue, Suite 700, Toronto, ON M5H 3M7.  DBRS performs financial research and analysis for commercial and governmental entities in the world's

debt securities markets. As a condition to the issuance of the HEMT Certificates, DBRS purportedly analyzed each Class of securities in the Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned appropriate credit ratings for each tranche of the Offering, which was integral in establishing pricing, interest rates and a market for the HEMT Certificates. DBRS maintains an office in this county at 140 Broadway, 35th Floor, New York, New York 10005.

26. Defendants Moody's, S&P and DBRS are collectively referred to herein as the "Rating Agency Defendants."

## CLASS ACTION ALLEGATIONS

27. Plaintiff brings this action as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules ("CPLR") on behalf of a class consisting of all persons who purchased or acquired the Certificates (the "Class") pursuant and/or traceable to the Registration Statement and Prospectus issued in connection with the Offering from the effective date through the date of the filing of this action. Excluded from the Class are Defendants, their respective officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

28. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff reasonably believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants and/or the Trustee for the Certificates and may be notified of the pendency of this action by mail, the internet or publication using the

form of notice similar to that customarily used in securities class actions.

29.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of statutory law complained of herein.

30.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained Schoengold, Sporn, Laitman & Lometti, P.C., counsel competent and experienced in class and securities litigation.

31.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a)    whether the provisions of the Securities Act of 1933 were violated by the Defendants as alleged herein;

    b)    whether the Registration Statement and Prospectus contained materially untrue statements or omitted statements of material fact; and

    c)    to what extent the members of the Class have sustained damages pursuant to the statutory measure of damages.

32.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

33.    Currently, the United States is ensnared in a financial crisis arising, in material part, from the greed which drove financial firms to issue billions of dollars of debt securities "collateralized" or securitized with mortgages which only recently have been revealed to have been recklessly underwritten and originated.    The Plaintiff and Class as purchasers of the Certificates have been the victims of just such negligent practices, having purchased the Certificates pursuant to a Registration Statement which contained misstatements and omissions concerning the mortgage collateral "securitizing" the Certificates. The HEMT entities and other entities related to the Offering, *i.e.*, the Depositor and Underwriter Defendants, had enormous financial incentive to consummate the Offering of the Certificates as quickly as possible since they were paid upon completion a percentage of the total dollar amount of the Offering sold to investors.   Since the risk of the PTC's collateral failing was not assumed by either HEMT, CSFBMS or the Underwriters, it also had enormous incentive not to conduct full, complete and meaningful due diligence of the statements in the Registration Statement including those relating to the mortgage collateral.

34.    The structure of the Offering was as follows: on or about October 30, 2006, CSFBMS filed a Registration Statement with the SEC in connection with the issuance of various series and classes of debt securities which would be governed by said Registration Statement.   At some time prior to the Offering, CSFBMS formed a trust under the laws of the State of New York, the Home Equity Mortgage Trust 2006-5, which then filed a Prospectus as the issuing entity of the Certificates at issue herein.

35.    Typically, the loans are originated by the Sponsor, who then disposes of its loans primarily by selling them to third parties and through securitizations.   The Sponsor works with

11

the underwriters and the rating agencies to select the pool of mortgage loans and structure the securitization transaction. The Sponsor also services the mortgage loans. On the closing date of the offering, the Sponsor conveys the initial mortgage loans and the related mortgage insurance policies to the Depositor, who will in turn convey the initial mortgage loans and the related mortgage insurance policies to the Trustee. The Certificates are backed by the Issuer, and consist of, *inter alia*, the mortgage loans; collections in respect of principal and interest of the mortgage loans received; and the amounts on deposit in the collection account, including the payment account in which amounts are deposited prior to payment to the certificate holders. On the payment date, the certificate holders receive payments from the Trustee based on the particular tranche purchased; typically, available funds for each distribution date will equal the amount received by the trustee and available in the payment account on that distribution date, including interest which differs depending upon the tranche held.

36.     In connection with the HEMT Offering, CSFBMS, HEMT and CSS prepared and disseminated a Registration Statement and subsequent Prospectus that contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading that were reasonably relied upon by Plaintiff and the Class to their own detriment.

**The Registration Statement and Prospectus Contained**
**Material Misstatements and Omissions of Fact**

37.     The Registration Statement represented that all of the loans which made up the pool of residential, subprime mortgages used to support the Certificates were subject to certain underwriting guidelines which assessed the borrower's creditworthiness, including multi-level reviews of loan applications and appraisals with only "case by case" exceptions to guidelines.

38.     The Registration Statement disclosed that the majority of the underlying loans were originated by two entities for each Offering: NCM (33.89%) and DLJ (23.86%). The

Registration Statement represented that all the underlying loans were subject to strict underwriting guidelines which stressed homeowner credit-worthiness:

> Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties and two to four unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to mortgaged property consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

> Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination.

> The mortgage loans have been originated under "full" or "alternative," "reduced documentation," "stated income/stated assets" or "no income/no asset" programs. The "alternative," "reduced," "stated income/stated asset" and "no income/no asset" programs generally require either alternative or less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories. Generally, an "alternative" documentation program requires information regarding the mortgagor's income (i.e., W-2 forms, tax returns and/or pay stubs) and assets (i.e., bank statements) as does a "full doc" loan, however, alternative

13

forms of standard verifications are used. Generally, under both "full" and "alternative" documentation programs at least one year of income documentation is provided. Generally, under a "reduced documentation" program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator. Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no income/no asset" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator. The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score. The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

HEMT, Registration Statement & Prospectus October 30, 2006 at 31-32.

39.    The statements in the preceding paragraph contained misstatements and material omissions including in connection with the underwriting of the collateral mortgages. As set forth below, a material portion of the underlying collateral for the HEMT Certificates originated by NCM and DLJ were not "in accordance with its credit, appraisal and underwriting standards."

40.    Specifically, with respect to the loans originated by NCM, the Registration Statement and Prospectus stated as follows:

14

As of June 30, 2006, New Century Financial Corporation employed approximately 7,100 associates and originated loans through its wholesale network of more than 53,000 independent mortgage brokers through 33 regional processing centers operating in 19 states. Its retail network operates through 246 sales offices in 35 states.

For the six months ending June 30, 2006, New Century Financial Corporation originated $29.6 billion in mortgage loans.

The following table describes the size, composition and growth of New Century's total residential mortgage loan production over the periods indicated.

| | December 31, 2003 | | December 31, 2004 | | December 31, 2005 | | June 30, 2006 | |
| | Number | Total Mortgage Loan Production ($) | Number | Total Mortgage Loan Production ($) | Number | Total Mortgage Loan Production ($) | Number | Total Mortgage Loan Production ($) |
|---|---|---|---|---|---|---|---|---|
| Residential Mortgage Loans | 164,373 | 27,382,838 | 242,877 | 42,199,640 | 310,389 | 56,108,241 | 161,965 | 29,610,757 |

### Underwriting Standards

All of the New Century mortgage loans were originated or acquired by New Century in accordance with the "New Century Underwriting Guidelines." The following is a general summary of the New Century Underwriting Guidelines as generally applied, with some variation, by New Century. This summary does not purport to be a complete description of the underwriting standards of New Century.

The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan. All of the New Century mortgage loans were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. While New Century's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The New Century mortgage loans, in most cases, bear higher rates of interest than mortgage loans that are originated in accordance with Fannie Mae and Freddie Mac standards, which is likely to result in rates of delinquencies and foreclosures that are higher, and that may be substantially higher, than those experienced by portfolios of mortgage loans underwritten in a more traditional manner. As a result of New Century's underwriting criteria, changes in the values of the related mortgaged properties may have a greater effect on the delinquency, foreclosure and loss experience on the mortgage loans than these changes would be expected to have on mortgage loans that are originated in a more traditional manner. No

assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans. In addition, there can be no assurance that the value of the related mortgaged property estimated in any appraisal or review is equal to the actual value of that mortgaged property at the time of that appraisal or review.

The New Century mortgage loans will have been originated in accordance with the New Century Underwriting Guidelines. On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the New Century mortgage loans will represent these exceptions.

Each applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments. Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of New Century or by an appraiser retained by New Century. New Century uses the value as determined by the review in computing the loan-to-value ratio of the related mortgage loan if the appraised value of a mortgaged property, as determined by a review, is (i) more than 10% greater but less than 25% lower than the value as determined by the appraisal for mortgage loans having a loan-to-value ratio or a combined loan to-value ratio of up to 90%, and (ii) more than 5% greater but less than 25% lower than the value as determined by the appraisal for mortgage loans having a loan-to-value ration or a combined loan-to-value ratio of between 91-95%. For mortgage loans having a loan-to-value ratio or a combined loan-to-value ratio greater than 95%, the appraised value as determined by the review is used in computing the loan-to-value ratio of the related mortgage loan. If the appraised value of a mortgaged property as determined by a review is 25% or more lower than the value as determined by the appraisal, then New Century obtains a new appraisal and repeats the review process.

The New Century mortgage loans were originated consistent with and generally conform to the New Century Underwriting Guidelines' full documentation, limited documentation and stated income documentation residential loan programs. Under each of the programs, New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the New Century Underwriting Guidelines that generally is equal to the interest rate on that loan. The New Century Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires New Century's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, currently supports the outstanding loan balance. In general, the maximum loan amount for mortgage loans originated under the programs is $1,500,000 (additional requirements may be imposed in connection with mortgage loans in excess of $1,500,000). The New Century Underwriting Guidelines generally permit loans on one- to four-family residential properties to have a loan-to-value ratio at origination of up to 95% with respect to first liens loans. The maximum loan-to-value ratio depends on, among other things, the purpose of the mortgage loan, a borrower's credit history, home ownership history, mortgage payment history or rental payment history, repayment ability and debt service-to-income ratio, as well as the type and use of the property. With respect to mortgage loans secured by mortgaged properties acquired by a mortgagor under a "lease option purchase," the loan-to-value ratio of the related mortgage loan is based on the lower of the appraised value at the time of origination of the mortgage loan or the sale price of the related mortgaged property if the "lease option purchase price" was set less than 12 months prior to origination and is based on the appraised value at the time of origination if the "lease option purchase price" was set 12 months or more prior to origination.

The New Century Underwriting Guidelines require that the income of each applicant for a mortgage loan under the full documentation program be verified. The specific income documentation required for New Century's various programs is as follows: under the full documentation program, applicants usually are required to submit one written form of verification of stable income for at least 12 months from the applicant's employer for salaried employees and 24 months for self-employed applicants; under the limited documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal checking account bank statements, and under the stated income documentation program, an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant meets certain criteria. All the foregoing programs require that, with respect to salaried employees, there be a telephone verification

of the applicant's employment. Verification of the source of funds, if any, that are required to be deposited by the applicant into escrow in the case of a purchase money loan is required. In evaluating the credit quality of borrowers, New Century utilizes credit bureau risk scores, or a FICO score, a statistical ranking of likely future credit performance developed by Fair, Isaac & Company and the three national credit data repositories: Equifax, TransUnion and Experian.

(*Id.*, at S-28-29).

41.     The statements in the preceding paragraph contained misstatements and material omissions including that "credit risk" and "quality control" were materially disregarded in favor of generating sufficient loan volume to complete the massive Certificate securitizations as alleged herein and as set forth below.

42.     Moreover, the Prospectus, which incorporates the language of the Registration Statement, set forth the applicable policy for granting "exceptions" to certain borrowers that did not meet the applicable underwriting standards:

> *Exceptions.* As described above, the foregoing categories and criteria are guidelines only. On a case by case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc. An exception may be allowed if the application reflects compensating factors, such as: low loan to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years. An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more. Accordingly, a mortgagor may qualify in a more favorable risk category than, in the absence of compensating factors, would satisfy only the criteria of a less favorable risk category. It is expected that a substantial portion of the New Century mortgage loans will represent these kinds of exceptions.

(*Id.*, at S-32-33).

43.     The statements in the preceding paragraph contained misstatements and material omissions including that the "guidelines" for determining exceptions were materially disregarded

in favor of generating sufficient loan volume to complete the massive Certificate securitizations as alleged herein and as set forth below.

**The Prospectus Stated That The Price of The Bonds Were Tied To Credit Ratings**

44.    The Certificates were rated by the Rating Agencies, which purported to take into account, *inter alia*, the underwriting standards used in originating the underlying mortgages to address the likelihood of the receipt of all distributions on the mortgage loans by the Certificateholders.  The Prospectus stated as follows

It is a condition of the issuance of the offered certificates that they receive ratings from Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") and Dominion Bond Rating Service ("DBRS") and as indicated:

|  | RATING AGENCY | | |
| --- | --- | --- | --- |
| **Class** | **Moody's** | **S&P** | **DBRS** |
| A-1 | Aaa | AAA | AAA |
| A-2 | Aaa | AAA | AAA |
| A-3 | Aaa | AAA | AAA |
| A-IO | Aaa | AAA | AAA |
| A-R | N/A | AAA | N/A |
| M-1 | Aa1 | AA+ | AA(high) |
| M-2 | Aa2 | AA | AA |
| M-3 | Aa3 | AA- | AA(low) |
| M-4 | A1 | A+ | A(high) |
| M-5 | A2 | A | A |
| M-6 | A3 | A- | A(low) |
| M-7 | Baa1 | BBB+ | A(low) |
| M-8 | Baa2 | BBB | BBB(high) |
| M-9 | Baa3 | BBB- | BBB |
| B-1 | Ba1 | BB+ | BBB(low) |

The ratings assigned by DBRS to mortgage pass-through certificates address the likelihood of the receipt by the certificateholders of all distributions on the mortgage loans under the pooling and servicing agreement. DBRS' ratings take into consideration the credit quality of the mortgage pool, including any credit support providers, the structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make payments required by the certificates. The ratings of DBRS do not address the possibility that, as a result of principal prepayments, certificateholders may receive a lower than anticipated yield. In addition, DBRS' ratings do not address

the effect on the certificates' yield attributable to recoveries on the underlying mortgage loans.

The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements that those certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with those certificates, and the extent to which the payment stream on that mortgage pool is adequate to make payments required by those certificates. Moody's ratings on those certificates do not, however, constitute a statement regarding frequency of prepayments on the related mortgage loans.

The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements that those certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with those certificates, and the extent to which the payment stream on that mortgage pool is adequate to make payments required by those certificates. S&P's ratings on those certificates do not, however, constitute a statement regarding frequency of prepayments on the related mortgage loans. The rating assigned by S&P to the Class A-R Certificates addresses only the likelihood of receipt of its Class Principal Balance plus interest on that amount.

The ratings of the rating agencies do not address the possibility that, as a result of principal prepayments, certificateholders may receive a lower than anticipated yield. Further, the ratings on the Class A-IO Certificates do not address whether investors will recoup their initial investment. The ratings assigned to the offered certificates should be evaluated independently from similar ratings on other types of securities. A rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the rating agencies.

The depositor has not requested a rating of the offered certificates by any rating agency other than DBRS, Moody's and S&P. There can be no assurance, however, as to whether any other rating agency will rate the offered certificates or, if it does, what rating would be assigned by that other rating agency. The rating assigned by that other rating agency to the offered certificates could be lower than the respective ratings assigned by the rating agencies.

The rating agencies have stated that it is their standard policy to monitor ratings on publicly offered securities for which a rating has been provided, as to each rating agency rating each class of offered certificates in accordance with the rating agencies' particular surveillance policies, unless the depositor requests a rating without surveillance. The depositor has not requested that any rating agency not monitor their ratings of the offered certificates, and the depositor has not

requested that any rating agency use any monitoring procedures other than their standard monitoring procedures.

(*Id.*, at S-107-09).

45.    The statements contained the preceding paragraph – and the initial ratings themselves – contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since the Rating Agencies issued the ratings based on an outdated credit rating methodology designed in or about 2002 and because the Rating Agencies presumed that the loans were of high credit quality issued in compliance with the stated underwriting guidelines when, in fact, HEMT had systematically disregarded its stated Underwriting Guidelines, as set forth herein.

## Disclosures Relating To NCM's Deficient Lending Practices

46.    NCM operated as one of the nation's largest mortgage finance companies until its meltdown amidst the United States mortgage crisis in early 2007. After its formation in 2006, the Company grew rapidly and became one of the country's largest sub-prime lenders, reporting $56.1 billion of total mortgage originations and purchases for the year-ended December 31, 2005, nearly ten times as much as the Company had originated and purchased in 2001, and an increase of over $10.0 billion of originations and purchases from the prior year-ended December 31, 2004.

47.    As the real estate market in this country softened and interest rates increased, NCM kept pushing ever-increasing sub-prime mortgage loan volume through its system by loosening the Company's underwriting practices and introducing a growing percentage of higher risk mortgage products, including adjustable-rate, interest-only loans and "stated income" loans, where even W-2 wage earners did not have to bother verifying their stated income levels.

48.    Since the Offering was consummated, NCM's actual deficient lending practices have come to light, causing NCM to largely shut down its lending operations and file for bankruptcy in April 2007.

49.    On February 8, 2007, NCM announced that it would be forced to restate its reported financial results for the first three quarters of 2006. The Company also announced that it would postpone reporting of its fourth quarter 2006 fiscal results, while disclosing that a net loss for the quarter was expected, which was contrary to the consensus of analyst estimates that NCM would report an earnings per share figure of $1.06. This announcement came less than one day before the Company was scheduled to report its fiscal year 2006 and fourth quarter 2006 financial results.

50.    Immediately following this announcement, NCM's stock price plummeted and analysts began to downgrade the Company's securities. The disclosures triggered an immediate liquidity crisis for NCM because of the Company's dependence on several short-term credit agreements, which required NCM to present its financials in accordance with GAAP standards, to fund its mortgage business and operations, all resulting in the Company's filing for bankruptcy in just two months later.

51.    Not long after the February 8 announcement, NCM disclosed and reported a net loss for the quarter and year-ended December 31, 2006, wiping out over $270.0 million of net income previously reported by the Company for the nine months ended September 30, 2006. In addition, NCM disclosed that its Audit Committee was reviewing the Company's accounting for 2006 and "prior periods." Thereafter, NCM repoted that an independent investigation into the Company's financials revealed that it was "more likely than not" that there was also a "material

overstatement" of NCM's earnings in 2005, and that the reported financial statements for the year-ended December 31, 2005 should no longer be relied upon.

52.    On February 12, 2007, it was reported in an article published by *Barron's* that "the slow-motion train wreck in the U.S. subprime mortgage market claimed another victim Thursday when shares of the major California-based specialist in the field, New Century...tumbled 36% to $19.24."

53.    Throughout 2005 and 2006, NCM's senior executive officers repeatedly stated that the credit quality of the Company's mortgage origination and purchasing process was "strong," "very high" and "higher" or "better" than it has been in the Company's past as the result of purportedly "strict," "improved" and "strong" underwriting controls and guidelines and risk management discipline, when the true facts revealed that this was far from the truth. In fact, as we now know in the wake of NCM's filing for bankruptcy, NCM's underwriting standards were not strengthened or raised, but in fact, they were actually loosened prior to and throughout the periods in which the Offering took place in order to continue to drive record-breaking loan volume through the Company's origination system in the face of adverse industry trends and severe competition, by focusing on quantity at the expense of quality.

54.    Subsequently, on March 3, 2007, NCM announced that it was facing a criminal probe by the United States Attorney for the Central District of California as well as elevated, formal regulatory investigations by the SEC and the regulatory arm of the New York Stock Exchange ("NYSE"). The Company also announced that it would likely breach a major lending covenant with its financial backers, calling into question the Company's ability to survive the looming crisis. In addition, recent reports indicate that members of the 2005 KPMG engagement

team for the NCM audits are also under investigation by the SEC and United States Department of Justice.

55.    On or about March 8, 2007, NCM announced that, because of its constrained funding capacity, it could no longer accept new loan applications and that it needed emergency financing to have any hopes of remaining a viable company. By this time, NCMs stock – which was priced at approximately $30.000 per share one month earlier – was trading at a measly $3.00 per share, a one month price decline of 90 percent.

56.    Thereafter, on March 12, 2007, NCM disclosed that all of its bank lenders pulled their funding and that the Company would not be able to meet repayment demands by its creditors. On this news, trading of shares of NCM on the NYSE was halted immediately.

57.    Over the weeks following this announcement, several states – including California – ordered NCM to halt all lending and business operations. Analysts recognized that this "spelled doom for the Company." This was followed just days later by the Company's filing for bankruptcy on April 2, 2007.

58.    The *Orange County Register*, in analyzing NCM's demise, concluded that "New Century's portfolio suffered a quick collapse because risks were layered on top of risks." In an article published on April 19, 2007, the periodical cited former employees who stated that "the Company was under pressure to relax [underwriting] standards to compete in an industry where customers could easily shop for a better deal..." One former senior loan processor "witnessed a deterioration in [NCM's] guidelines [in 2006]." Other former employees told the paper that "New Century started making more exceptions to is guidelines in 2006," at a time when "alarms began sounding as the default rate began to climb. Causing greater concern was the type of defaults – first or second payments, long before adjustable rates ratcheted up."

59.    In the wake of NCM's bankruptcy filing, several entities that purchased loans issued by NCM filed legal proceedings against the Company, seeking information relating to how the loans were processed.  According to *Euromoney Institutional Investor*, "[t]hese lawsuits highlight how secondary market buyers of sub-prime mortgages often did not examine the details of the mortgages they bought, instead relying on aggregated data about the loans…"

60.    On or about March 26, 2008, the *Associated Press* reported that the final report of Michael J. Missal, the Bankruptcy Court Examiner assigned to investigate the facts surrounding NCM's demise (the "Examiner"), dated February 29, 2008, stated that "serious loan quality issues at [New Century] beginning as early as 2004; numerous "red flags" related to loan quality; and the failure of New Century's senior management and Board of Directors to devote sufficient attention to improving loan quality until the final quarter of 2006, when it was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market."

61.    The report went on to state "[r]ather,  New Century continued to focus on generating greater quantities of ever-riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kick-outs of loans offered for sale."

62.    Contrary to the statements set forth in the Registration Statement and Prospectus, according to the Examiner, New Century "devoted its resources to generating high volumes of loans, which relatively little attention to loan quality" and did not even have any "formal exceptions policy" in place.  The Examiner found these ever-increasing risks to be "a veritable ticking time bomb."

63.    As a result of these findings, the Examiner concluded that the statements set forth above in the Registration Statement and Prospectus by NCM regarding the purported credit

characteristics of its loans and strict underwriting guidelines were "not supportable" and without "justifiable basis" when made.

64.     After the issuance of the Registration Statement containing the Company's purported adherence to underwriting guidelines and standards, CSFBMS routinely deviated from those guidelines so that overly risky loans were approved in order to continually fuel the securitization process and CSFBMS profits. The Company then issued bonuses for the underwriters based solely on the number of loans they reviewed. This led to immense pressure on underwriters to approve risky loans.

**CS' Failure To Adhere To Underwriting**
**Guidelines Result In Massive Write-Downs**

65.     CS played a key role in the subprime mortgage market and its ultimate collapse. According to industry research for 2004-2005, CS was the number three U.S. collateralized mortgage-backed securities loan contributor and master servicer; among the top five participants in leveraged loan syndications and U.S. collateralized debt obligations; and one of the foremost U.S. asset-based lending lead arrangers. CS's mortgage lending affiliate DLJ was also a major player in the mortgage origination and purchasing industry. DLJ was purchased by CSUSA in 2000 and operates as an affiliate of CSG.

66.     CS and DLJ's good fortune in the mortgage backed securities business didn't last long. CS, beginning in 2006, began to experience an exponential increase in their mortgage default rate. Tellingly, a large percentage of the defaults were occurring, not after rates were ratcheted up by way of an adjustable mortgage, but instead within or around thirty days after the mortgages were approved – on either first or second payments and long before any adjustable rate kicked up the rates on the mortgages.

67.    Having recognized the gross inadequacy of the mortgage collateral that they had purchased from various lenders around the country, CS and DLJ filed several lawsuits in New York Federal District Court, Southern District throughout 2007, against the lenders from which CS had purchased the mortgages:

> *DLJ Mortgage Capital, Inc. v. Sunset Direct Lending, LLC, et al.*, Civ. No. 07-01418, filed February 27, 2007;

> *DLJ Mortgage Capital, Inc. v. Right-Away Mortgage, Inc.*, Civ. No. 07-02791, filed April 6, 2007;

> *DLJ Mortgage Capital, Inc. v. Sea Breeze Financial Services, Inc.*, Civ. No. 07-03747, filed May 11, 2007;

> *DLJ Mortgage Capital, Inc. v. Cameron Financial Group, Inc.*, Civ. No. 07-03746, filed May 11, 2007;

> *DLJ Mortgage Capital, Inc. v. Home Loan Corporation*, Civ. No. 07-04167, filed May 29, 2007;

> *DLJ Mortgage Capital, Inc. v. Eastern American Mortgage Company*, Civ. No. 07-07933, filed September 10, 2007.

68.    These lawsuits asserted by CS on behalf of its affiliate DLJ alleged breach of contract for failure to repurchase loans due to early payment defaults; failing to repurchase loans arising out of breaches of representations and warranties; and failing to reimburse DLJ for losses incurred due to early payment defaults.

69.    Each agreement that DLJ entered into with the respective mortgage lenders contained clauses which required the lenders to repurchase the mortgage obligations or reimburse DLJ for losses in the event that defaults occurred within a certain time period after DLJ's original purchases.

70.     By way of example, according to the Complaint filed by DLJ against Sunset Direct Lending, LLC, DLJ incurred over $20,000,000 in losses due to defaults on loans purchased from Sunset Direct between late July 2006 and early January 2007.

71.     As the mortgage crisis in the United States grew over the first half of 2007, the problems facing DLJ spread throughout CS and its affiliates, ultimately resulting in massive write-downs and losses on the company's underwriting, lending and investing arms, all of which were intricately involved in the mortgage backed securities business.

72.     On October 1, 2007, CSG announced that its financial results have been "hurt by recent market events" involving the U.S. housing market.  Analysts immediately took this announcement as a "profit warning" for the Company's third quarter results.

73.     On or about November 1, 2007, the Associated Press reported that CSG suffered a 33 percent decline in earnings due to write-downs related to the U.S. housing market.

74.     Thereafter, the Associated Press, on or about February 12, 2008, reported that CSG had announced that the Company's fourth quarter profit declined 72 percent due to write-downs of $1.30 billion on debt and leveraged loans.

75.     On or about February 20, 2008, an article published in the New York Post reported that CSG was forced to take an additional $2.85 billion write-down resulting from the use of outdated pricing information in connection with the valuation of their U.S. mortgage securities.  On the same day, CSG announced that the additional write-downs and use of outdated pricing models resulted in an internal investigation of a handful of its traders.

76.     In an April 24, 2008 Associated Press article, it was reported that CSG was forced to incur write-downs due to the U.S. mortgage crisis of over $5.30 billion, resulting in a net loss for the first quarter 2008 of over $2.0 billion.

77.     Not long after, in an article published by the American Banker, it was disclosed that CSG's losses in the first quarter of 2008 were mainly due to CSS' losses resulting from massive write-downs related to the U.S. mortgage meltdown.

78.     In connection with the HEMT Offering, CSS failed to conduct meaningful due diligence, including in connection with the underwriting standards used to originate the Certificate collateral.

**Disclosures of True Deficient Lending Practices**
**Underwriter Lapses and High Certificate Collateral**
**Delinquency Rates Result in Certificates Collateral Downgrades**

79.     Beginning in late 2007, the Moody's began a series of downgrades on the HEMT Certificates as it revised its ratings criteria and methodology to more accurately assess the risk associated with debt securities backed by sub-prime collateral.  Specifically, Moody's announced in October of 2007 it had downgraded $33.4 billion of debt securities issued in 2006 backed by subprime loans, including the HEMT Certificates.  Moody's explained that its downgrades reflected "updates to its analytical model" that included, among other fictions, recognition of "*aggressive loan underwriting standards*."

80.     Subsequently, during the period spanning November 2007 through April 2008, using these "new" ratings criteria that take into account "aggressive loan underwriting standards," S&P and DBRS, in addition to Moody's, also downgraded the HEMT Series 2006-5 Certificates.  These downgrades, as well as those made by Moody's, were as follows:

| Class | Initial Certificate Ratings | | | 2007-2008 Revised Certificate Ratings | | |
|---|---|---|---|---|---|---|
| | Moody's | S&P | DBRS | Moody's | S&P | DBRS |
| A1 | Aaa | AAA | AAA | Ba1*- | B | AA |
| A2 | Aaa | AAA | AAA | Ba3*- | B | AA |
| A3 | Aaa | AAA | AAA | B3*- | B | AA |
| AIO | Aaa | AAA | AAA | Aaa | AAA | AA |
| M1 | Aa1 | AA+ | AA (high) | Caa3 | CCC | A |
| M2 | Aa2 | AA | AA | C | CCC | BBB (low) |
| M3 | Aa3 | AA- | AA (low) | C | CCC | C |

81.    As a result of these disclosures and the Rating Agencies' reassessment of the appropriate ratings to be assigned to the Certificates, the value of the Certificates has substantially collapsed.  The Carpenters Health Fund's investment in HEMT Certificates has declined by approximately *64%* - from *$160,000.00* at the time of the Offering to *$59,200.00* at the time this action was commenced.

## COUNT I

### Violation of Section 11 of The Securities Act
### (Against All Defendants)

82.    Plaintiff repeats and realleges each and every allegation contained above.

83.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act and asserted on behalf of all other members of the Class who purchased or acquired HEMT Certificates on or traceable to the Offering.

84.    Defendant CSFBMS is the registrant for the Offering and filed the Registration Statement and Prospectus as the issuer of the HEMT Certificates, as defined in Section 11(a)(1) of the Securities Act.

85.    The Individual Defendants were officers and/or directors of CSFBMS at the time the Registration Statement before the Offering became effective, and at the time of the Prospectus, and with their consent were identified as such in the Registration Statement.  The

Individual Defendants are liable for the misstatements and omissions in the Registration Statement alleged herein under Section 11(a)(1) of the Securities Act.

86.    Defendant CSS served as the Underwriter for the Offering and qualifies as such according to the definition in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, CSS participated in the solicitation, offering, and sale of the HEMT Certificates to the investing public pursuant to the Registration Statement and the Prospectus.

87.    The Ratings Agency Defendants prepared valuations, *i.e.*, assigned ratings to the Certificates, in connection with the Offering, as defined in Section 11(a)(4) of the Securities Act.

88.    The Registration Statement and the Prospectus, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectus.

89.    The Defendants did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Registration Statement and Prospectus were true, did not omit any material fact, and were not materially misleading.

90.    Plaintiff and the other Class members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions contained in the Registration Statement and the Prospectus.

91.    Plaintiff and other Class members sustained damages as a result of misstatements and omissions in the Registration Statement and the Prospectus, for which they are entitled to compensation.

92.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offering.

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act
### (Against CSFBMS, HEMT and CS)

93.    Plaintiff repeats and realleges each and every allegation contained above.

94.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants.

95.    By means of the Registration Statement and Prospectus, and by using means and instruments of transportation and communication in interstate commerce and of the mails, the Defendants through the Offering sold HEMT Certificates to Plaintiff and other members of the Class.

96.    Defendants CSFBMS, HEMT, the Individual Defendants and the Underwriter Defendant each successfully solicited these purchases, motivated at least in part by their own financial interest.  The Defendants each reviewed and participated in drafting the Prospectus. Through ensuring the successful completion of the Offering, the Underwriter Defendant obtained substantial underwriting fees.

97.    The Registration Statement and the Prospectus, at the time it became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectus.

98.    Defendants as "sellers" owed to the purchasers of the HEMT Certificates, including Plaintiff and other Class members, the duty to perform due diligence and make a reasonable and diligent investigation of the statements contained in the Registration Statement

and the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

99.    Plaintiff and other members of the Class purchased or otherwise acquired HEMT Certificates pursuant to the defective Registration Statement and Prospectus. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement and the Prospectus.

100.    Plaintiff, individually and representatively, hereby offers to tender to Defendants those securities which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon. Class members who have sold their HEMT Certificates are entitled to rescissionary damages.

101.    By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of the Class who hold HEMT Certificates purchased pursuant and/or traceable to the Offering have the right to rescind and recover the consideration paid for their HEMT Certificates and hereby elect to rescind and tender their HEMT Certificates to the Defendants sued herein. Plaintiff and Class members who have sold their HEMT Certificates are entitled to rescissionary damages.

### COUNT III

**Violation of Section 15 of The Securities Act**
**(Against Defendants CSFBMS, HEMT and the Individual Defendants)**

102.    Plaintiff repeats and realleges each and every allegation contained above.

33

103.    This claim is brought by Plaintiff pursuant to Section 15 of the Securities Act and asserted on behalf of all Class members who purchased or acquired HEMT Certificates in the Offering.

104.    The Individual Defendants at all relevant times participated in the operation and management of CSFBMS and HEMT, and conducted and participated, directly and indirectly, in the conduct of CSFBMS and HEMT's business affairs.

105.    As officers and/or directors of CSFBMS, the Individual Defendants had a duty to disseminate accurate and truthful information in the Registration Statement and the Prospectus.

106.    Defendant CSFBMS is the Parent Corporation and sole owner of HEMT, and at all relevant times participated in the operation and management of the HEMT, and conducted and participated, directly and indirectly, in the conduct of HEMT business affairs.

107.    As set forth above, it is alleged that the Registration Statement and Prospectus issued in connection with the HEMT Offering contained material misstatements of fact, and omitted facts necessary to make the facts contained therein not misleading, in violation of Sections 11 and 12 of the Securities Act.

108.    Because of their positions of control and authority as senior officers and directors of CSFBMS, the Individual Defendants were able to, and did, control the contents of the Registration Statement and Prospectus which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.    The Individual Defendants were therefore "controlling persons" of HEMT within the meaning of Section 15 of the Securities Act.

109.    In addition, because of its sole ownership of HEMT and its control and authority as Parent Corporation, Defendant CSFBMS was able to, and did, control the contents of the

34

Registration Statement and the Prospectus which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. Defendant CSFBMS was therefore a "controlling person" of HEMT within the meaning of Section 15 of the Securities Act.

110.    Plaintiff and other Class members purchased HEMT Certificates issued pursuant to the Offering. The Offering was conducted pursuant to the Registration Statement and the Prospectus.

111.    The Registration Statement and Prospectus, at the time it became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectus.

112.    Plaintiff and the Class did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions in the Registration Statement and the Prospectus.

113.    Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Registration Statement and the Prospectus, for which they are entitled to compensation.

114.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offering.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under CPLR Article 9;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:    June 3, 2008
         New York, New York

Respectfully submitted,

By: _____
        Samuel P. Sporn
        Joel P. Laitman
        Christopher Lometti
        Jay P. Saltzman
        Frank R. Schirripa
        Daniel B. Rehns
**SCHOENGOLD SPORN LAITMAN &
LOMETTI , P.C.**
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile: (212) 267-8137

*Counsel for Plaintiff and
     the Proposed Class*

36

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

———————————————————————X

New Jersey Carpenters Health Fund, On Behalf
of Itself and All Others Similarly Situated,      :      Index No.

               Plaintiff,      :

      v.      :      **VERIFICATION**

Home Equity Mortgage Trust 2006-5, Credit      :
Suisse First Boston Mortgage Securities      :
Corporation, Andrew A. Kimura, Thomas Zingalli,  :
Jeffrey A. Altabef, Michael A. Marriott, Evelyn      :
Echevarria, Credit Suisse Group, Credit Suisse      :
(USA), LLC, Credit Suisse Securities (USA),      :
LLC, Moody's Investors Service, Inc., The      :
McGraw-Hill Companies, Inc. and DBRS, Inc.      :

               Defendants.      :

———————————————————————X

(STATE OF NEW YORK      )
(CITY OF NEW YORK       )
(COUNTY OF NEW YORK   )

     Daniel B. Rehns, being duly sworn, states that he is one of the attorneys for Plaintiff in this action and that the foregoing complaint is true to his own knowledge, except as to matters therein stated on information and belief and as to those matters he believes to be true; that the ground of his belief as to all matters not stated upon his knowledge are upon review of publicly available information filed with the United States Securities and Exchange Commission, media and newspaper articles and information contained on the internet; and that the reason why the verification is not made by Plaintiff is that, Plaintiff New Jersey Carpenters Health Fund is not in the county where Plaintiff's attorney has their office.

                                   _____
                                   Daniel B. Rehns, Esq.

_____
Notary Public

Sworn to me before this
3ʳᵈ day of June , 2008

JAY P. SALTZMAN
Notary Public, State of New York
No. 02SA5064567
Qualified in Nassau County
Commission Expires September 27, 20 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |  |
|---|---|---|
| ———————————————————X |  |  |
| New Jersey Carpenters Health Fund, On Behalf of Itself and All Others Similarly Situated, | : : | Index No. |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | :· |  |
| Home Equity Mortgage Trust 2006-5, Credit Suisse First Boston Mortgage Securities Corporation, Andrew A. Kimura, Thomas Zingalli, Jeffrey A. Altabef, Michael A. Marriott, Evelyn Echevarria, Credit Suisse Group, Credit Suisse (USA), LLC, Credit Suisse Securities (USA), LLC, Moody's Investors Service, Inc., The McGraw-Hill Companies, Inc. and DBRS, Inc. | : : : : : : : : : | |
|  | : |  |
| Defendants. | : |  |
| ———————————————————X |  |  |

## VERIFIED COMPLAINT

**CERTIFICATION:** I, Daniel B. Rehns, Esq. hereby certify that all of the papers that I have served, filed or submitted to the court in this divorce action are not frivolous as defined in subsection (c) of Section 130-1.1 of the Rules of the Chief Administrator of the Courts.

Dated:     June 3, 2008

Daniel B. Rehns, Esq.
**SCHOENGOLD SPORN LAITMAN &**
**LOMETTI , P.C.**
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile: (212) 267-8137
*Counsel for Plaintiff and*
*the Proposed Class*