**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

NEW JERSEY CARPENTERS HEALTH FUND, :
On Behalf of Itself and All Others Similarly :    Docket No.: 08-CV-5653 (PAC)
Situated, :
:
              Plaintiff, :    **AMENDED  SECURITIES**
   v. :    **CLASS ACTION COMPLAINT**
:
DLJ MORTGAGE CAPITAL, INC., CREDIT :
SUISSE MANAGEMENT, LLC f/k/a CREDIT :
SUISSE FIRST BOSTON MORTGAGE :
SECURITIES CORPORATION, ANDREW A. :
KIMURA, THOMAS ZINGALLI, JEFFREY A. :
ALTABEF, MICHAEL A. MARRIOTT, EVELYN :
ECHEVARRIA and CREDIT SUISSE :
SECURITIES (USA), LLC, :
:
            Defendants. :
------------------------------------------------------------X



# I.

## SUMMARY OF THE ACTION

1.      This Amended Complaint (the "Complaint"), which is alleged upon personal knowledge with respect to Plaintiff, and upon information and belief with respect to all other matters, is brought pursuant to the Securities Act of 1933 (the "Securities Act") by Court-Appointed Lead Plaintiff New Jersey Carpenters Health Fund ("New Jersey Carpenters," "Lead Plaintiff" or "Plaintiff"), on its own behalf and as a class action on behalf of all persons and entities who purchased or otherwise acquired interests in the Issuing Trusts (as set forth in ¶ 23-24, *infra*) (the "Issuing Trusts" or the "Home Equity Mortgage Trusts") pursuant or traceable to the Registration Statement and accompanying Prospectus filed with the Securities and Exchange Commission (the "SEC") by Credit Suisse First Boston Mortgage Securities Corporation ("CSMSCo") on August 10, 2006 (the "Registration Statement").

2.      Pursuant to the Registration Statement and later-filed Prospectus Supplements (the "Prospectus Supplements," with the Registration Statement, collectively referred to herein as the "Offering Documents"), which were incorporated by reference into the Registration Statement, Credit Suisse Securities (USA), LLC ("CSS" or the "Underwriter") underwrote the issuance of $2.39 billion of Home Equity Mortgage Trust ("HEMT") Pass-Through Certificates (the "Certificates").  The Certificates were issued in four Offerings conducted between August 28, 2006 and April 27, 2007 (collectively, the "Offerings").[1]

3.      As set forth below, the Offering Documents contained material misstatements and omitted material information in violation of Sections 11, 12 and 15 of the Securities Act, 15

---

[1]      Pursuant to the common Registration Statement, $595 million of HEMT 2006-4 Certificates ("HEMT 2006-4") were issued on August 28, 2006; $784 million of HEMT 2006-5 Certificates ("HEMT 2006-5") were issued on October 30, 2006; $272.52 million of HEMT 2006-6 Certificates ("HEMT 2006-6") were issued on December 28, 2006; and $825.3 million of HEMT 2007-2 Certificates ("HEMT 2007-2") were issued on April 27, 2007.  (*See* ¶ 23).

U.S.C. §§ 77k, 77l(a)(2) and 77o.  Defendants are strictly liable for these material misstatements and omissions under the Securities Act.  The Complaint asserts no allegations or claims sounding in fraud.

4.      Plaintiff seeks redress against the Issuer of the Registration Statement and Depositor of the underlying collateral, Defendant CSMSCo, renamed  Credit Suisse Management, LLC ("CSM"); the individual signatories to the Registration Statement, Defendants Andrew A. Kimura ("Kimura"), Thomas Zingalli ("Zingalli"), Jeffrey A. Altabef ("Altabef"), Michael A. Marriott ("Marriot") and Evelyn Echevarria ("Echevarria"); the Sponsor and Seller for each of the Offerings, Defendant DLJ Mortgage Capital, Inc. ("DLJMC"); and the underwriter of the Offerings, Defendant Credit Suisse Securities (USA), LLC ("CSS"). CSS, CSM/CSMSCo and DLJMC along with their affiliates and subsidiaries are referred to collectively herein as "Credit Suisse."

5.      This action arises from the role of Credit Suisse, its affiliates and subsidiaries, in acquiring and then converting 20,694 home equity mortgages issued to subprime borrowers into $2.39 billion of purportedly "investment grade" mortgage-backed securities ("RMBS" or "MBS"), which were then sold to Plaintiff and the Class in the Offerings pursuant to the Offering Documents.  The value of the Certificates was directly tied to repayment of the home equity loans since that principal and interest payments due to investors were secured and derived from cash flows from those loans.[2]

---

[2]      As the original borrowers on each of the underlying home equity loans paid their mortgages, distributions were made to investors through the Issuing Home Equity Trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates.  If borrowers failed to pay back their mortgages, defaulted, or were forced into foreclosure, the resulting losses flowed to the Certificate investors.  As set forth in the Prospectus Supplements, the Certificates were divided into a structure of classes, or "tranches," reflecting different priorities of seniority, payment, exposure to risk and default, and interest payments.

6.     In issuing these securities, Credit Suisse controlled every aspect of the securitization and underwriting process. Credit Suisse acquired the home equity mortgage loans by direct purchase from third-party subprime loan originators, principally New Century Mortgage Corporation ("New Century"), WMC Mortgage Corporation ("WMC") and Accredited Home Lenders, Inc.[3] ("Accredited" or "AHL") (collectively referred to herein as the "Originators").  CSMSCo, another Credit Suisse subsidiary, served as "Depositor," acquiring the loans from DLJMC and "depositing" them to the Issuing Trusts where DLJMC securitized the cash-flows from the mortgage loans into the Certificates.  CSS, an SEC-registered broker-dealer and direct subsidiary of Credit Suisse, served as underwriter on all the Offerings.  DLJMC engaged and paid Moody's Investors Service, Inc. ("Moody's"), a wholly-owned subsidiary of Moody's Corp., and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("McGraw-Hill") ("S&P," with Moody's collectively referred to herein as the "Ratings Agencies") and ensured that the Certificates were assigned investment grade ratings.

7.     Since Credit Suisse's profit was largely determined from the sale of the securitized loans to pension funds and insurance companies who were unable to purchase below investment grade securities, Credit Suisse was highly incentivized to have the Rating Agencies assign its highest ratings to a majority of the securitized loans no matter the quality of those loans.  At the time the Certificates were issued, S&P and Moody's assigned their highest investment grade rating of "AAA" for S&P and "Aaa" for Moody's (herein collectively "AAA") to over 82% ($1.96 billion) and 85% ($2.02 billion), respectively, of the $2.39 billion of Certificates.  The ratings reflected the risk or probability of default by the borrower.  None of the Certificates were rated below "investment grade," ("BBB" and below for S&P and "Baa" and

---

[3]       Aames Investment Corporation ("Aames") was also a third-party originator of Home Equity Mortgage Trust 2006-4.  Aames was purchased by Accredited in May 2006 for $340 million.  (See ¶ 95, *infra*).

below for Moody's).  The Certificates were sold to Plaintiff and the Class at approximately par or $100.00 per unit.

8.      Soon after issuance, the impaired nature of the underlying home equity loan collateral began to emerge.  By the fourth month after each of the Offerings, borrower delinquency and default rates skyrocketed by over 5,000% - from 0% at the time of each Offering, as represented in each Prospectus Supplement (¶¶ 162-181), to, on average, 4.98% four month later.  By the sixth month after each Offering, borrower default and delinquencies increased by over 8,000% from initial rates to an average of 7.77% of the total home equity mortgage loan balances.  Borrower default and delinquency rates have continued to worsen. To date, delinquencies have increased to, on average, 21.88% of the total home equity mortgage loan collateral underlying the Certificates.[4]

9.      As a result of the impaired nature of the home equity mortgage loan collateral, the value of the Certificates has collapsed. Plaintiff's holdings have lost 79% of their total initial value. (¶¶ 53-57).  Further, S&P and Moody's have downgraded 100% (49 and 48 classes, respectively) of the classes of Certificates, citing "aggressive" loan underwriting practices, with over 87% (42 and 43 classes, respectively) of the Certificates now downgraded to speculative "junk bond" investments.  *Id.*

10.     The Certificates were issued pursuant to a number of core representations in the Offering Documents each of which contained material misstatements and omissions.  It was represented that the home equity loans were originated pursuant to underwriting guidelines detailed in both in the Registration Statement and the Supplemental Prospectuses. (¶¶ 154-200). These guidelines required an analysis of borrower creditworthiness (*i.e.*, ability to repay the loan)

---

[4]      As of the date of the filing of the Complaint herein, borrower delinquency and default rates have increased to 18.99% for HEMT 2006-4, 22.61% for 2006-5 20.87% for HEMT 2006-6 and 24.40% for HEMT 2007-2, of the total mortgage pool balances.  (See, *infra*).

and an appraisal of the mortgaged property pursuant to standard appraisal practices and procedures. (¶¶ 154-181).  The guidelines also described that when loans were issued with limited or no borrower documentation there were compensating factors such as the lender's reliance primarily on the valuation of the mortgaged properties.  (¶¶ 154-200).

11.    The nearly identical pattern of systemic borrower default almost immediately after completion of each of the four Offerings evidences that there was no meaningful compliance with the stated guidelines contained in the Offering Documents. (¶¶ 154-200).  The Rating Agencies in downgrading the Certificates from the highest investment grade to junk bond status specifically attributed their actions to "aggressive underwriting" deployed in originating the loans. (¶¶ 58, 114-119).  Further, well after the completion of the Offerings, disclosures began to emerge that the principal home equity loan Originators - *i.e.,* New Century, Accredited and WMC - engaged in origination practices which flagrantly violated underwriting guidelines set forth in the Offering Documents.  (¶¶ 60-100).

12.    Credit Suisse conducted inadequate due diligence to ensure compliance with the underwriting guidelines stated in the Offering Documents.  It was incentivized to acquire and securitize as many loans as possible since its profit was achieved upon the sale of the securities.  The due diligence Credit Suisse did perform was in the period when it was acquiring the loans from third parties – not in underwriting the issuance of the Certificates - when there was a serious disincentive for Credit Suisse to reject loans submitted for auction by originators, for fear that they would be cut-off from access to further loans for future securitization. (¶¶ 106-113).  Further, Credit Suisse did not actually conduct the due diligence itself, but rather contracted it out to third party vendors Clayton Holdings, Inc. ("Clayton") and The Bohan Group ("Bohan").  In doing so, Credit Suisse directed them to inspect only a small percentage of the loan collateral.

(¶¶ 106-113).  These practices have been confirmed by Clayton and Bohan themselves as part of the New York Attorney General's ongoing investigation of investment banking misconduct in underwriting MBS in this period.  Indeed, these firms have disclosed that they routinely provided their investment bank clients with detailed reports of loans that were non-compliant with underwriting guidelines, but the investment banks routinely overrode exclusion of those loans from purchase and securitization.  (¶ 119-135).

13.     The Offering Documents represented that the Certificates had been assigned ratings by Moody's and S&P.  (¶¶ 154-200).  The Offering Documents failed to disclose the material financial conflicts of interests between Credit Suisse and the Rating Agencies which incented the rating firms to inflate the ratings assigned to the Certificates.  The Offering Documents also failed to disclose that the Rating Firms were engaged by Credit Suisse through a "rating shopping" process which allowed Credit Suisse to engage the firms which assigned the highest ratings to the Certificates.  It was only after a year-long SEC investigation into the practices of Moody's and S&P in rating residential mortgage backed securities between 2005 and 2007 concluding in March 2008 and in hearings before the U.S. House of Representatives Committee on Oversight and Governmental Reform ("House Oversight Committee") in October 2008, that it was revealed that these Ratings Agencies were incentivized to inflate the ratings of these securities and, in fact, used outdated models to do so.  (¶¶ 119-135).  There was also no disclosure in the Offering Documents that, as a result of the use of these outdated models, the ratings assigned to the collateral were inflated.

14.     Finally, the Offering Documents described an elaborate set of investor protections or "credit enhancements" designed to provide senior classes with limited protection for Certificate losses arising from borrower default.  These protections included "subordination"

whereby senior Certificate purchasers were provided some insulation from losses by the creation of numerous subordinate Certificate classes (each with their own yields, level of seniority and investment grade rating) which would absorb losses from borrower default first; "excess spread" whereby senior Certificate holders were provided additional limited protection from losses from cash generated from borrower loan payments in excess of expenses and payments to bondholders; a "swap agreement" which provided investors with limited protection from interest rate fluctuation; and limited bond insurance for certain Certificate classes in the event of losses. (¶¶ 119-135).  It was only well after the issuance of the Certificates that it was disclosed that, in light of the true undisclosed impaired quality of the home equity loan collateral, the credit enhancements were wholly inadequate.  The stated credit enhancements did not even begin to provide meaningful "credit support", much less provide justification, as described in the Offering Documents, for assigning the Certificates investment grade ratings.

15.     As set forth herein, the Offering Documents contained material misstatements and omissions of material facts in violation of Section 11 and 12 of the Securities Act, including the failure to disclose that: (i) the Certificate home equity mortgage loan collateral was not originated in accordance with the  loan underwriting guidelines stated in either  the Registration Statement or the Prospectus Supplements, with the Originators having failed to conduct both a meaningful assessment of the borrower's  creditworthiness and effective  appraisals  of the mortgaged properties sufficient to assess their fair value (¶¶ 154-200); (ii) Credit Suisse failed to conduct adequate due diligence with respect to the Originators' compliance with the loan underwriting guidelines stated in the Offering Documents (¶¶ 106-113); (iii) the stated Credit Enhancement did not support the investment grade ratings assigned to the Certificates in light of the true undisclosed and impaired quality of the home equity collateral. (¶¶ 119-135); (iv) there

were material undisclosed conflicts of interest between Credit Suisse and the Ratings Agencies, including as reflected in the undisclosed ratings shopping practices, which incentivized the Ratings Agencies to understate the appropriate Certificate credit enhancement and inflate the Certificate ratings; and, (v) the amount of credit enhancement provided to the Certificates was inadequate to support the AAA and investment grade ratings because those amounts were determined primarily by Ratings Agencies' models which had not been updated in a timely manner. (¶¶ 119-135).

16.     As a result of these material misstatements and omissions of material fact Plaintiff and the Class have suffered damages for which Defendants are liable pursuant to Sections 11, 12 and 15 of the Securities Act.

## II.

### JURISDICTION AND VENUE

17.     The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by Section 22 of the Securities Act and venue is proper pursuant to Section 22 of the Securities Act.

18.     The violations of law complained of herein occurred in this County, including the dissemination of materially false and misleading statements complained of herein into this County.  CSS, DLJMC, CSMSCo and their affiliates and subsidiaries conduct or conducted business in this County.

## III.

### PARTIES AND RELEVANT NON-PARTIES

19.     Court-appointed Lead Plaintiff New Jersey Carpenters is a Taft-Hartley Pension Fund.  As reflected in the certification filed herein, New Jersey Carpenters purchased the

following Certificates pursuant and traceable to the Registration Statement and Prospectus Supplements and has been damaged thereby.

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) | Value as of the Date of Filing of Complaint (Per Unit) |
|---|---|---|---|
| | | | |
| Home Equity Mortgage Trust, Series 2006-5, Class A1 | 130,000 | $ 99.938 | $ 21.463 |
| Home Equity Mortgage Trust, Series 2006-5, Class A1 | 30,000 | $ 99.938 | $ 21.463 |

20.    Credit Suisse Group ("CSG"), based in Switzerland, is a global financial services company which provides a broad range of banking and investment services.  Credit Suisse Holdings USA, Inc. ("CSHUSA") is a wholly owned direct subsidiary of CSG.  CSHUSA is the holding company through which CSG holds ownership and operates its U.S. subsidiaries and affiliates.   CSHUSA's US-based, wholly-owned, direct subsidiary is Credit Suisse USA ("CSUSA"), which operated under the name Credit Suisse First Boston until 2004.  All US-based Credit Suisse entities are either direct or indirect wholly-owned subsidiaries of CSUSA.  CSUSA's investment banking arm is its principal subsidiary and the underwriter of these Offerings, Credit Suisse Securities, USA, Inc. ("CSS").  DLJ Mortgage Capital, LLC (defined herein as "DLJMC") was purchased and merged into CSUSA in 2000 when the Swiss bank acquired DLJMC's parent company, Donald Lufkin & Jenrette, Inc. ("DLJI").

21.    Defendant DLJMC acted as the Sponsor for the Certificates issued pursuant to the Registration Statement.  Credit Suisse originated or acquired all underlying mortgage collateral for the various RMBS deals through the Sponsor, DLJMC.  (*See* ¶¶ 101-105, *infra*).  DLJMC made certain representations and warranties in connection with the loan pools collateralizing the Certificates. (*Id*.)   As set forth in the Registration Statement, DLJMC then conveyed the

mortgages to Special Purpose Entities ("SPE") created for the sole purpose of creating, and thereafter depositing the collateral into, the Issuing Trusts (*i.e.*, the Depositor, Defendant CSMSCo). The Issuing Trusts then issued the Certificates supported by the cash flows from the loan assets and secured by those assets. DLJMC's principal office is located at 11 Madison Avenue, New York, New York.

22.    Defendant CSMSCo, now operating under the name Credit Suisse Management, LLC ("CSM"), filed the following Registration Statement and accompanying Prospectus with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| August 10, 2006 | S-3/A Amended Registration Statement, File No. 333-135481 | $13,000,000,000 |

23.    Defendant CSS, a wholly-owned subsidiary of CSUSA, is an SEC registered broker-dealer. CSS is located at 11 Madison Avenue, New York, New York. CSS served as the underwriter for all of the Certificate Offerings made pursuant to the Registration Statement. CSS is a leading underwriter of and market maker in residential and commercial mortgages and asset-backed securities. CSS acted as the underwriter in the sale of Home Equity Pass-Through Certificates and helped to draft and disseminate the Offering Documents. CSS served as underwriter for the following Offerings:

| Trust | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| Home Equity Mortgage Pass-Through Certificates, Series 2006-4 | $ 515,280,100 | August 28, 2006 | CSS | CSMSCo | DLJMC |
| Home Equity Mortgage Pass-Through Certificates, Series 2006-5 | $ 784,000,100 | October 30, 2006 | CSS | CSMSCo | DLJMC |

| | | | | | |
|---|---|---|---|---|---|
| Home Equity Mortgage Pass-Through Certificates, Series 2006-6 | $ 272,525,100 | December 28, 2006 | CSS | CSMSCo | DLJMC |
| Home Equity Mortgage Pass-Through Certificates, Series 2007-2 | $ 825,300,100 | April 27, 2007 | CSS | CSMSCo | DLJMC |

24.     Each of the Issuers of the various Certificates is a New York common law trust. Each of the Issuing Trusts issued hundreds of millions of dollars worth of Certificates pursuant to a Prospectus Supplement which listed numerous classes of the Certificates.  The Issuing Trusts were Home Equity Mortgage Trust 2006-4, Home Equity Mortgage Trust 2006-5, Home Equity Mortgage Trust 2006-6, and Home Equity Mortgage Trust 2007-2:

25.     The McGraw-Hill Companies, Inc. ("McGraw-Hill") is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020, and several offices located in the State of California.  Standards & Poor's ("S&P," as defined previously), a division of the McGraw-Hill Companies, provides credit ratings, risk evaluation, investment research and data to investors.  S&P participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.  In addition, S&P worked with DLJMC, loan sellers and servicers in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

26.     Moody's Corp. is a Delaware corporation with its principal place of business located at 250 Greenwich Street, New York, New York 10007.  Moody's Investors Service, Inc. ("Moody's," as defined previously), a division of Moody's Corp., provides credit ratings, risk

evaluation, investment research and data to investors.  Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.  In addition, Moody's worked with DLJMC, loan sellers and servicers in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

27.     McGraw-Hill, inclusive of S&P, and Moody's Corp., inclusive of Moody's, are collectively referred to hereinafter as the "Ratings Agencies."

28.     Defendant Andrew A. Kimura ("Kimura") was, at all relevant times, President of CSMSCo.  Kimura signed the Registration Statement as Director and President (Principal Executive Officer) of CSMSCo.  Kimura also served as the head of the RMBS and MBS operations at Credit Suisse.

29.     Defendant Thomas Zingalli ("Zingalli") was the Principal Accounting Officer and Controller (Principal Financial Officer) of CSMSCo at all relevant times.  Zingalli signed the Registration Statement.

30.     Defendant Jeffrey A. Altabef ("Altabef") was Vice President and a Director of CSMSCo during the relevant time period.  Altabef signed the Registration Statement.

31.     Defendant Michael A. Marriott ("Marriot") was a Director of CSMSCo during the relevant time period and worked directly under Defendant Kimura at Credit Suisse.   Marriot signed the Registration Statement.

32.     Defendant Evelyn Echevarria ("Echevarria") was a Director of CSMSCo during the relevant period.  Echevarria signed the Registration Statement.

33.     The Defendants identified in ¶¶ 28-32 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors to the Issuing Trusts as they were directors to CSMSCo and signed the Registration Statement for the registration of the securities issued by the Issuing Trusts.

34.     The Individual Defendants participated with and/or conspired with the remaining Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

**IV.**

**<u>BACKGROUND</u>**

**A.     Credit Suisse Becomes A Significant Issuer And
        <u>Underwriter of Home Equity Mortgage-Backed Securities</u>**

35.     As illustrated below, a mortgage securitization is where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



**Follow the Mortgage** What happens to your mortgage after you sign on the dotted line

| | Borrower | Broker | Lender | Investment Bank | | Investors |
|---|---|---|---|---|---|---|
| | | Finds a lender who can close the loan. They usually have a working arrangement with multiple lenders. | Often funds loan via 'warehouse' line of credit from investment bank. Then sells loan to investment bank | Packages the loans into a mortgage-backed bond deal, often known as a securitization. | Sells the securitization sorted by risk to investors. Lower-rated slices take the first defaults when mortgages go bad, but offer higher returns. | Choose what to buy based on their appetites for risk and reward. |
| **What they get** | Financing needed to purchase a home or cash from refinancing | Takes fees for doing the preliminary sales and paperwork | Takes up-front fees for making the loan | Collects fees for packaging the loans into bond deal | | Earn interest on the bonds and absorb any gain or loss in price of the bond. |
| **If the loan goes bad** | House can be repossessed | May get cut from lender's approved broker list | Can be forced to take back loan if there's an early default or documentation is questionable | May push back loan to lender, or be forced to eat any loss | | May have legal recourse against bank if they can show the quality of the loan or loan documentation was misrepresented. |

Source: WSJ Reporting

36.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage.  Of course, because the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

37.     The securitization of loans fundamentally shifts the risk of loss from the mortgage loan originator to the investor who purchased an interest in the securitized pool of loans.  When the originator holds the mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan.  As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  In securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

38.     In the 1980s and 1990s, securitizations were generally within the domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators.  Investors in these early GSE securitizations were

provided protections since the underlying loans were originated pursuant to strict underwriting guidelines.

39.     Between 2001 and 2006, however, there was dramatic growth in both non-GSE loan originations and securitizations, for which there were no such underwriting limitations. That growth resulted in a commensurate increase in subprime securitizations.  According to *Inside Mortgage Finance* (2007), in 2001, agency originations were $1.433 trillion and securitizations were $1.087 trillion – far outpacing non-agency originations of $680 billion and securitizations of $240 billion.  In 2006, agency originations grew to $1.040 trillion while securitizations declined to $904 million.  However, in that same period, non-agency originations had grown by 100% to $1.480 trillion, and non-agency securitizations had grown by 330% to $1.033 trillion in 2006.  Further, non-agency origination of subprime loans grew by 315% – from $190 billion in 2001 to $600 billion in 2006; and non-agency Alt-A origination grew by 566% – from $60 billion in 2001 to $400 billion in 2006.  Non-agency securitizations of subprime loans had also grown exponentially by 415% – from $87.1 billion in 2001 to $448 billion in 2006.

40.     Along with the growth of subprime securitizations the growth of subprime home equity securitizations also grew – from approximately $150 billion in 2002 to $475 billion in 2006 or 216%.  (Moody's, *Bloomberg Asset Securitization*, January 2008.)  Credit Suisse became a significant underwriter of home equity securitization market.  According to *Inside Mortgage Finance*, Credit Suisse originated $20.49 billion and $13.55 billion of home equity loan securities in 2005 and 2006.  Credit Suisse underwrote $47.45 billion and $29.46 billion of home equity securities in 2005 and 2006.

**B.**     **Credit Suisse's Securitization and Underwriting Operations**

41.     In 2005 and 2006, Credit Suisse's RMBS operations were run primarily out of its offices at 11 Madison Avenue in New York City.   Defendant Kimura was the head of the Mortgage Trading Desk.   Chris Schoen was responsible for subprime securitizations while Mitch Levine ("Levine") was in charge of Alt-A securitizations.   The traders reporting to Chris Schoen ("Scheon") on the subprime desk included Patrick Dodman ("Dodman"), Bob Mattesky ("Mattesky"), Kevin Dwyer ("Dwyer") and Liz Pavlov ("Pavlov").   The managing director for home equity and second lien securitizations was Alex Huang ("Huang").   Victor Baev ("Baev") worked directly under Huang on the HEMT desk.

42.     Credit Suisse derived its profit from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans. The goal for Credit Suisse was to sell the Certificates for a price above par or $100 per unit. As noted, for securitized Certificates to be marketable to begin with, approximately 80% of the securitization had to have the highest rating by the rating agencies.   With that condition met, subprime securitizations and home equity securitizations posed the greater profit potential for Credit Suisse.   The markup for AAA subprime bonds often was in the range of 105 to 106, while fixed rate securitizations were traded at par.   Alt-A securitizations were in the 102 to 103 range, while Home Equity securitizations could trade in the area of 110 and higher.

**1.**     **Credit Suisse's Bulk-Loan Purchases From Third-Party Originators**

43.     Before securitization could begin, Credit Suisse had to acquire the underlying mortgage loans.   Generally, this was accomplished in two ways.   First, Credit Suisse, by way of DLJMC, made substantial bulk loan purchases from third-party originators through originator-initiated auctions.   This was the primary method by which Credit Suisse obtained the Home

Equity mortgage collateral used in securitizing and structuring HEMT deals.  Second, Credit Suisse also had agreements with affiliate or correspondent lenders through which Credit Suisse would have pre-determined contractual obligations to purchase a block of mortgage loans at a pre-determined price structure on a periodic basis.

44.     In bulk-loan auction purchases for HEMT securitizations, Credit Suisse's Structuring Team would be notified, by a third-party originator, of a pool of mortgages that was going to be sold at auction.  Originators, such as New Century or Accredited, for example, would contact the Credit Suisse Whole Loan Acquisitions Team and inform it of a certain pool of mortgage loans it was auctioning off and set a date and time for bids to be submitted by competing investment banks to purchase a pool of mortgage loans.  The pools of mortgage loans averaged in size from 200 to 400 loans – but could be smaller or larger depending on investor demand and market conditions.  Once the auction was announced to the potential bidders, the originator would send to each bidding investment bank a "Loan Tape" in the form of a computerized spreadsheet, which contained 50 to 100 columns of data which outlined the credit quality of the borrowers as well as the loan-to-value of the underlying loans being auctioned. The spreadsheet would include information such as borrower FICO scores, LTV, WAC, physical location of the property, appraisal value and the level of documentation supporting the loan, in addition to several others.  Credit Suisse's Loan Acquisition Team Group would "crack the tape" and analyze the underlying loan characteristics by running the Tape through its "Dealmaker" software – which provided a preliminary structure of the upcoming deal.

45.     Once the Tape was scrubbed and initially analyzed by the Loan Acquisition Team (otherwise referred to as the "Banking Team"), the Loan Acquisition Team would provide the Tape to the Structuring Team which would begin the deal structuring process with the

Dealmaker Software.  Once the structuring process began, talk would start to circulate from around the trading floor that a deal was being put together.  This would signal the Sales Team to get the word out to institutional clients to get an idea of their interest in investing in the deal.

46.     Simultaneously, Credit Suisse would conduct some minimal pre-purchase due diligence on the Tape.  Credit Suisse's Banking Team (which was still part of the trading desk, but not actually on the floor), would take a previously stipulated-to sample of the loan pool, typically 5 to 7% of the pool and "scrub" the data in that sample – kicking-out loans that were obvious fraud or Early-Payment Defaults ("EPD") or were seasoned and late.  Credit Suisse's RMBS Banking Team and the Credit Suisse mortgage group in general were highly incentivized to "kick-back" as few loans as necessary to the originator.  This was because (1) increasing the amount of loans kicked-back decreased the notional size of the pool, thereby decreasing the subsequent size of the securitization and thus the fee generated to Credit Suisse; and (2) institutions that kicked-back too high a percentage of the loan pools were disfavored by originators selling the pools, and would not include the purchasers who kicked-back too many loans in future auctions.

### 2.     Credit Suisse's Loan Tape "Due Diligence" Between <u>Acceptance of Bid at Auction and Offering Date</u>

47.     Between the date of the auction where Credit Suisse's bid was accepted and the date of the Offering of the Certificates, which was usually as soon as one week after the auction, a limited review of the underlying mortgage loans and properties was conducted by the  outside-third-party due diligence firms Clayton or Bohan.  The ostensible purpose of this review was to determine principally whether the loans contained the requisite legal documentation as reflected in the loan tape provided before the auction and whether the loans were originated in accordance with the Originators loan underwriting guidelines.  However, Credit Suisse limited this "due

diligence" from the outset by instructing Bohan and Clayton, only approximately 5% of the loans.

48.     Once the mortgages were purchased by Credit Suisse, the Structuring Team would circulate confidential internal memos that would include some "unique characteristics" of the loan pool – number of loans in the securitization, the name of the originator, geographic diversity, low LTV or borrower FICO – which the Credit Suisse RMBS Sales Team would use to determine client interest in the upcoming securitization.

49.     Credit Suisse's Structuring Team would be running the mortgage loans through various computer models, structuring the cash flows of the deal and gathering the information regarding investor and client interest from the Sales Team.  Essentially, the Structuring Team would reverse engineer the deal to fit the specifications of what the Sales Team informed them that investors were interested in purchasing.

50.     Moreover, the Structuring Team would sometimes provide certain clients of Credit Suisse a limited and modified version of the Loan Tape, in order to see if they were interested.  In exchange, those clients would have to sign "confidentiality agreements" before they looked at the spreadsheet. It would sometimes be the case that portions of a securitization would be "pre-placed" to friendly clients.  These portions would typically be the subordinate classes of the deal (BBB rated classes and the residual security).  The thought process was that if Credit Suisse could place the riskiest classes that took the first losses, it would create momentum and the illusion of "smart money" confidence of the quality of the deal since only the most sophisticated investors were privy to pre-placed classes of a deal.  It was also the case that less risky classes (*i.e.,* AAA rated classes) would be placed to the monolines putting on a negative basis trade, but there was less incentive to pre-place the senior classes because when the deal was

brought to market with overwhelming demand, a continuous rising price of the AAA rated Certificates would make the deal that much more profitable to Credit Suisse.  A more formal "red-herring" document, including a substantial amount of the information set forth in the Prospectus Supplement, would be circulated to clients prior to the deal be priced and launched into the market.

### 3.    Credit Suisse's "Ratings Shopping" Practices

51.    Credit Suisse ultimately engaged the Ratings Agencies through a "ratings shopping" process.  Immediately after the Structuring Team received the Loan Tape from the Loan Acquisition Team, they would run it through their structuring models.  The Structuring Team was headed by Huang and included Senior Structurer, Baev.  They would send the HEMT Deal File (the Credit Suisse "scrubbed" and revised version the Loan Tape) to third-party credit ratings agencies, primarily Moody's and S&P.  S&P, for example, would run the HEMT Deal File through both its LEVELS and SPIRE Models again and provide Credit Suisse with the results in an effort to obtain the ratings engagement.  Through the LEVELS Model, S&P would advise Credit Suisse, for example, that 94.25% of the Certificates would be rated AAA as long as 5.75% of the total collateral balance supporting those Certificates were subordinate.  This 5.75% was the amount of loss coverage required.  Credit Suisse would then again "negotiate" with the Ratings Agencies before they were hired, in order to get them to agree to the least amount of loss coverage and credit enhancement, and the highest percentage of AAA designated Certificates.

52.    S&P would also again run the HEMT Deal File through its SPIRE Model in order to provide a deal structure that was within its acceptable levels of subordination or overcollateralization in order to obtain class sizes with the appropriate ratings.  Credit Suisse relied on this "ratings shopping" process to obtain the most profitable structure on the Offerings.

As set forth below, ratings shopping was disclosed in detail in the SEC Report released in July 2008 (¶ 139, 147-150) and in testimony by former Moody's and S&P managers in October 2008 (¶¶ 124-142).  The practice was effectively ended by way of an agreement entered into between the Ratings Agencies and New York Attorney General in 2008.  (¶ 140).

**V.**

**DEFENDANTS' OMISSIONS OF MATERIAL FACT FROM THE OFFERING DOCUMENTS UNDER THE SECURITIES ACT**

A.   **Exponential Increase In Borrower Delinquencies Following The Offerings Evidenced Impaired Collateral And Systemic Disregard of Stated Underwriting Guidelines**

53.   A pattern of significant early borrower default occurred in the months immediately following each of the HEMT Offerings even though the Offerings occurred on different dates during 2006 and 2007.  For each Offering, it was represented that there were no loans delinquent (30 days or more) in the month each Offering was completed stating as follows: "None of the initial mortgage loans are 30 or more days delinquent as of August 1, 2006." (HEMT 2006-4, Prospectus Supplement, at S-21; HEMT 2006-5 Prospectus Supplement, at S-23; HEMT 2006-6 Prospectus Supplement, at S-19; HEMT 2007-2 Prospectus Supplement, at S-21).

54.   Four months after the completion of each of the Offerings, delinquencies increased over 5,000% - from less than .001% to on average, 4.98% of the entire loan pool. Delinquencies as of the fourth month following the each Offering were 3.89% for HEMT 2006-4; 5.15% for HEMT 2006-5; 4.00% for HEMT 2006-6 and 6.87% for HEMT 2007-2.  Six months after each Offering, delinquency rates continued to skyrocket increasing to between 6.82% and 9.08% of the total home equity loan pool balance - from 3.89%  to 6.82% for HEMT

2006-4; from 5.15% to 7.69% for HEMT 2006-5; from 4.00% to 7.49% for HEMT 2006-6; and from 6.87% to 9.08% for HEMT 2007-2.

55.    As of the filing of this complaint borrower delinquencies have increased even further to 18.99% for HEMT 2006-4; 22.61% for HEMT 2006-5; 20.87% for HEMT 2006-6; and 24.40% HEMT 2007-2;

56.    The early default and delinquency rates which occurred with respect to Certificate collateral is reflective of fundamentally impaired loans as a result of borrower misrepresentation. As reported by the FBI in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  The study cited by the FBI and conducted by Base Point Analytics, found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not.  The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more, fictitious employers and falsified tax returns.  The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty In., found the same top states for mortgage fraud - including the states where the HEMT collateral was principally originated – were also the same top states with the highest percentage of early payment default.

57.    This pattern of borrower default shortly after the completion of the Offerings evidences substantial early payment default and borrower misrepresentations.  The origination of such fundamentally impaired loan collateral could only have occurred as a result of systematic failures to abide by the underwriting guidelines in the Offering documents and as a result of inadequate due diligence by Credit Suisse in monitoring compliance with those guidelines.

**B.      Rating Agencies Dramatically Downgrade The Certificates To Junk
Bond Status Soon After Issuance Citing "Aggressive Underwriting"**

58.      The Rating Agencies rated the Certificates pursuant to the following twenty three

(23)  level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

59.      As noted, at issuance over 85% (or $2.02 billion) and 82% (or $1.96 billion) of

the total $2.39 billion of HEMT Certificates issued were assigned the highest ratings of AAA

and Aaa by S&P and Moody's.  As a general matter, a rating downgrade of even one level - *e.g.,*

from AAA to AA or from Aaa to Aa - is considered material to the financial condition of the

rated entity or security.  Here, the magnitude of the Certificate downgrades is unprecedented. The Certificates were downgraded as many as 20 levels - with  $1.2 billion (of the total $2.39 billion of Certificates issued) downgraded from AAA or Aaa to "CCC" or below, meaning these Certificates were not only designated "junk bonds", but were assessed to be in danger of "imminent default."  The remaining Certificate tranches have fared no better.  The 18 tranches, valued initially at $249.97 million, of Certificates rated in the AA and A range by S&P at issuance have been downgraded to CC and below by S&P – from "very high grade" and "upper medium" securities to "extremely speculative" junk bonds. This historic and dramatic reversal in the financial assessment of the Certificates by the Rating Agencies underscores that these securities were impaired from the outset.

**C.      Subsequent Disclosures Evidence That Originators
         Disregarded Stated Mortgage Loan Underwriting Guidelines**

> **1.       Subsequent Disclosures Reflected New Century Systematically
>            Disregarded Stated Mortgage Loan Underwriting Guidelines**

60.     Following issuance of the Certificates, disclosures began to emerge which reflected New Century's systemic disregard for the underwriting guidelines set forth in the Offering Documents. Maggie Hardiman, a former New Century appraiser whose job was to weed out bad mortgage applications, described to the Washington Post what happened when she turned away bad loans:

> [she] cringed as she heard the salesmen knocking the sides of desks with a baseball bat as they walked through her office.  *Bang!  Bang!*
>
> "'You cut my [expletive] deal!'" she recalls one man yelling at her.  "'YOU can't do that.'"  *Bang!*  The bat whacked the top of her desk.  As an appraiser for a company called New Century Financial, Hardiman was supposed to weed out bad mortgage applications.  Most of the mortgage applications Hardiman reviewed had problems, she said.

But "you didn't want to turn away a loan because all hell would break loose," she recounted in interviews.  When she did, her bosses often overruled her and found another appraiser to sign off on it.

*          *          *

"The stress in that place was ungodly.  It was like selling your soul," said Hardiman, who worked for New Century in 2004 and 2005.  "There was instant notification to everyone as soon as you rejected a loan.  And you dreaded doing it because you paid for it.  Two guys would come with a bat, and they were all [ticked] off because you cut their deals.

*New York Post,* "Pressure at Mortgage Firm Led to Mass Approval of Bad Loans," May 7, 2007.

61.     A detailed complaint for violations of the federal securities laws was filed against New Century on April 30, 2008 in the United States District Court for the Central District of California.  *In re New Century*, Civ. No. 07-931, Second Amended Complaint (the "New Century Complaint" or the "New Century Compl.").

62.     The New Century Complaint provides that, according to a former New Century fraud investigator and senior loan underwriter who examined numerous New Century mortgage loans from January 1999 until April 2007, "New Century's problems began when it 'started to abandon prudent underwriting guidelines' at the end of 2003 in order to 'push more loans through' the system.  According to the former employee, New Century, in effect, 'stopped underwriting' and adopted an approach that the Company would be 'okay if [it] could out run [its] delinquency rate' which eventually caught up with the Company." (New Century Compl. ¶ 138.)

63.     The New Century Complaint also provides that, according to a former New Century underwriter and risk manager employed from December 2001 until April 2007, "New Century became more and more lenient over the years with its underwriting standards until the fall of 2006, when standards finally began to tighten up.  According to the former employee,

until that time, exceptions were prevalent and it was 'more about quantity than quality' with the attitude being 'get the volume on; get the volume on.'"  According to the former employee, "New Century 'got a little crazy' with high loan-to-value ratios and 80/20 loans."  As New Century's "underwriting practices and guidelines loosened throughout [her] long tenure with the Company, she reviewed increasingly more loans that she recommended denying.  These mortgage loan applications were given to the operations manager with [her] recommendation of denial, but the operations Manager overrode [her] recommendation nine out of ten times, and approved the loans."  (New Century Compl. ¶ 144.)

64.    In a decision dated December 3, 2008 (the "New Century Decision" or "New Century Dec."), Judge Dean D. Pregerson of the United States District Court for the Central District of California upheld the bulk of the 569-page New Century Complaint which detailed a massive fraud involving New Century.  Judge Pregerson stated in the New Century Decision:

> "In summary, Plaintiffs allege that Defendants, during the Class Period, misrepresented New Century's ability to repurchase defaulted loans; overvalued its residual interests in securitizations; falsely certified the adequacy of its internal controls, loan origination standards and the quality of its loans; and failed to identify these problems in public statements, registration documents, audits, or elsewhere." (New Century Dec., p. 3.)

> "The Complaint alleges that Defendants made false and misleading statements regarding New Century's underwriting standards and loan quality.  During the Class Period, the Officer Defendants made public statements regarding the company's "strong," "excellent," "very high" credit quality and that the credit quality was "better" than in the past because the Company used "strict," "improved," and "strong" underwriting guidelines. (Compl. ¶ 120.)  These public statements were contrary to data on increasing defaults. (Id. at ¶¶ 120-121.)  Also contrary to these statements, and notwithstanding the increasing interest rates and downturn in the real estate market, the underwriting standards were loosened in order to increase the volume of loans.  (Id. at ¶ 125.)  The Complaint recites data and confidential witness statements that purport to show the rising rates of delinquent New Century loans, the poor quality of loans issued by New Century, weak internal controls, and lenient loan origination standards.  (Id. at ¶¶ 126-168.)  The convergence of these factors created a 'recipe for disaster[.]'  (Id. at ¶ 172.)" (New Century Dec., p. 13.)

"The Court determined that the Complaint adequately alleges false and misleading statements with respect to financial accounting, internal controls, and loan quality and underwriting. …. The Court therefore finds that the Complaint supports reasonable inferences of material false and misleading statements." (New Century Dec., p. 63.)

65.     Judge Pregerson also outlined the events leading to New Century's downfall and bankruptcy filing:

On February 7, 2007, New Century disclosed that during the first three quarters of 2006, it did not properly discount the allowance for loan repurchase losses "by the amount the repurchase prices exceed the fair values" and "did not properly consider … the growing volume of repurchase claims that resulted from the increased pace of repurchase requests that occurred in 2006 …." (Compl. ¶ 457.) It explained that "earnings-related press releases for those periods should no longer be relied upon" and to expect "a net loss for that period." *Id.* It further noted that "errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006." New Century additionally explained that adjustments were expected for its residual interests held as securities." *Id.*

On March 1, 2007, New Century disclosed that it would be unable to file a timely 2006 year-end financial report (Form 10-K). On March 2, 2007, New Century filed a notification of late filing with the SEC, in which it stated that its Audit Committee had initiated an independent investigation of the issues related to the need for financial restatements; that it expected to conclude that there were material weaknesses in internal control over financial reporting; that modifications to the ALL would result in lower restated net income for the first three quarters of 2006; that there were declines in earnings and profitability for 2006; and provided additional disclosures, including that the SEC requested a meeting with the company and the U.S. Attorney's Office had initiated a criminal investigation. (Compl. ¶ 464.)

On March 12, 2007, New Century disclosed that certain lenders discontinued financing for the company, that this would allow lenders to accelerate the company's obligations to repurchase loans, and that this could total $8.4 billion in repayment obligations. New Century further disclosed that it lacked the liquidity to keep pace with the repurchase requests. (Id. at ¶ 472.) After close of trading on March 13, 2007, the New York Stock Exchange delisted New Century stock. (Id. at ¶ 476.)

On May 24, 2007, New Century filed a Form 8-K providing that, in addition to its restatements with respect to 2006, the Audit Committee had found "errors in the Company's previously filed annual financial statements [for 2005] … with respect

to both the accounting and reporting of loan repurchase losses," and found it "more likely than not that these errors … resulted in a material overstatement of pretax earnings … [such that] the [annual financial statements for 2005] should no longer be relied upon." (Compl. ¶ 482.) The Form 8-K further explained that New Century had overstated its residual interests.

On April 2, 2007, New Century filed for Chapter 11 bankruptcy protection. (*Id.,* at 480.) (New Century Dec., pp. 8-10.)

66.    Michael J. Missal (the "Examiner") was appointed Bankruptcy Examiner in the New Century bankruptcy proceeding to examine "any and all accounting and financial statement irregularities, errors and misstatements" in connection with New Century's practices and procedures. The Bankruptcy Examiner's Report (the "Examiner's Report") was filed on February 29, 2008 and was formally unsealed and publicly released at the request of former New Century employees on March 26, 2008.

67.    In his Report, the Examiner found that New Century "engaged in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes." (Examiner's Report, at 2). Because "[a]ll of New Century's revenues, assets and operations were directly affected by the Company's subprime lending policies and practices," it is "therefore pertinent to New Century's accounting and financial reporting processes to examine issues related to the Company's loan originations." (Examiner's Report, at 3).

68.    Among other things, the Examiner concluded that:

A.    "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006. The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named "CloseMore University." Although a primary goal of any mortgage banking company is to make more loans, New Century did so in

an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." (Examiner's Report, at 3.)

B.     "The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers. For example, more than 70% of the loans originated by the Company had low initial "teasers rates" that were highly likely to increase significantly over time. A senior New Century officer noted in 2004 that borrowers would experience "sticker shock" after the teaser rates expired." *Id*.

C.     "More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as 'liars' loans' because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that 'we are unable to actually determine the borrowers' ability to afford a loan.'" *Id.*

D.     "Another common loan product offered by New Century that had a high degree of risk was the '80/20' loan, which involved two separate loans for the same transaction: a first lien mortgage loan with an 80% loan to value ratio and a second lien loan with a 20% loan to value ratio, resulting in a combined financing of 100% of value of the mortgaged property. One Senior Officer of New Century noted in early 2006 that the performance of these 80/20 loans in 2005 was 'horrendous.'" *Id.*

E.     "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan, A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.' Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies. Of the New Century loans rejected by investors, issues with appraisals were the cause of more than 25% of these 'kick-outs.'" *Id., at 3-4.

F.     "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. ...." *Id.* at 4.

G.     "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid-2004. The surge in real estate prices slowed and then began to decrease, and interest rates started to rise. The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of

> investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans. Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages. New Century was not able to survive and investor suffered mammoth losses. *Id.*

69.    On March 12, 2007, *USA Today* reported that, one day after New Century "said its lenders were cutting off financing because it didn't have enough money, or prospects of new assistance, to cover billions of dollars in obligations," New Century disclosed that the SEC "is investigating the company." *USA Today* also reported that "New Century also said Tuesday that it has received a grand jury subpoena requesting documents. The request is part of the U.S. Attorney in Los Angeles' criminal probe into the company."

70.    On May 1, 2007, *The New York Times* (Today in Business), reported that New Century was facing investigations by both federal prosecutors and securities regulators.

71.    On July 6, 2007, *Reuters* reported that the SEC had elevated its investigation of New Century to "formal status" which "gives the SEC subpoena power."

72.    On December 6, 2007, *The New York Times* reported that "[l]oans made by New Century, which filed for bankruptcy protection …, have some of the highest default rates in the industry – almost twice those of competitors like Wells Fargo and Ameriquest, according to data from Moody's Investor Services."

73.    On January 12, 2008, *The New York Times* reported on investigations into the mortgage crisis by Andrew Cuomo, the Attorney General of New York State, and Connecticut's Attorney General, Richard Blumenthal. With respect to New Century, *The New York Times* stated:

> The New Century Financial Corporation, for instance, waived its normal credit rules if home buyers put down large payments, had substantial savings or demonstrated "pride of ownership." The once-high-flying lender, based in Irvine, Calif., filed for bankruptcy last year.

74.     On January 30, 2008, *The Los Angeles Times* reported that the FBI was conducting criminal investigations of mortgage lenders including New Century and that the principal focus of the FBI probe was whether the "companies had juggled their books to conceal problems with mortgages made during the frenzy of the housing boom."

75.     On July 24, 2008, *The Los Angeles Times* reported that "three big Southland lenders (are) under federal investigation; Sources say IndyMac, Countrywide and New Century [have been] subpoenaed."  *The Los Angeles Times* further reported that officials have begun to investigate whether investors were defrauded by  the value of mortgage-backed securities:

> A federal grand jury in Los Angeles has begun probing three of the nation's largest subprime mortgage lenders in the clearest sign yet that prosecutors are investigating whether fraud and other crimes contributed to the mortgage debacle.
>
> ***Grand jury subpoenas have been issued in recent weeks and months to Countrywide Financial Corp., New Century Financial Corp. and IndyMac*** Federal Bank seeking a wide range of information, according to sources with direct knowledge of the subpoenas.
>
> People familiar with the situation told The Times that the subpoenas seek e-mails, phone bills and bank records and follow interviews that federal investigators have conducted with employees and others knowledgeable about the lending operations of the three Southern California institutions, which all collapsed under the weight of bad loans.  ….
>
> The investigations are part of a coordinated Justice Department effort that until now has focused primarily on smaller operators suspected of defrauding homeowners and mortgage lenders.
>
> The subpoenas, while indicating that the effort is still at an early stage, show that the government is starting to take aim at the largest lenders and their executives to determine whether they were complicit in the multibillion-dollar mortgage crisis. The sources familiar with the subpoenas spoke on condition of anonymity because they were not allowed to discuss them publicly.
>
> The mortgage losses have regulators and law enforcement personnel gearing up for what experts say could prove to be the biggest financial fraud case since the savings and loan crisis of the 1980s.

> ***Officials have said they are beginning to investigate whether securities investors were defrauded about the value of subprime mortgages they purchased, as well as other possible crimes such as insider trading by corporate officials who sold stock knowing their holdings were about to deflate in value.***

(Emphasis added).

76.     On October 17, 2008, *The Chicago Sun-Times* reported:

> The top federal prosecutor in Los Angeles has indicated charges are coming soon from an investigation of banks and subprime lenders for their role in the nation's mortgage crisis.   U.S. Attorney Thomas O'Brien said he expects "dramatic results" will come from probes into some of the largest U.S. Lenders.  O'Brien did not give a timetable but said it would be in the near future.  A grand jury is investigating at lease three mortgage lenders: Countrywide Financial Corp., New Century Financial Corp. and IndyMac Bancorp Inc.  Prosecutors are looking at whether mortgage fraud and other white-collar crimes were committed.

### 2.     Subsequent Disclosures Reflected WMC Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

77.     WMC was a principal originator for the HEMT 2006-4 Offering. Following issuance of these Certificates stories began to emerge which reflected WMC's systemic disregard for the stated mortgage loan underwriting guidelines set forth in the Offering Document.

78.     As reported by *Reuters* on March 9, 2007, at the height of the subprime mortgage market disaster, WMC was credited with originating some of the worst performing loans in the home-equity asset-backed securities market.

79.     As reported in a September 20, 2007 article on *MortgageDaily.com*, General Electric ("GE") purchased WMC from private equity firm, Apollo Management in 2004. At the time, WMC was the sixth-biggest subprime lender in the nation.  *Id.*  In 2006, WMC was responsible for more than $100 million of GE's profit.  *Id.* WMC's concentration was in non-prime loans and jumbo loans up to $1 million dollars.  *Id.* The company prided itself on its ability to finance up to 95% loan-to-value and working with applicants with FICO scores as low as 530. *Id.*  However, according to a March 2007 article published by *MortgageDaily.com*,

WMC, faced with growing delinquencies, announced that it would no longer write mortgages with no down payments.  Soon after, on September 20, 2007, GE closed WMC's operations, taking a $400 million charge as a result.  The following month, GE started looking for buyers for the defunct lender.  *Id.*

80.     After GE closed operations at WMC, disclosures began to emerge regarding WMC's reckless loan originating practices.  In June 2008, the Washington State Department of Financial Institutions, Division of Consumer Services filed a statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees against WMC Mortgage and Its principal owners individually, Amy C. Brandt, WMC's CEO and President, Mark Walter, the company's executive vice president, and Marc Becker, the company's Director.  The allegation was the result of a lengthy investigation in which WMC's books and those of the Company's business partners were subpoenaed.

81.     The investigation found that WMC had "failed to provide borrowers with good faith estimates or the Annual Percentage Rate (APR) and the existence of a prepayment penalty." WMC had also been found to have originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on multiple loans and amounts relating to payments made to escrow companies, understated Annual Percentage Rates by almost one-half of 1% and many other violations of Washington State deceptive and unfair practices laws.  To date, this investigation is still ongoing.

82.     In January 2009, in the United States District Court for the Eastern District of California, suit was commenced against WMC Mortgage for violations of the Truth In Lending Act, 15 U.S.C. § 1601 et seq. WMC, as alleged, in an effort to maximize the number of loans

sold to consumers and to maximize their profits, WMC assured Plaintiff throughout the loan application process that Plaintiff would have low mortgage payments and failed to disclose the correct payment amounts or finance charges.

### 3.    Subsequent Disclosures Reflected That Accredited Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

83.    Accredited Home Lenders, Inc. (defined herein as "Accredited or "AHL") was a principle originator of the HEMT 2006-6 Offering.  Following issuance of these Certificates stories began to emerge evidencing AHL's systemic disregard for its stated mortgage loan underwriting guidelines set forth in the Offering Documents.

84.    Founded in 1990, Accredited specialized in non-prime residential mortgage loans. From its inception, Accredited grew at an explosive rate, at some points, even faster than the subprime industry itself.  In 2000, AHL originated $1.5 billion in loans.  By 2004, the company had increased its origination volume exponentially to more than $12.4 billion.

85.    As the mortgage bubble burst, disclosures emerged exposing the reckless loan origination practices employed by AHL.  The most notable of these disclosures was a Class Action complaint filed Against AHL in 2007.  *See Atlas v. Accredit Home Lenders Holding Co,* Civ. No 07-488 H (RBB) (S.D. Cal. 2007).[5]  According to the Complaint in *Atlas* ("Atlas Compl."), and sources therein, AHL abandoned its stated underwriting guidelines for the sake of growing mortgage volume and profits.  (Atlas Compl. ¶ 30.)

86.    Corporate underwriters were frequently overridden by managers if they denied loan applications.  (Atlas Compl. ¶¶ 48, 56).  By early 2005, AHL had made a regular practice of approving risky loans that did not comply with its own underwriting guidelines in an effort to reach monthly production targets.  In many cases, AHL employees were encouraged to push

---

[5]    On January 4, 2008, the Southern District of California denied Accredited's Motion to Dismiss.

loans through regardless of quality.  (Atlas Compl. ¶52).  AHL, as further alleged, engaged in "pervasive, widespread exceptions to the Company's underwriting policies and substantial pressure to approve such loans at the end of the reporting periods in an effort to meet financial projections." (Atlas Compl. ¶ 48).

87.     As one confidential witness described it, "[t]he problem with the whole system was the overrides.  The overrides were rampant, especially during the last few days of each month when they wanted to substantially increase loan production.  During those last few days of the month it was balls to the wall to get loans approved. *If the borrower breathed, he got the loan.*"  (Atlas Compl. at ¶ 57 (emphasis added)).

88.     AHL maintained a database accessible only by AHL personnel that contained underwriter's notes concerning each loan that was first denied but later approved by more senior management.  The database included explicit notes delineating glaring problems with the loan application such as "(1) the borrower was acting as a "straw borrower" for someone else; (2) employment could not be verified; (3) income claimed on a stated-income loan was way above that which could be possible for the stated job title; and (4) multiple exceptions to AHL's underwriting guidelines regarding debt-to-income, minimum credit score, loan-to-value, and/or previous employment history."  (Atlas Compl. ¶ 49).

89.     Further, as stated by a former AHL underwriter, "[t]hey absolutely knew about the degree of overrides.  I used to get e-mails from Joe Lydon [AHL's President and Chief Operating Officer] about what type of crap was going on and the losses we were taking."  (Atlas Compl. ¶ 52).   In some cases, managers as high as the Director of Retail Operations were the ones who approved the already denied loans.  (Atlas Compl. ¶ 60).

90.     By the end of 2005, the number of overrides became so large that the Company was "forced to institute a system to track such overrides, which included a box on the loan file that needed to be checked off by an underwriter if the loan was approved 'as a business decision' by a higher-level manager over the recommendation of the underwriter to reject the application." (Atlas Compl. ¶ 62 (emphasis supplied)).

91.     Where underwriters objected to the practice, their challenges were shot down by managers.  One former employee, dismissed from AHL for, as he believed, being vocal about AHL's credit quality problems, stated, "over and over again we tried to challenge these loans and were told 'You have to go forward with it.'  If you made a big stink about it, they would raise their eyebrows and say, 'Do you want a job?'"  (Atlas Compl. ¶ 67).

92.     As stated in the Atlas Complaint, AHL was also very aggressive in lending to those with very bad credit.  The effort to originate any loan was so pervasive, "you could even get a loan one day out of bankruptcy.  You could get a 100% loan-to-value." *Id.*  AHL even had programs where you could get a loan at more than 100% loan-to-value. *Id.*

93.     In 2006, the incentive to approve questionable loans grew even more as AHL changed its compensation scheme so that account executives were compensated regardless of loan quality.  (Atlas Compl. ¶ 70).  This increased the origination of non-compliant, bad-quality loans. *Id.*

94.     Another means by which AHL grew the volume of loans they originated was by relaxing collateral requirements by falsifying and/or manipulating property appraisals so that they would comply with the Company's stated policies.  (Atlas Compl. ¶ 73).  In this practice, underwriters and sales managers were able to override appraisers without any valid justifications. Atlas Compl. ¶75).

95.     In May 2006, as reported by *Business Wire*, AHL acquired Aames Investment Corporation (defined herein as "Aames"), a non-prime mortgage originator with 76 retail offices and three wholesale operation centers throughout the nation.  The sale price of the transaction was $340 million.  *Id*.  According to the *Business Wire* article, as a result of the acquisition, AHL became the nation's sixth largest retail originator and twelfth largest overall originator holding the ninth largest non-prime mortgage portfolio in the industry.  *Id*.

96.     According to former Aames employees, AHL's lending standards were much more lenient than those employed by Aames before the acquisition.  Even with defaults and delinquencies increasing at record pace, it was not until February 2007 that AHL finally tightened its lending guidelines.  But, by then, "it was too late."  (Atlas Compl. ¶ 88).

97.     In AHL's 2006 Form 10-K Annual Report filed with the SEC, the Company's extensive losses in the subprime mortgage market were laid out.  As reported on August 2, 2007 by *USA Today*, AHL's annual statement read as "a Reader's Digest version of how subprime loans went from lucrative sources of returns to tripping up financial markets and threatening the survival of many of the companies that helped fuel the housing boom."  Furthermore, the article stated that AHL's 2006 Form 10-K Annual Report filed with the SEC was "a dramatic departure from [its] 2005 filing."  *Id.*

98.     Because of the mounting losses, according to an August 13, 2007 article published by *MaketWatch*, AHL began negotiations with Lone Star Funds ("Lone Star") for the sale of the company.  Lone Star offered to purchase AHL for $400 million or $15.10 per share.  Soon after, as news of AHL's massive losses began to emerge, *MarketWatch* reported that Lone Star had backed out of the deal telling the lender that "because of the drastic" deterioration of AHL's financial and operational condition," the deal's conditions would not be satisfied.  *Id.*

99.     In August 2007, as reported by *MortgageDaily.com* on August 18, 2007, AHL had stopped taking loan applications and halted nearly all retail lending, half of its wholesale lending operations, and laid off about half of the Company's staff.

100.     The following month, AHL announced in its quarterly filing, that without the completion of its planned merger with Lone Star Funds, the company would be forced into bankruptcy.   On September 19, 2007, *Forbes* reported that AHL had commenced suit in Delaware Chancery Court seeking to enforce Lone Star's obligations to close the tender offer and complete the merger.  Lone Star eventually completed the sale of AHL.

### 4.     Subsequent Disclosures Reflected That DLJMC Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

101.     As set forth above, DLJMC was represented as having originated or acquired a substantial portion of the mortgage collateral in the HEMT 2006-5 and HEMT 2007-2 Offerings.

102.     While DLJMC itself did not engage in the business of mortgage loan origination in the way that originators such as New Century or WMC did, DLJMC did purchase a substantial amount of mortgage loan collateral from other originators such as Infinity Home Mortgage Company, Inc. ("Infinity"), ATC Lending Corporation, Sea Breeze Financial Service, Inc., Sunset Direct Lending, Inc. and Right-Away Mortgage, Inc. (¶ 104).   DLJMC bundled the mortgage loan collateral purchased from these smaller lenders and securitized the collateral, in combination with mortgage loan collateral originated by, for example, New Century, as was the case in the HEMT 2006-5 and HEMT 2007-2, Offerings.

103.     After issuance of these securities, disclosures began to emerge reflecting the impaired quality of the loans DLJMC acquired from these smaller lenders. As reported in April 2007 by *MortgageDaily.com*, DLJMC commenced numerous actions against no less than seven of so called counterparty lenders. In these actions DLJMC sought to recover or have well over

$100 million of these loans repurchased.   According to *MortgageDaily.com*, the DLJMC lawsuits sought to force either repurchase of these already defaulted loans by the lender or, in the alternative, payment of damages to cover the cost of holding these loans by the lender. *MortgageDaily.com*, Mortgage Lawsuits Balloon, April 9, 2007.  The suits alleged that these companies failed to forward borrower payments, neglected to pay mortgage insurance and refused to comply with requests for mortgage information, all responsibilities that would have easily been discovered had DLJ conducted any degree of due diligence before it purchased millions of dollars of loans from these firms. *MortgageDaily.com*, Mortgage Lawsuits Balloon, April 9, 2007.

104.    For example, *DLJ Mortgage Capital, Inc. v. Infinity Home Mortgage Company, Inc.*, Civ. No.06-15380 (NRB) (THK) (S.D.N.Y. 2007), DLJMC sought to compel Infinity Home Mortgage Co., Inc. to buy back $3 million in bad loans that had all suffered early payment defaults.[6]  The complaint defined "early payment defaults" as those mortgage loans that occurred payment defaults within three months after the Closing Date.   (Infinity Home Mortgage Company Compl. at ¶ 7).  The suit alleged, in part, that the lender had failed to comply with the purchase agreement which represented that: "'the mortgage file for each Mortgage Loan … contains an appraisal of the related Mortgage property signed prior to the final approval of the mortgage loan application by a Qualified Appraiser, who had no interest, direct or indirect in the Mortgaged Property or in the loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan, and the appraisal and appraiser

---

[6]      *See also, DLJ Mortgage Capital, Inc., v. ACT Lending Corporation, et. al.,* 07-cv-10318 (S.D.N.Y. Nov. 14, 2007), *DLJ Mortgage Capital, Inc v. Sunset Direct Lending, LLC, et.al,* 07-cv-1418 (S.D.N.Y. Feb. 27, 2007), *DLJ Mortgage Capital, Inc., v. Right-Away Mortgage Inc,* 07-cv-2791 (S.D.N.Y. Feb. 2008), *DLJ Mortgage Capital, Inc, v. Thomas Kontogiannis, et. al.,* 08-cv-4607 (E.D.N.Y. Nov. 13. 2008), *DLJ Mortgage Capital, Inc. v. Home Loan Corporation,* 07-cv-4167 (S.D.N.Y., May 29, 2007); *DLJ Mortgage Capital, Inc., v. Sea Breeze Financial Services, Inc.* SACV 08-0977 (C.D. Cal. Sept. 2, 2008); *DLJ Mortgage Capital, Inc., v. Cameron Financial Group, Inc.,* 07-cv-3746 (S.D.N.Y. Dec. 14, 2007).

both satisfy the requirement of Fannie Mae or Freddie Mac and Title XI of FIRREA and the regulations promulgated thereunder ...'" (Infinity Home Mortgage Compl. at ¶ 9). Thus, DLJMC had purchased loans that failed to abide by stated underlying guidelines and had gone into default within three months.

105.    At the same time Credit Suisse, on behalf of DLJMC, was seeking rescission on thousands of purchased loans Bankers Life Insurance Company had instituted an action against DLJ Mortgage Capital, and its parent company, Credit Suisse First Boston in the Middle District of Florida. (*Bankers Life v. Credit Suisse First Boston Corporation*, Civ. No. 07-00690-EAK-MSS (M.D. Fl. 2008)). The suit alleged actions similar to those that DLJ relied on in its breach of contract suits against other lenders. The Prospectus Supplements issued by Credit Suisse First Boston and originated by DLJMC contained statements that no loan would be more than 30 days delinquent. However, the complaint itself cites the trustee's own statement to Certificate-holders that this was a lie. Each certificate contained loans that were in fact delinquent more than 30 days. (*Bankers Life* Compl. ¶ 20.) Moreover, the allegations in the Banker's Trust Complaint make clear that DLJMC and Credit Suisse made a series of misstatements and omissions in an effort to cover their own lax underwriting and due diligence practices. *Id.*

**B.    The Offering Documents Failed To Disclose Credit Suisse's Inadequate Due Diligence With Respect To Originator Compliance With Mortgage Loan Underwriting Guidelines**

106.    The Registration Statement provided that the loan underwriting guidelines used to originate the loan collateral is as specifically set forth in each of the Prospectus Supplements. (¶¶ 154-199). The Prospectus Supplements provide that the Mortgage Loans underlying the Certificates were originated pursuant to stated underwriting guidelines of the principal loan Originators as set forth in the Prospectus Supplements. *Id.*

107.     As underwriter of the Certificates Offerings, Credit Suisse conducted inadequate due diligence with respect to whether the Originator complied with the loan underwriting guidelines described in the Prospectus Supplements.

108.     Credit Suisse and other investment banks contracted with external firms to review whether the loans included in MBS that they underwrote were in compliance with the loan originators' represented standards.  Credit Suisse was a noted client of Bohan and Clayton.  In June of 2007, the New York Attorney General subpoenaed documents from Clayton and Bohan, seeking information regarding whether the investment banks withheld information that should have been disclosed to investors.  Similar subpoenas were issued by the SEC and by Massachusetts and Connecticut regulators.

109.     In June 2007, the New York Attorney General, subpoenaed documents from Bohan and Clayton related to their due diligence efforts on behalf of the investment banks, such as Credit Suisse, that underwrote mortgage backed securities.  The NYAG, along with Massachusetts, Connecticut and the SEC (all of which also subpoenaed documents) are investigating whether investment banks held back information they should have provided in the disclosure documents related to the sale of mortgage backed securities to investors.

110.     In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on Loans", *The New York Times* reported:

> An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.
>
> Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms. But the banks did not disclose the details of these reports to credit-rating agencies or investors.

The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter.  Charges could be filed in coming weeks.

\*       \*       \*

The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures.  The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.

As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans.  In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.

It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans.  Some industry officials say such loans made up a quarter to a half of the portfolios they saw.  In some cases, the loans accounted for as much as 80 percent.  While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.

Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

\*       \*       \*

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco.  Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

\*       \*       \*

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort

Worth that verifies borrowers' incomes for mortgage companies, said lenders and
investment banks routinely ignored concerns raised by these consultants,

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said,
"We stopped checking."

111.    On January 27, 2008, Clayton revealed that it had entered into an agreement with
the NYAG for immunity from civil and criminal prosecution in the State of New York in
exchange for agreeing to provide additional documents and testimony regarding its due diligence
reports, including copies of the actual reports provided to its clients.  On the same day, both the
*New York Times* (Anderson, J. and Bajaj, V., "Reviewer of Subprime Loans Agrees to Aid
Inquiry of Banks," Jan. 27, 2008), and the *Wall Street Journal* ran articles describing the nature
of the NYAG's investigation and Clayton's testimony.  The *Wall Street Journal* reported that the
NYAG's investigation is focused on "the broad language written in prospectuses about the risky
nature of these securities changed little in recent years, even as due diligence reports noted that
the number of exception loans backing the securities was rising."  According to the *New York
Times* article, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of
lending standards and a parallel jump in lending expectations" and "some investment banks
directed Clayton to halve the sample of loans it evaluated in each portfolio."

112.    A March 23, 2008 *Los Angeles Times* article reported that Clayton and Bohan
employees "raised plenty of red flags about flaws [in subprime home loans] so serious that
mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated
or documents that looked fake – but the problems were glossed over, ignored or stricken from
reports" as follows:

The reviewers' role was just one of several safeguards – including home
appraisals, lending standards and ratings on mortgage-backed bonds – that were
built into the country's mortgage-financing system.

But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start.  Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.

"The investors were paying us big money to filter this business," said loan checker Cesar Valenz.  "It's like with water.  If you don't filter it, it's dangerous.  And it didn't get filtered."

As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.

The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages.  And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

*The Los Angeles Times*, <u>Subprime Watchdogs Ignored</u>, March 23, 2008.

113.    Moreover, while underwriters would have sought to have Clayton review 25% to 40% of loans in a pool that was going to be securitized earlier in the decade, by 2006 the typical percentage of loans reviewed for due diligence purposes was just 10%.  Bohan's President, Mark Bohan, stated that "[b]y contrast [to investment banks in RMBS deals], buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."

**C.    Governmental Agency Investigations And Subsequent**
       **<u>Findings Related To The Residential Mortgage Industry</u>**

114.    In August 2007, following reports of defaults in mortgage loans underlying various MBS, downgrades of such MBS and potential downgrades of additional MBS in the future, and the resulting illiquidity in the credit markets, the President of the United States commissioned the Secretary of the Treasury, the SEC and the Commodities Futures Trading Commission ("CFTC") (hereinafter referred to as the "President's Working Group" or the

"PWG") to investigate the causes of the market turmoil.  After a seven-month investigation, the PWG issued its report on March 13, 2008.  The PWG found as follows :

- A significant erosion of market discipline by those involved in the securitization process, including *originators, underwriters, credit rating agencies, and global investors,* related in part to failures to provide or obtain adequate risk disclosures;

- The turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages*…

(Emphasis added).

115.    Further, as noted, relatively soon after issuance, the delinquency and foreclosure rates of the Certificate collateral began to increase. (¶¶ 8, 54, 56, 184).  This performance was an indication to S&P of pervasive underwriting failures in the origination of the collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes.  On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous RMBS Certificates because the performance of the underlying collateral "called into question" the accuracy of the loan data.  This announcement triggered several governmental investigations which only began reporting their findings in 2008.  (¶¶ 112, 114, 121-151).

116.    S&P announced that it was revising its methodology assumption to require increased "credit protection" for rated transactions.  S&P reiterated that it would also seek in the future to review and minimize the incidence of potential underwriting abuse given "the level of *loosened underwriting* at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

117.    One day later, on July 11, 2007, Moody's announced it was also revising its methodology used to rate the Certificates, and anticipated Certificate downgrades in the future.

Moody's did in fact significantly downgrade most of the Certificate classes, noting "aggressive underwriting" used in the origination of the collateral.

118.    Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to each of the Originators which further evidenced that they had engaged in loan underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statement and Prospectus Supplements.  (¶¶ 60-105, 154-181).

**D.    The Offering Documents Failed To Disclose That Credit Suisse Relied On S&P And Moody's Outdated Models To Determine Levels of Credit Enhancement and Ratings**

119.    The Prospectus Supplements describe the varying forms of credit enhancement, including by way of subordination and over-collateralization.  The Supplements contain material misstatements and omissions of fact, including the failure to disclose that the amounts and forms of credit enhancement were insufficient and understated because they were largely determined by Ratings Agencies' models that had not been materially updated since 1999 (for S&P) and 2002 (for Moody's).    As a result, these outdated models were based primarily on the performance of fixed interest loans and not subprime, Alt-A, no or limited documentation loans – which were the kinds of loans substantially included in the Certificate collateralizations.  The models failed both to provide sufficient, appropriate credit enhancement and to disclose the deficiencies in the manner in which credit enhancement was determined.

120.    The Ratings Agencies' determinations of the amount and kind of credit enhancement to be included in the Certificates were faulty.  These same faulty determinations were then used by the same firms to assign inflated and faulty AAA ratings to a substantial portion of the total Certificate value of the Offerings (83% by S&P and 85% by Moody's). These ratings were unjustifiably high because they were determined pursuant to the same models

used to determine credit enhancement – models that had not adequately been updated at the time the Certificates were issued.

121.   The truth about the Ratings Agencies' undisclosed use of outdated models in rating RMBS deals only began to emerge in 2008.  The inadequacy of the models used to rate (and determine the amount of credit enhancement needed to support the rating) was discussed in the April 2008 issue of *Mortgage Banking* which explained that the Ratings Agencies' models used statistical assumptions that were too heavily based on the performance of 30-year fixed mortgages – which were not the kinds of mortgages that had been securitized in the prior four years:

> S & P's Coughlin admits that "assumptions that went into decision-making [on credit ratings] were informed by what had happened in the past," and yet in this instance "previous loss data proved to be much less of a guide to future performance."
>
> But why?  Drexel University's Mason believes it's because the CRAs relied on statistical models that were misleading, at best.   "I think their [credit-rating] methodologies were demonstrably insufficient," he says.
>
> "Unlike the traditional rating processes for single-named issuers, which rely on empirical analysis at their core, structured-finance rating analysis is essentially driven by statistical models," write Mason and Rosner in their paper.  And the data that the rating agencies used when evaluating mortgage-backed securities-- including those backed by subprime mortgages--were heavily biased by over- reliance on traditional 30-year fixed prime mortgage loans.  But it turns out that a subprime loan, as Mason explains during an interview, is a very different animal.
>
> "This is not your historical mortgage loan," he says.  "This is more like a credit- card loan."  Mason cites the increased popularity during the mortgage boom of so- called option ARMs, which are home loans that give the borrower a variety of monthly payment options and have variable cash-flow characteristics that are more like credit cards.

122.   In an article appearing in *The New York Times* on April 8, 2008, entitled "Triple A Failure," *The New York Times* took note of Moody's April 2007 disclosure that it was "revising" its model which had not been revised since 2002:

In April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages. It noted that the model "was first introduced in 2002. Since then, the mortgage market has evolved considerably." This was a rather stunning admission; its model had been based on a world that no longer existed.

123. The article explained that when Moody's had analyzed subprime delinquency data in 2007 it had found trends that its 2002 model never accounted for:

> Poring over the data, Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the size of their first and second loans – that is, their total debt – combined. This was rather intuitive; Moody's simply hadn't reckoned on it. Similarly, credit scores, long a mainstay of its analyses, had not proved to be a "strong predictor" of defaults this time. Translation: even people with good credit scores were defaulting. Amy Tobey, leader of the team that monitored XYZ, told me, "it seems there was a shift in mentality; people are treating homes as investment assets." Indeed. And homeowners without equity were making what economists call a rational choice; they were abandoning properties rather than make payments on them. Homeowners' equity had never been as high as believed because appraisals had been inflated.

124. On October 22, 2008, the United States House of Representatives Committee on Oversight and Government Reform (defined herein as the "House Oversight Committee") heard testimony from Frank Raiter (the "Raiter Testimony"), the former Managing Director and head of Residential Mortgage-Backed Securities at S&P from March 1995 through April 2005. Raiter testified that the Ratings on S&P deals turn in part on the credit rating of the individual mortgages. It was from this credit analysis that S&P determined *(1) the expected default probability* of a loan and *(2) the loss that would occur in the event of a default* which, in turn, was used to establish the amount of AAA bonds that could be issued against the pool and amount of equity or "credit enhancement" needed to protect the AAA bonds from experiencing losses:

> A mortgages backed security consists of a pool of individual mortgage loans. Depending on the type of mortgage product (i.e., prime-jumbo, subprime, Alt-A or HEL) underlying a given security, the pool could consist of 1,000 to 25,000 loans. The ratings process consists of two distinct operations – the credit analysis of individual mortgages and a review of the documents governing the servicing of loans and the payments to investors in the securities.

> ***The credit analysis is focused on determining the expected default probabilities on each loan and the loss that would occur in the event of a default.*** These, in turn, establish the expected loss for the entire pool and determine the amount of AAA bonds that can be issued against the pool. It is analogous to your equity position in your home and the underlying mortgage.
>
> The loss estimate determines the equity needed to support the bond – it is intended to protect the AAA bonds from experiencing any losses, much the same as the homeowners' equity stake in a house protects the lender from loss in the mortgage loan.

Raiter Testimony at 3 (emphasis added).

125.    Raiter testified that in 1995, S&P developed a sophisticated model to estimate the default and loss of individual loans and pools – a model based on approximately 500,000 loans with performance data going back five or more years. This "LEVELS" Model was updated in early 1999 based on a database of 900,000 loans. Raiter testified further that ***"it was critical to maintain the best models as they were the linchpins of the rating process."*** (Raiter Testimony at 4 (emphasis added)). After the housing boom took off in 2001, S&P developed a far better model in 2001, with updated data in 2003 and 2004, based on approximately 9.5 million loans ***"covering the full spectrum of new mortgage products, particularly in AAA and fixed/floating payment type categories."*** *Id.*

126.    Nevertheless, S&P failed to implement this updated model, which, in Raiter's view, would have forewarned on the loan-losses from the new loan products, in particular:

> [T]he analysts at S&P had developed better methods for determining default which did capture some of the variations among products that were to become evident at the advent of the crisis. It is my opinion that had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses. That, in turn, should have caused the loss estimates mentioned above to increase and could have thus caused some of these products to be withdrawn from the market as they would have been too expensive to put into bonds.

Raiter Testimony at 4.

127.    As Raiter explained, the unfortunate consequences of continuing to use outdated versions of the rating model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."    S&P's current President, Deven Sharma, agreed, noting: "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work … [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

128.    Executives at Moody's also acknowledged a lack of investment in Moody's ratings models and the failure of Moody's ratings models to capture the decrease in lending standards.    In a confidential presentation to Moody's Board of Directors from October 2007, released by the House Oversight Committee on October 22, 2008 during the Committee's "Hearing on the Credit Agencies and the Financial Crisis" (the "House Oversight Committee Hearing"),[7] Raymond McDaniel, the current Chairman and CEO of Moody's, noted that underfunding can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment."    McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape. *Id.*    Brian Clarkson – the former President and Chief Operating Officer of Moody's – also recognized during a Moody's Town Hall on September 10, 2007, the transcript of which was released during the House Oversight Committee Hearing on October 22, 2008, Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decrease in underwriting standards]."

---

[7]    All exhibits released by the House Oversight Committee from the Committee's "Hearing on Credit Agencies and the Financial Crisis" can be found on the Committee's website at www.oversight.house.gov.

129.   Not only were Moody's and S&P's models based on outmoded data but they were often constructed by people who were not familiar with the housing markets in the areas that they were rating.  And, in some instances, real estate investments were graded by analysts who never actually reviewed the investment and who merely relied upon ratings assigned by a competitor ratings agency.

**E.   The Ratings Agencies Relaxed The Ratings Criteria Which Led To Artificially High Ratings For The Certificates**

130.   Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business.  In a September 25, 2008 article published by *Bloomberg*, titled "Race to Bottom at Moody's, S&P Secured Subprime's Boom, Bust," a former S&P Managing Director – Richard Gugliada – explained the easing of standards as a "'*market-share war where criteria were relaxed*'" and admitted, "'*I knew it was wrong at the time ... [i]t was either that or skip the business*.  That wasn't my mandate.  My mandate was to find a way. Find the way.'" According to Gugliada, when the subject of tightening S&P's ratings criteria came up, the co-director of CDO ratings, David Tesher, said: "Don't kill the golden goose." *Id.*

131.   The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney"), two S&P analysts, from April 5, 2007, that described S&P's rating of an investment similar to the Trusts and that was submitted during the House Oversight Committee Hearing:

> **Shah:** btw – that deal is ridiculous
>
> **Mooney:** i know right ... model def does not capture half of the rish [sic]
>
> **Mooney:** *risk*
>
> **Shah:** we should not be rating it
>
> **Mooney:** we rate every deal
>
> **Mooney:** it could be structured by cows and we would rate it

**Shah:** but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

132.    In an email sent on December 5, 2006, released during the House Oversight Committee Hearing, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the "[r]ating agencies continue to create and [sic] *even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters.*"

133.    On October 28, 2008, former Moody's Managing Director Jerome S. Fons ("Fons") testified before the House Oversight Committee (hereinafter "Fons Testimony").  Fons had been an Executive at Moody's for 17 years, in various positions including Managing Director of Credit Policy.  Fons testified that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

134.    Fons explained that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "*typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality.*" (Fons Testimony, at 3.)  Fons noted that the rating agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  *Id.*  Fons said it was this business model that "*prevented analysts from putting investor interests first.*"  *Id.*

135.    Raymond McDaniel, the current CEO of Moody's, also acknowledged the degradation of ratings standards.  In the same confidential presentation to Moody's Board of Directors in October 2007, cited *supra*, McDaniel told the Board: "The real problem is not that

the market ... underweights ratings quality but rather that in some sectors, it actually penalizes quality ... It turns out that *ratings quality has surprisingly few friends*."  He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'"  In fact, *The Wall Street Journal,* in an article published on April 24, 2007, found that in at least one instance, Moody's increased the proportion of AAA ratings within a mortgage after its client complained and said it might go with a different rating firm.

**F.     The Prospectus Supplements Did Not**
**        Reflect The True Risk of The Certificates**

136.     The Ratings Agencies rated the Certificates based in large part on data about each mortgage loan that Credit Suisse provided to them – including appraisal values, LTV ratios, and borrower creditworthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels.  As discussed above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting addressed in this Complaint.  Neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities).  Nor did they seek representations from sponsors that due diligence had been performed.  During Moody's September 2007 "Town Hall Meeting," hosted by Moody's Managing Director, Raymond McDaniel, executives at Moody's acknowledged that the Ratings Agencies used inaccurate data to form their ratings:

> We're on notice that a lot of things that we relied on before just weren't true...
> [W]e relied on reps and warrantees that no loans were originated in violation of
> any state or federal law.  We know that's a lie.

*        *        *

There's a lot of fraud that's involved there, things that we didn't see...We're sort of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis.

*          *          *

[W]e're being asked to figure out how much everyone lied. ... [I]f all of the information was truthful and comprehensive and complete, we wouldn't have an issue here ...

What we're really being asked to do is figure out how much lying is going on and bake that into a credit ... which is a pretty challenging thing to do.  I'm not sure how you tackle that from a modeling standpoint.

Moody's Town Hall Meeting Transcript, at 16, 58.

137.    In response to the "Town Hall Meeting," a Moody's employee noted:

[W]hat really went wrong with Moody's sub prime ratings leading to massive leading to massive downgrades and potential more downgrades to come? We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets.  As for #1, it seems to me that *we had blinders on and never questioned the information we were given*. Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan?  As for #2, *it is our job to think of the worst case scenarios and model them ... Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both*.

Moody's Town Hall Meeting Transcript, at 79 (emphasis added).

138.    Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk, and the Certificates were given investment grade ratings when in reality they were not of investment grade quality.  These artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

**G.     The Offering Documents Failed To Disclose
        Credit Suisse's Ratings Shopping Practices**

139.    The Registration Statement disclosed the engagement of Ratings Agencies but

omitted disclosure of the manner in which the Ratings Agencies were engaged – so-called Rating

Shopping.  As noted, the SEC Report set forth that S&P and Moody's engaged in the practice of

"ratings shopping," as indicative of one of the practices which may have pressured Ratings

Agencies to issue faulty ratings for MBS.  (¶¶ 147-150).

140.    In June, 2008, the New York State Attorney General's Office announced that after

an investigation of the Ratings Agencies in the context of mortgage-backed securities, it had

reached an agreement with S&P, Moody's and Fitch which contemplated a complete overhaul of

the then-current ratings procedures and guidelines and to put an end to what had been termed

"ratings shopping."  Instead of investment banks looking to issue mortgage-backed bonds going

to all three agencies for a review, but only use, and pay for, the most optimistic rating, the

agencies now will get paid up front regardless if they are hired to assign a rating, a move

expected to remove any potential for conflicts of interest.

141.    As set forth above, in Fons' Testimony before the House Oversight Committee,

he explained that Moody's provided inadequate ratings on RMBS because of conflicts of interest

and being forced to "bid" or "shop" its ratings to obtain engagements:

> Why did it take so long for the rating agencies to recognize the problem?  Why
> were standards so low in the first place?  And what should be done to see that this
> does not happen again?
>
> ***My view is that a large part of the blame can be placed on the inherent conflicts
> of interest found in the issuer-pays business model and rating shopping by
> issuers of structured securities.***  A drive to maintain or expand market share
> made the rating agencies willing participants in this shopping spree.  It was also
> relatively easy for the major banks to play the agencies off one another because of
> the opacity of the structured transactions and the high potential fees earned by the
> winning agency.  Originators of structured securities typically chose the agency

56

with the lowest standards, engendering a race to the bottom in terms of rating quality.  While the methods used to rate structured securities have rightly come under fire, in my opinion, the business model prevented analysts from putting investor interests first.

Fons Testimony, at 3 (emphasis added).

142.   In further testimony at the October 22, 2008 House Oversight Committee

Hearing, Managing Director of Egan-Jones Rating Co., Sean J. Egan ("Egan"), stated, in part:

> Assigning ratings on structured finance bonds differs from the process for corporate and municipal bonds.  In the unsecured corporate and municipal markets, debt issuers are subject to being rated by all of the rating agencies because financial information is publicly available to all parties.  The structured finance market has been a "rating by request" market where the debt issuers invite some or all of the major rating agencies to preview the collateral pools so the rating agencies can provide preliminary rating indications that can be used to size the bond classes and structure the bond transactions.
>
> ***Historically, all of the rating agencies have agreed to bow out of the rating process if they are not actually selected by the debt issuer to rate a securities transaction.  This has encouraged the debt issuers to shop for the best ratings so they can optimize their securitization proceeds.***

Testimony of Sean J. Egan, House Oversight Committee Hearing, October 22, 2008, at 9 (emphasis added).

## H.   The Offering Documents Failed To Disclose The True Roles of Ratings Agencies In Forming And Structuring The Certificates For Sale As Primarily AAA Securities

143.   In the April 2008 issue of *Mortgage Banking*, critics began to note the role of the

Ratings Agencies in providing "structuring advice:"

> But serious concerns have also been voiced by members of Congress about whether the CRAs' business model--where the large investment banks that underwrite mortgage-backed securities (MBS) and collateralized debt offerings actually pay to have their deals rated by the agencies, and the agencies in turn provide feedback to the underwriters on how to boost their deals' credit rating to the highly coveted triple-A status – may have prejudiced their objectivity and integrity.
>
> "It seems to me that the credit-rating agencies are playing both coach and referee," said Sen. Robert Menendez (D-New Jersey), during a September 2007

hearing by the Senate Banking Committee on the collapse of the subprime market.

Critics also argue that the CRAs are actively involved in the structuring of RMBS and CDO deals, and thus can hardly claim that their ratings are merely "opinions" on the likelihood that a debt security might go into default – or, as one agency official has called them, "the world's shortest editorials."

Joseph Mason, an associate professor of finance at Drexel University in Philadelphia and a former economist at the Office of the Comptroller of the Currency (OCC), says *it is indisputable that the CRAs provide underwriters with "active structuring advice" on how to get a triple-A credit rating for their deals. While the CRAs insist they're merely providing information to the investment bankers during the underwriting process, Mason says they're trying to draw "an artificial line between advice and communication."*

(Emphasis added).

144.    As reported in the *International Herald Tribune* on June 1, 2007, the Ratings Agencies did "much more than evaluate [MBS instruments] and give them letter grades," they played an "integral role" in structuring the transactions and instructing the assemblers "how to squeeze the most profit out" of the MBS by maximizing the tranches with the highest ratings. Now, it is evident that these credit ratings agencies indirectly and directly participated in and took steps necessary to the distribution of mortgage pass-through certificates and other MBS.

145.    An article appearing in *The Financial Times* on October 17, 2008 entitled "When Junk Was Gold," addressed the unique role of the Ratings Agencies in structured finance deals such as mortgage backed securities:

The first mortgage-backed bonds were created in the late 1980's, well before Clarkson's time, by a trader called "Lewie" Ranieri. Ranieri, the head of the mortgage trading desk at the former investment bank Salomon Brothers, was famous for the huge sums of money he netted for his employer and for the quantity of cheeseburgers he ate. What he struck upon in structured finance was a process of pure alchemy: a way of turning myriad messy mortgage loans into standardized, regimented and easy-to-assess bonds.

Ranieri knew that the magic of structuring was in the packaging. Packaged in the right way, mortgages could come to create a huge, new tradable bond market.

And this is where the rating agencies came in.  Structured bonds, like any other bond, needed ratings in order to be sold.  ***But with a structured bond, the pools of debt could be built or modified in order to attain a particular rating.  This wasn't a matter of disguising the risk, rather a way of reapportioning it and allowing investors with different risk appetites to buy the right product for them.  "The rating is what gives birth to the structure in the first place," explains Sylvain Raynes, a financial modeling expert who was with Moody's in the 1990s, when Clarkson joined.  In some cases, the ratings are known before the bonds have even been inked.  "You start with a rating and build a deal around a rating," Clarkson told an investment magazine last year.***

(Emphasis added).

146.   The actual role of the Ratings Agencies in structuring the securitizations first began to emerge in an article appearing on *Conde Naste's Portfolio.com* in September 2007. The article described a presentation that Moody's gave to a group of Russian investors in 2006 where Moody's explained the "interative" process of MBS securitization where Moody's gave "feedback" to underwriters before the bonds were issued as follows:

Moody's revealed a significant, and ultimately more dangerous, role that the agencies play in financial markets.  ***The slides detailed an "iterative process, giving feedback" to underwriters before bonds are even issued.  They laid out how Moody's and its peer's help their clients put together complicated mortgage securities before they receive an official ratings stamp.***  But this give-and-take can go too far: Imagine if you wanted a B-plus on your term paper and your high-school teacher sat down with you and helped you write an essay to make that grade.

***The [investors] had just been let in on one of the dirtiest open secrets in the mortgage-ratings world, one that may have played a part in creating the housing bubble that's now popping: The ratings agencies have had a bigger role in the subprime-mortgage meltdown than most people know.  So far, irate investors have focused on—and upcoming congressional hearings and investigations will probe – the agencies' overly optimistic ratings for packages of subprime mortgages, many of which are now – blowing up.  It's becoming clear that the ratings agencies were far from passive raters, particularly when it came to housing bonds.  With these, the agencies were integral to the process, and that could give regulators and critics the ammunition they've been looking for to finally force the Big Three to change.***  The credit-ratings agencies "made the market. Nobody would have been able to sell these bonds without the ratings," says Ohio attorney general Marc Dann, who is investigating the agencies for

possibly aiding and abetting mortgage fraud. "That relationship was never disclosed to anybody."

(Emphasis added).

147.    The Ratings Agencies' unique role in influencing the structure of the securitization was more fully discussed in the July 2008 SEC Report. The SEC Report confirmed that S&P and Moody's provided "feed back" to the Sponsor of the Offerings as to the structure, which would result in the highest rating:

> The three examined rating agencies generally followed similar procedures to develop ratings for subprime RMBS and CDOs. ***The arranger of the RMBS initiates the ratings process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence),*** the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each RMBS trance issued by the trust. Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. ***The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche – as the highest rated tranche – pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.***

(Emphasis added).

## I.    The Offering Documents Failed To Disclose Material Financial Conflicts of Interest Between Credit Suisse And The Ratings Agencies

148.    The Offering Documents make no mention of the material financial conflicts of interest between Credit Suisse and the Ratings Agencies, including the fact that the analysts involved in rating were also involved in the rating fees or the Ratings Agencies' business interests. The SEC Report confirmed significant undisclosed conflicts of interest which incented ratings agencies to issue inflated ratings. The SEC Report found, in violation of SEC Rules,

"key participants" in the securitization process negotiated fees the rating agency would receive in exchange for their high ratings. (SEC Report at 23-24).

149.    The SEC noted, *inter alia*, that analysts are "aware" of the rating firm's "business interests when securing the rating of the deal" as follows:

- ***While each rating agency has policies and procedures restricting analysts from participating in fee discussions with issuers,*** these policies still allowed key participants in the ratings process to participate in fee discussions.

- Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal. The Staff notes multiple communications that indicated that some analysts were aware of the firm's fee schedules, and actual (negotiated) fees. There does not appear to be any internal effort to shield analysts from emails and other communications that discuss fees and revenue from individual issuers.

- ***"Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."***

SEC Report at 24-25 (emphasis added).

150.    The July 2008 SEC Report found that a number of factors unique to the rating of RMBS may have "exacerbated" the effect of conflicts of interest inherent in the fact that the issuer or arranger pays for the ratings. These factors include that the arranger of the deal has:

- ***"More flexibility to adjust the deal to obtain a desired credit rating as compared to arrangers of non-structured asset classes."***

- "Second, there is a high concentration in the firms conducting the underwriting function… While 22 different arrangers underwrote subprime RMBS deals, 12 arrangers accounted for 80% of the deals, in both number and dollar volume."

- With a fast-changing market, rating processes are frequently and quickly changed. The high concentration of arrangers with the influence to determine the ***choice of rating agency heightened the inherent conflicts in the "issuer pays" compensation model.*** Compensation is calculated by volume of deals and total dollar volume, as a result arrangers prefer fast and predictable ratings processes.

- Ratings Agencies may be pressured by arrangers to produce a more *favorable outcome or reduce credit enhancement levels,* thus reducing *the cost of the debt for a given level of cash inflows from the asset pool.* When the arranger also sponsors the RMBS or CDO trust, pressure can influence an agency's decision to update a model when the update would lead to a less favorable outcome.

- *High profit margins may have provided an incentive for rating agencies to encourage the arrangers to route future business its way.* Unsolicited ratings were not available to provide independent checks on the rating agencies' ratings, nor was information regarding the structure of the security or portfolio of assets readily available to parties unrelated to the transaction, especially before issuance.

SEC Report at 31-33 (emphasis added).

151. As reported in *The Washington Post* on June 6, 2008, the New York State Attorney General's Office announced that it had reached an agreement with the credit-rating companies, S&P, Moody's and Fitch to:

> … change the way they evaluate mortgage securities that have roiled financial markets for the past year.
>
> The deal with Moody's Investors Service, Standard & Poor's and Fitch Ratings aims to restore confidence among investors -- who saw top-rated securities lose much of their worth in a matter of months -- by revising how the agencies are paid for issuing ratings. The agreement also requires credit-rating agencies to direct investment banks to provide them with more data on the pools of mortgages that make up the bonds.
>
> The agencies have been under fire for the role they played in the subprime mortgage crisis by awarding top ratings to securities that soured. Regulators and investors have alleged that the agencies have a conflict of interest because they are paid by the investment banks issuing the securities, thus encouraging the credit agencies to give high ratings to win business.
>
> The agreement seeks to end this practice by having the issuers pay the credit-rating agencies at four points during the rating process, not just at the end when the rating is given.
>
> Credit-rating agencies will also be required to disclose information about all securities submitted for review, allowing investors to determine whether issuers sought, but subsequently decided not to use, ratings from a specific agency. This will allow investors to see whether investment banks shopped around for the

agency that would give their securities the best rating, said Andrew M. Cuomo, New York's attorney general.

152.    The NYAG further stated that:

"The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities," Cuomo said in a statement.  "By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and increasing industry-wide transparency, these reforms will address one of the central causes of that collapse."

*Id.*, at 2.

153.    In or about July 2008, both Moody's and S&P sought to make internal changes to reform the conflicts of interest problems identified by the SEC.  In a *Reuters* article, S&P Draws Criticism as Sets Ratings Reform, published on July 2, 2008, it was reported that S&P had "unveiled an overhaul of its ratings process on Thursday, responding to widespread criticism of the quality and accuracy of credit ratings" and had:

… [a]nnounced 27 steps that its aid would boost confidence in credit ratings.  It came on the heels of planned reforms announced this week by its major rivals, [Moody's and Fitch].

Ratings agencies have come under fire from regulators and investors who say they helped precipitate the U.S. subprime mortgage crisis and credit tightening that began in 2007.

"The supposed reforms announced today by Standard & Poor's and by Moody's on Tuesday are too little, too late," New York State Attorney General Andrew Cuomo said in a statement.  "Both S&P and Moody's are attempting to make piecemeal change that seem more like public relations window-dressing than systematic reform."  He pledged to continue investigating their roles in the mortgage crisis.

Critics say the agencies at first assigned high ratings to hundreds of billions of dollars of securities linked to low-quality debt, only to exacerbate market turmoil by later rapidly downgrading many of those same securities.

This has contributed to write-downs piling up in the financial industry, hurting stock prices and causing losses in a variety of pension and mutual funds.

**VI.**

**MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS**

A.     **Material Misstatements And Omissions**
           **Regarding Mortgage Loan Underwriting Guidelines**

        1.       **Registration Statement Misstatements Regarding Underwriting**

154.    The August 10, 2006 Registration Statement also described that generally the adequacy of the property financed by the loan will have been determined by an appraisal according to guidelines as follows:

> The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. The underwriting criteria applied by the originators of the loans included in a pool may vary significantly among sellers. The accompanying prospectus supplement will describe most aspects of the underwriting criteria, to the extent known by the depositor, that were applied by the originators of the loans. In most cases, the depositor will have less detailed information concerning the origination of seasoned loans than it will have concerning newly-originated loans.
>
> The underwriting standards of any particular originator typically include a set of specific criteria by which the underwriting evaluation is made. However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually. Rather, a loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards. ***For example, a loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the loan is considered to be in substantial compliance with the underwriting standards.***

HEMT 2006-5 Prospectus Supplement, Base Prospectus dated October 27, 2006 at 31.

155.    ***Omitted Information:*** In fact, Credit Suisse and DLJMC did not attempt to confirm the standards actually used by mortgage brokers, correspondents and other third parties from which they acquired mortgages. These third parties were able to engage in serious

underwriting deficiencies with, at most, a limited review of a small percentage of the loan pool at the time of auction.  Higher deal fees and more profitable conditions motivated Credit Suisse to avoid investigating too many of the loans.  At most 5% of the loan pool was investigated before Credit Suisse purchased the loans at auction allowing a substantial amount of bad loans to escape inspection.  Further, with Credit Suisse's use of the Dealmaker software, the loans became numbers blindly plugged into a computer with little or no attention paid to the underlying collateral.

156.    According to stated underwriting guidelines, borrowers were required to submit applications to the originators that were then verified for creditworthiness.  For example, the August 10, 2006 Registration Statement provided:

### Loan Application of Credit Information Generally Required

Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.

Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income.

HEMT 2006-5 Prospectus Supplement, Base Prospectus dated October 27, 2006 at 32.

157.    **_Omitted Information:_** Credit Suisse, DLJMC and independent originators were not nearly as thorough in getting documentation from or about borrowers as the statement implied.   The emphasis was on getting loans done which allowed underwriters to overlook substantial flaws in a borrower's application.

158.    Moreover, the Registration Statement further stated:

> The mortgage loans have been originated under "full" or "alternative," "reduced documentation," "stated income/stated assets" or "no income/no asset" programs. The "alternative," "reduced," "stated income/stated asset" and "no income/no asset" programs generally require either alternative or less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories.   Generally, an "alternative" documentation program requires information regarding the mortgagor's income (_i.e._, W 2 forms, tax returns and/or pay stubs) and assets (_i.e.,_ bank statements) as does a "full doc" loan, however, alternative forms of standard verifications are used. Generally, under both "full" and "alternative" documentation programs at least one year of income documentation is provided. Generally, under a "reduced documentation" program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator.  Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no income/no asset" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator.  ***The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.***

CSMSCo, Registration Statement Form S-3/A (August 10, 2006) at 45; _see also,_ HEMT 2006-5, Prospectus Supplement, Base Prospectus dated October 27, 2006, at 31. (Emphasis added).

159.    **_Omitted Information:_** These programs allowing for deficiencies in income documentation made accurate and reliable appraisals essential since so much emphasis was placed on the value of the mortgaged property.   However, appraisers were in fact pressured to appraise to certain levels.   Appraisers knew if they appraised under certain levels they would not

be hired again.  Thus, the appraisals were inherently unreliable and there was little to support the value and adequacy of the mortgaged property.

160.    The Registration Statement, with regard to appraisals of the mortgaged property, also provided:

> The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.
>
> Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre established appraisal procedure guidelines established by the originator.  The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.  Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

CSMSCo, Registration Statement Form S-3/A (Aug. 10, 2006), at Preliminary Prospectus Version No. 4, at 41; *see also,* HEMT 2006-5 Prospectus Supplement, Base Prospectus dated October 27, 2006.

161.    ***Omitted Information:***  These statements were materially false and misleading since appraisal standards were largely disregarded and the values of the underlying mortgage properties were in many instances inflated in the loan underwriting process.

2.      **Prospectus Supplement Statements Regarding New
Century's Stated Mortgage Loan Underwriting Guidelines**

162.    The underlying loan collateral for a certain number of the Issuing Trusts[8] was

originated principally pursuant to New Century's underwriting guidelines.   The Prospectus

Supplement for HEMT 2006-5, issued October 30, 2006, described the underwriting guidelines

used by New Century in originating the Certificate Collateral.

> The New Century Underwriting Guidelines are primarily intended to assess the
> borrower's ability to repay the related mortgage loan, to assess the value of the
> mortgaged property and to evaluate the adequacy of the property as collateral for
> the mortgage loan.    All of the New Century mortgage loans were also
> underwritten with a view toward the resale of the mortgage loans in the secondary
> mortgage market.   While New Century's primary consideration in underwriting a
> mortgage loan is the value of the mortgaged property, New Century also
> considers, among other things, a mortgagor's credit history, repayment ability and
> debt service-to-income ratio, as well as the type and use of the mortgaged
> property.   The New Century mortgage loans, in most cases, bear higher rates of
> interest than mortgage loans that are originated in accordance with Fannie Mae
> and Freddie Mac standards, which is likely to result in rates of delinquencies and
> foreclosures that are higher, and that may be substantially higher, than those
> experienced by portfolios of mortgage loans underwritten in a more traditional
> manner.   As a result of New Century's underwriting criteria, changes in the values
> of the related mortgaged properties may have a greater effect on the delinquency,
> foreclosure and loss experience on the mortgage loans than these changes would
> be expected to have on mortgage loans that are originated in a more traditional
> manner.   No assurance can be given that the values of the related mortgaged
> properties have remained or will remain at the levels in effect on the dates of
> origination of the related mortgage loans.   In addition, there can be no assurance
> that the value of the related mortgaged property estimated in any appraisal or
> review is equal to the actual value of that mortgaged property at the time of that
> appraisal or review.

HEMT 2006-5 Prospectus Supplement, October 30, 2006, at S-28.

163.    ***Omitted Information:*** These statements were materially false and misleading

because they failed to disclose that the issues of borrower creditworthiness were largely

disregarded.   Beginning in 2003, New Century began abandoning prudent lending standards in

---

[8]       The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated, in
part by New Century were HEMT 2006-5 and HEMT 2007-2.

order to "push more loans through the system."  The Company's approach was to originate enough loans so that they could outrun their own delinquency rates.  The lax controls led to the substantial increase of early payment defaults in 2004 as the Company stressed quantity over quality of loans which did not stop until the Company was under SEC investigation for their underwriting practices.

164.    The Prospectus Supplement for HEMT 2006-5 also provided that:

**Credit Report and Standard Appraisal Required**

Each applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  **The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company.**  The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments.  Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  *All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of New Century or by an appraiser retained by New Century.*

*Id*., at S-29. (Emphasis added).

165.    ***Omitted Information:*** Appraisal standards were largely disregarded and the values of the underlying mortgage properties were in many instances inflated in the loan underwriting process.  As discovered by the Bankruptcy Examiner, many of the appraisals used to value the homes had deficiencies.  In cases where appraisers did weed out the bad loans, account executives overturned their decisions finding another appraiser to sign off on it.  In some

instances, salesmen used threats and intimidation to keep appraisers from "cutting their deal" by kicking out bad loans.

166.    Describing New Century's various documentation programs, the Prospectus Supplement for HEMT 2006-5 provided that:

> ***The New Century mortgage loans were originated consistent with and generally conform to the New Century Underwriting Guidelines' full documentation, limited documentation and stated income documentation residential loan programs. Under each of the programs, New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property.*** In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the New Century Underwriting Guidelines that generally is equal to the interest rate on that loan. The New Century Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires New Century's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, currently supports the outstanding loan balance.

> The New Century Underwriting Guidelines require that the income of each applicant for a mortgage loan under the full documentation program be verified. The specific income documentation required for New Century's various programs is as follows: under the full documentation program, applicants usually are required to submit one written form of verification of stable income for at least 12 months from the applicant's employer for salaried employees and 24 months for self-employed applicants; under the limited documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal checking account bank statements, and under the stated income documentation program, an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant meets certain criteria. All the foregoing programs require that, with respect to salaried employees, there be a telephone verification of the applicant's employment. Verification of the source of funds, if any, that are required to be deposited by the applicant into escrow in the case of a purchase money loan is required.

*Id.,* at S-32. (Emphasis added.)

167.   *Omitted Information:* New Century did not verify the income of borrowers as represented.  New Century was very liberal with terms even to borrowers with low credit scores.  In fact, as the Bankruptcy Examiner found, more than 40% of the loans originated by New Century were underwritten on a stated income basis, often referred to as "no-doc" or "liars' loans."

168.   New Century's own practices allowed for exceptions to the standard guidelines where certain factors were present.   For example, the HEMT 2006-5 Prospectus Supplement provided that:

### **Exceptions Permitted Where "Compensating Factors"**

As described above, the foregoing categories and criteria are guidelines only. On a case by case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc.   An exception may be allowed if the application reflects compensating factors, such as: low loan-to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years. An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more.   Accordingly, a mortgagor may qualify in a more favorable risk category than, in the absence of compensating factors, would satisfy only the criteria of a less favorable risk category. It is expected that a substantial portion of the New Century mortgage loans will represent these kinds of exceptions.

*Id.*

169.   *Omitted Information:* Exceptions to the underwriting criteria were granted not only when compensating factors existed but were liberally granted to achieve loan volume.  The emphasis was more focused on generating loan volume than ensuring that borrowers would and could repay their loans.  New Century's practices were so aggressive and its controls so poor,

that the Company's lenders cut off their financing in March 2007, forcing the Company into bankruptcy.

### 3.   Prospectus Supplement Statements Regarding AHL's Stated Mortgage Loan Underwriting Guidelines

170.   The underlying loan collateral for a certain number of the Issuing Trusts[9] was originated principally pursuant to the underwriting guidelines of AHL.  The HEMT 2006-6 Prospectus Supplement, dated December 28, 2006, described the underwriting guidelines used by AHL in originating the Certificate Collateral.

> Each mortgage loan originated or acquired by Accredited is underwritten prior to loan closing, or re-underwritten after loan closing but prior to purchase by Accredited, in accordance with Accredited's underwriting guidelines. Accredited's underwriting process is intended to assess a mortgage loan applicant's credit standing and repayment ability and the value and adequacy of the real property security as collateral for the proposed mortgage loan.  All underwriting and re-underwriting is performed by Accredited's underwriting personnel, and Accredited does not delegate underwriting authority to any broker, correspondent or other mortgage loan provider.  Accredited's underwriting standards are applied in a standardized manner which complies with applicable federal and state laws and regulations
>
> All of Accredited's prospective mortgage brokers and correspondents are subjected to a pre-approval process, including verification that all required licenses are current, and are required to sign agreements pursuant to which they represent and warrant compliance with Accredited's underwriting guidelines and all applicable laws and regulations.  Accredited periodically reviews each of its mortgage broker's and correspondent's performance  relative to issues disclosed by Accredited's quality control review, and discontinues relationships with unacceptable performers.

HEMT 2006-6, Prospectus Supplement, December 28, 2006, at S-33.

171.   ***Omitted Information:*** Accredited often relaxed underwriting guidelines in an effort to increase loan volume.  Where underwriters denied a borrower's application based on poor credit, managers and senior executives would often overturn their decisions.  As early as

---

[9]      The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated, in part by Accredited were HEMT 2006-6 and HEMT 2006-4.

2005, overrides were so pervasive that the company needed a tracking system to follow this type

of loan alone.

172.    Accredited's underwriting guidelines required a credit report for each prospective

borrower. For example, the Prospectus Supplement for HEMT 2006-6 provided that:

**Credit Report Required**

Each prospective mortgagor completes a mortgage loan application that includes
information with respect to the applicant's liabilities, income, credit history,
employment history and personal information.  At least one credit report on each
applicant from an independent, nationally recognized credit reporting company is
required.  The credit report typically contains information relating to such matters
as credit history with local and national merchants and lenders, installment debt
payments and any record of defaults, bankruptcies, repossessions, or judgments.
All derogatory credit items occurring within the preceding two years and all credit
inquiries within the preceding 90 days must be addressed by the applicant to the
satisfaction of Accredited.

*Id.*

173.    ***Omitted Information:*** Lending officers were regularly satisfied about adverse

information in a borrower's credit report by ignoring such adverse information.  AHL's focus on

increasing loan volume caused its consideration of borrowers' repayment ability to be cursory at

best.   Further, with AHL's practice of overrides, an underwriter's denial of a borrower's

application was readily overturned.

174.    In addition to assessing the creditworthiness of each borrower, Accredited's

guidelines required a full appraisal by an independent appraiser of the proposed collateral. For

example, the HEMT 2006-6 Prospectus Supplements provided that:

**Appraisal Required**

A full appraisal of the property proposed to be pledged as collateral is required in
connection with the origination of each first priority mortgage loan and each
second priority mortgage loan greater than $50,000.  Appraisals are performed by
licensed, third-party, fee-based appraisers and include, among other things, an
inspection of the exterior and interior of the subject property.  Appraisals are also

73

required to address neighborhood conditions, site and zoning status and the condition and value of improvements.  Following each appraisal, the appraiser prepares a report which includes a reproduction costs analysis (when appropriate) based on the current cost of constructing a similar home and market value analysis based on recent sales of comparable homes in the area.  Appraisals generally conform to the Uniform Standards of Professional Appraisal Practice and must be on forms acceptable to Freddie Mac and Fannie Mae.  Every appraisal is reviewed by a non-affiliated appraisal review firm or by Accredited's Appraisal Review Department or a qualified underwriter before the mortgage loan is closed.  The appraisal may not be more than 180 days old on the day the mortgage loan is funded.  A second full appraisal is required for combined mortgage loan amounts and/or property values greater than $1,000,000.  For second priority mortgage loans of $50,000 or less, "drive-by" appraisals alone are acceptable.  The standard appraisal may be waived in favor of an Insured Automated Value Model (AVM) with a physical inspection, provided the mortgage loan meets certain criteria.  The Insured AVM is effective for the life of the mortgage loan, is transferable, and provides an unbiased opinion of the property value.  The Insured AVM process includes a Property Condition Report which is a drive-by inspection that verifies the collateral is conforming.  The insurance certificate provides protection that minimizes loss severity in the event of Foreclosure.

*Id.*

175.    ***Omitted Information:*** The appraisals were not performed and reviewed in line with the standards implied, but instead, were cursory in nature.  In fact, many of AHL's loans were not subject to independent appraisal at all but instead were fed through computer programs which ignored many of the factors that would have ultimately led to Accredited not originating the loan.  The supposedly "independent" appraisers knew they would likely not be hired again if they did not come back with a certain appraised value.  The prepared appraisal reports were manipulated and falsified in order to satisfy the Company's standards.  Those loans that were denied by "independent appraisers" were often overturned and accepted by the appraisers' managers.

176.    Not all of the loans originated by Accredited were created in an identical manner.  The originator employed several different programs, all with different verification requirements,

to originate the loans included in this securitization.  For example, as provided in the Prospectus Supplement for HEMT 2006-6:

### Documentation Required

Accredited's underwriting guidelines require verification or evaluation of the income of each applicant pursuant to Accredited's "Full Documentation," "Lite Documentation" or "Stated Income" programs.  Under each of these programs, Accredited reviews the mortgage loan applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, and calculates debt service-to-income ratios to determine the applicant's ability to repay the mortgage loan.  Under the Full Documentation program, applicants are generally required to submit the most current year-to-date pay stub and written verification of income signed by the employer, Forms W-2 or 1040 and, in the case of self-employed applicants, most recent two years' complete tax returns, signed year-to-date profit and loss statement, or bank statements.  Personal bank statements are acceptable as Full Documentation, with bank statements for the preceding 24 months acceptable for "Alt2" documentation type or bank statements for the preceding 12 months acceptable for "Alt1."  Under the Lite Documentation program, applicants must be self-employed and are required to submit personal bank statements covering at least the preceding six months.  Under the Stated Income program, applicants are evaluated based upon income as stated in the mortgage loan application.  Under all programs, Accredited may verify by telephone employment, business and income, and self-employed applicants may be required to submit a business license.

Verification of the source of funds (if any) required  to be paid by the applicant at closing is generally required under all documentation  programs in the form of a standard verification of deposit, two months' consecutive bank statements or other acceptable documentation.  On Accredited's core mortgage loan products and on some of its specialty products, twelve months' mortgage payment or rental history must be verified by the related lender or landlord.

HEMT 2006-6, Prospectus Supplement, December 28, 2006, at 34.

177.  ***Omitted Information:*** Accredited rarely verified borrower income to the extent stated in their guidelines.  As a former employee stated, "if the borrower breathed, he got the loan" from Accredited.  Further, because of the 2006 change in Accredited's compensation policy, account executives were compensated regardless of loan quality, removing any incentive the underwriters and their managers had to verify borrower documentation.

178.   The HEMT 2006-6 Prospectus Supplement also described the Loan-to-Value ratios that Accredited would offer to different types of prospective borrowers.

**LTV Decrease With Credit Quality**

In general, Accredited's LTV maximums decrease with credit quality, and, within each credit classification, the LTV maximums vary depending on the property type.  LTV maximums for mortgage loans secured by owner-occupied properties are higher than for mortgage loans secured by properties that are not owner-occupied.  LTV maximums for Lite Documentation and Stated Income programs are generally lower than the LTV maximums for corresponding Full Documentation programs.  Accredited's maximum debt-to-income ratios range from 50% to 55% for Full Documentation programs, and maximum 50% for Lite Documentation and Stated Income Programs.

Accredited offers a variety of specialty programs that provide higher LTV's and CLTV's to borrowers in higher credit grades.  Credit grades may be determined by the same criteria as in the core programs, but may also be determined only on the basis of mortgage credit or credit score.  Specialty programs may be restricted as to property and occupancy types and documentation requirements.

*Id.,* at 34-35.

179.   ***Omitted Information:***   In reality, Accredited approved borrowers at all credit scores.  The effort to increase loan volume was so pervasive that the originator would approve loans to borrowers one day out of bankruptcy.  Accredited also gave 100% LTV loans to many borrowers regardless of the borrower's creditworthiness.

180.   Accredited's guidelines allowed for exceptions to be made to their stated underwriting standards but only in the presence of other compensating factors.  The HEMT 2006-6 Prospectus Supplement provided that:

**Exceptions Where Compensating Factors**

Accredited may allow exceptions to its underwriting guidelines in accordance with Accredited's established exception policy.  Exceptions may be allowed based upon the presence of compensating factors such as a low LTV, demonstrated pride of ownership and stability of employment.

*Id.,* at 35.

181.   ***Omitted Information:*** Exceptions to the underwriting criteria were granted not only when compensating factors existed but were liberally granted to achieve loan volume. Where underwriters had determined that no "compensating factors" existed, Accredited's managers would override their decisions and approve the loan.   The improper monitoring finally stopped when skyrocketing borrower defaults almost forced Accredited into bankruptcy before Lone Star Funds purchased the lender.

**B.      Registration Statement Omitted Information**
         **Regarding Delinquencies As of The Cut-Off Date**

182.   The Registration Statement contained a section which described the percentage of delinquencies at a cut-off date just prior to the Offering date.  The precise figures were left blank. Each of the HEMT Prospectus Supplements contained the identical language that none of "the initial loans were 30 or more days delinquent as of:

...August 1, 2006."

HEMT 2006-4, Prospectus Supplement, August 28, 2006, at S-21.

...October 1, 2006"

HEMT 2006-5, Prospectus Supplement, October 30, 2006, at S-23.

... the closing date." (*i.e.,* December 27, 2006)

HEMT 2006-6, Prospectus Supplement, December 28, 2006, at S-19.

...the closing date." (*i.e.*, April 20, 2007)

HEMT 2007-2, Prospectus Supplement, April 27, 2007, at S-21.

183.   ***Omitted Information:*** These statements masked the true impaired nature of the collateral since the delinquency rates for these loan pools followed the same pattern of skyrocketing delinquencies immediately following the Offering dates.

184.    In the four months after the 2006-4 Offering, the rate of delinquencies of 30 days or more increased from 0% to 3.89% of the balance of the mortgage collateral; in the four months after the 2006-5 Offering, the rate of delinquencies of 30 days or more increased from 0% to 5.15% of the balance of the mortgage collateral; in the four months after the 2006-6 Offering, the rate of delinquencies of 30 days or more increased from 0% to 4.00% of the balance of the mortgage collateral; and in the four months after the 2007-2 Offering, the rate of delinquencies of 30 days or more increased from 0% to 6.87% of the balance of the mortgage collateral.

**C.    Registration Statement Misstatements and Omissions Regarding Credit Support**

185.    With respect to Credit Support, the Registration Statement provided as follows:

> Credit enhancement for all of these certificates will be provided by subordinated certificates; overcollateralization represented by the excess of the balance of the mortgage loans over the balance of the Class A Certificates…

CSMSCo, Registration Statement Form S-3/A, August 10, 2006, at Preliminary Prospectus Version No. 2, at 74-75.

186.    Furthermore, the Prospectus Supplement for HEMT 2006-4 provided that Credit Enhancement would include:

- Subordination provided by the mezzanine and subordinate certificates to the senior certificates.
- Subordination provided to the mezzanine certificates by the mezzanine certificates lower in priority and subordinate certificates and subordination provided to the subordinate certificates by the subordinate certificates lower in priority.
- Excess interest used to create and maintain overcollateralization.
- A swap agreement.

HEMT 2006-4, Prospectus Supplement, August 28, 2006, at S-1.

187.    The HEMT 2006-5 Prospectus Supplement stated that its Credit Enhancement would also include:

- Subordination provided by the mezzanine and subordinate certificates to the senior certificates.
- Subordination provided to the mezzanine certificates by the mezzanine certificates lower in priority and subordinate certificates and subordination provided to the subordinate certificates by the subordinate certificates lower in priority.
- Excess interest used to create and maintain overcollateralization.
- A swap agreement.

HEMT 2006-5, Prospectus Supplement, October 30, 2006, at S-1.

188.    The Prospectus Supplement for HEMT 2006-6 also provided that Credit

Enhancement would include:

- Subordination provided by the mezzanine certificates to the senior certificates.
- Subordination provided to the mezzanine certificates by the mezzanine certificates lower in priority.
- Excess interest used to create and maintain overcollateralization.
- A swap agreement.

HEMT 2006-6, Prospectus Supplement, December 28, 2006, at S-1.

189.    The Prospectus Supplement for HEMT 2007-2 provided that Credit Enhancement

would include:

- Subordination provided by the mezzanine and subordinate certificates to the senior certificates.
- Subordination provided to the mezzanine certificates by the mezzanine certificates lower in priority and subordinate certificates and subordination provided to the subordinate certificates by the subordinate certificates lower in priority.
- Excess interest used to maintain overcollateralization.
- A financial guaranty insurance policy issued by MBIA Insurance Corporation for the benefit of the Class 1A-1, Class 2A-1A, Class 2A-1F,  Class 2A-2, Class 2A-3 and Class 2A-4 Certificates only as described in this prospectus supplement under "Description of the Certificates -- The Policy."
- A swap agreement.
- An interest rate cap agreement.

190.    ***Omitted Information:*** The above statements failed to disclose that the Ratings

Agencies largely determined the amount and kind of Credit Support or Credit Enhancement to be

provided for each Certificate, both before and after Ratings Agencies were formally "engaged" by Credit Suisse, in order for the Certificates to be assigned predetermined ratings.  The above statements also failed to disclose that the amounts and kind of Credit Support the Ratings Agencies determined was appropriate for the Certificates, as specifically set forth in each Prospectus Supplement, were faulty, erroneous and inaccurate since the Ratings Agency models had not been updated and failed to accurately or adequately reflect the performance of the Certificate mortgage loans.

**D.     The Prospectus Supplements Misstated The True Loan-to-Value Ratios Associated With The Underlying Mortgages**

191.    Each of the Prospectus Supplements contained detailed information about the LTV ratios of the loans underlying the trusts. In a series of charts, investors were provided with LTV ratio data, including information about the number of loans containing LTV ratios within a given range.  The following chart, taken from the Prospectus Supplement for HEMT Series 2006-5:

**Initial Mortgage Loans**
**Combined Loan-to-Value Ratios [(1)]**

| Combined Loan-to-Value Ratios (%) | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Aggregate Principal Balance Outstanding |
|---|---|---|---|
| 50.00 or Less.................. | 27 | $    2,065,412.98 | 0.30% |
| 50.01 - 60.00.................. | 20 | 1,584,494.04 | 0.23 |
| 60.01 - 70.00.................. | 25 | 2,473,862.08 | 0.36 |
| 70.01 - 80.00.................. | 162 | 13,119,979.33 | 1.91 |
| 80.01 - 90.00.................. | 1,702 | 79,052,886.23 | 11.51 |
| 90.01 - 95.00.................. | 1,691 | 90,781,942.79 | 13.22 |
| 95.01 - 100.00.................. | 8,378 | 497,845,826.34 | 72.47 |
| Totals ......................... | 12,005 | $  686,924,403.79 | 100.00% |

_____
(1)        The weighted average CLTV ratio of the initial mortgage loans is expected to be approximately 97.16%.

HEMT 2006-5 Prospectus Supplement, October 30, 2006, at s-24.

192.    ***Omitted Information***: As explained above, the appraisals of the properties underlying the mortgage loans were inaccurate and inflated. Furthermore, due to hidden incentives, the stated sales price of properties underlying the mortgage loans did not accurately reflect the true value of the properties. These inflated appraisals and misleading sales price figures were used to form the LTV ratios listed in the prospectus supplements. Incorporating an inflated appraisal into the LTV calculation will result in a lower LTV ratio for a given loan. For instance, as described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000). Due to the inflated appraisals, the LTV ratios listed in the prospectus supplements were artificially low, making it appear that the loans underlying the trusts were less risky than they really were.

193.    The Prospectus Supplement for HEMT 2006-5 also stated that in addition to the "full/alternate" underwriting guidelines, the originators originate or purchase loans:

> Generally, under a "reduced documentation'' program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator. Under a "stated income/stated assets'' program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test'' is applied. … The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score. The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal…

HEMT 2006-5, Prospectus Supplement, October 30, 2006, at S-32.

194.    ***Omitted Information***: Due to the artificially inflated appraisals (as detailed above) mortgages were extended to borrowers whose true LTV ratio did not support the amount

of the mortgage loan.  Further, contrary to the statement that these "limited documentation" loans were extended to borrowers who have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the originators' underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs.

- Steering borrowers to more expensive loans that exceeded their borrowing capacity.

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes.

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted.

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the originators' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.

- Incentivizing their employees to approve borrowers under exceptions to the originators' underwriting policies.

- Failing to determine whether stated income or stated assets were reasonable.

**E.    The Prospectus Supplements Misstated The Certificates' True Investment Rating**

195.    The Registration Statement and Prospectus Supplements contained statements regarding the ratings of the Certificates that were supported by the mortgage loans.  The

Registration Statement referred the investor to the Prospectus Supplements for specific information as to the ratings for each of the Certificates.

196.    Each of the Prospectus Supplements provided: (1) both S&P's and Moody's actual rating for each class of Certificate within a Trust; or (2) stated that the Certificates in each class would not be offered unless they received ratings from both Moody's and S&P that were at least as high as those set forth in the Prospectus Supplement. All of the ratings set forth in all of the Prospectus Supplements were within the "Investment Grade" range of Moody's (Aaa through Baa3) and S&P (AAA through BBB) and the majority of Certificate classes received the highest rating of Aaa/AAA.

197.    The following chart, taken from the Prospectus Supplement for HEMT 2006-5, is an example of the first type of representation:

|  |  |  | Initial Rating of Certificates | | | | |
|---|---|---|---|---|---|---|---|
| Class | Initial Class Principal Balance | Pass-Through Rate (per annum) | Moody's Rating | S&P Rating | DBRS Rating | Designation and Features | Form |
| **Offered Certificates** | | | | | | | |
| A-1 | $475,800,000 | 5.500%(1) | Aaa | AAA | AAA | Senior/ Fixed Rate | Book-Entry |
| A-2 | $ 59,500,000 | Adjustable(2)(3) | Aaa | AAA | AAA | Senior/ Floater | Book-Entry |
| A-3 | $ 59,500,000 | Adjustable(2)(3) | Aaa | AAA | AAA | Senior/ Floater | Book-Entry |
| A-IO | $        (4) | 10.000%(1) | Aaa | AAA | AAA | Senior/ Fixed Rate/Interest Only | Book-Entry |
| A-R | $       100 | (5) | N/A | AAA | N/A | Senior/ Residual | Physical |
| M-1 | $ 40,400,000 | Adjustable(2)(3) | Aa1 | AA+ | AA (high) | Mezzanine/ Floater | Book-Entry |
| M-2 | $ 33,200,000 | Adjustable(2)(3) | Aa2 | AA | AA | Mezzanine/ Floater | Book-Entry |
| M-3 | $ 18,000,000 | Adjustable(2)(3) | Aa3 | AA- | AA (low) | Mezzanine/ Floater | Book-Entry |
| M-4 | $ 16,800,000 | Adjustable(2)(3) | A1 | A+ | A (high) | Mezzanine/ Floater | Book-Entry |
| M-5 | $ 16,000,000 | Adjustable(2)(3) | A2 | A | A | Mezzanine/ Floater | Book-Entry |
| M-6 | $ 15,200,000 | Adjustable(2)(3) | A3 | A- | A(low) | Mezzanine/ Floater | Book-Entry |
| M-7 | $ 14,800,000 | Adjustable(2)(3) | Baa1 | BBB+ | A (low) | Mezzanine/ Floater | Book-Entry |
| M-8 | $ 11,600,000 | Adjustable(2)(3) | Baa2 | BBB | BBB (high) | Mezzanine/ Floater | Book-Entry |
| M-9 | $  9,600,000 | Adjustable(2)(3) | Baa3 | BBB- | BBB | Mezzanine/ Floater | Book-Entry |
| B-1 | $ 13,600,000 | Adjustable(2)(3) | Ba1 | BB+ | BBB (low) | Subordinate/ Floater | Book-Entry |
| **Non-Offered Certificates** | | | | | | | |
| P | $       100 | (5) | N/A | N/A | N/A | Prepayment Charges | Physical |
| X-1 | $ 16,000,000 | Variable | N/A | N/A | N/A | Subordinate | Physical |
| X-2 | $         0 | 0.00% | N/A | N/A | N/A | Charged Off Loans | Physical |
| X-S | $         0 | (6) | N/A | N/A | N/A | Interest Only | Physical |

HEMT 2006-5 Prospectus Supplement, October 30, 2006, at S-3.

198.    The HEMT 2006-5 Prospectus Supplement also stated:

The sponsor selected the mortgage loans for sale to the depositor from among its portfolio of mortgage loans based on a variety of considerations, including type of mortgage loan, geographic concentration, range of mortgage interest rates, principal balance, credit scores and other characteristics. In making this selection, the depositor took into account investor preferences and the depositor's objective

of obtaining the most favorable combination of ratings on the certificates.

HEMT 2006-5 Prospectus Supplement, October 30, 2006, at S-21.

199.    ***Omitted Information*:** The ratings stated in the Prospectus Supplements were based on outdated models, lowered ratings criteria, and inaccurate loan information.  These flaws produced artificially high credit ratings for the Certificates, making them appear less risky than they really were.

## VII.

## CLASS ACTION ALLEGATIONS

200.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure behalf of a class consisting of all persons or entities who acquired the Certificates issued by the Defendant Issuers, as set forth in ¶¶ 1-4 and 19, pursuant and/or traceable to the false and misleading Registration Statement and who were damaged thereby (the "Class").

201.    Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

202.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CSUSA, CSM/CSMSCo, DLJMC or their transfer agents and maybe notified of the pendency of this action by mail, using the form of notice

similar to that customarily used in securities class actions.  Billions of dollars worth of Certificates were issued pursuant to the Registration Statement.

203.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

204.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

205.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants violated the Securities Act; whether the Registration Statement issued by Defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

206.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of § 11 of the Securities Act
### (Against CSS, CSMSCo, and The Individual Defendants)

207.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

208.    This Cause of Action is brought pursuant to § 11 of the Securities Act, on behalf of Plaintiff and the Class, against the Issuer of the Registration Statement, the Individual Defendants and the Underwriter of the Offerings.  This Cause of Action is predicated upon Defendants' strict liability for making material misleading statements and omitting material information from and in the Offering Documents.

209.    The Offering Documents were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

210.    The Individual Defendants, CSS and CSMSCo are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

211.    The Individual Defendants each signed the Registration Statement.

212.    CSS acted as underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, directly and indirectly solicited offers to purchase the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.  CSS was an underwriter for the respective Issuing Trusts.

213.    CSMSCo, the Individual Defendants and CSS owed to the Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such

statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

214.     The CSMSCo, the Individual Defendants and CSS knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

215.     CSMSCo, each of the Individual Defendants and CSS failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

216.     CSMSCo, the Individual Defendants and CSS issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

217.     By reason of the conduct alleged herein, each of the CSMSCo, the Individual Defendants and CSS violated § 11 of the Securities Act, and are liable to Plaintiff and the Class.

218.     Plaintiff and other Class members acquired the Certificates pursuant and/or traceable to the Registration Statement.  At the time Plaintiff and Class members obtained their Certificates they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

219.     Plaintiff and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of CSMSCo, the Individual Defendants and CSS.

220.    By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, CSMSCo and CSS, as set forth in § 11 of the Securities Act.

221.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Securities Act
### (Against CSS)

222.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

223.    This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, on behalf of Plaintiff and the Class, against the underwriter of the Offerings, CSS.

224.    CSS promoted and sold the Certificates pursuant to the defective Prospectus Supplements Documents for their own financial gain.  The Prospectus Supplements contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

225.    CSS owed to Plaintiff and the other Class members who purchased Certificates pursuant to the Offering Documents, a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein

not misleading.  CSS knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth herein.

226.    Plaintiff and other Class members purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Offering Documents.  Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Offering Documents.

227.    By reason of the conduct alleged herein, CSS violated § 12(a)(2) of the Securities Act, and are liable to Plaintiff and other Class members who purchased Certificates pursuant to and/or traceable to the Offering Documents.

228.    Plaintiff and other Class members were damaged by CSS' wrongful conduct. Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in § 12(a)(2) of the Securities Act. Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in § 12(a)(2) of the Securities Act.

229.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents, within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

**THIRD CAUSE OF ACTION**

**Violations of § 15 of the Securities Act**
**(Against the Individual Defendants and CSS)**

230.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

231.     This Cause of Action is brought pursuant to § 15 of the Securities Act against the Individual Defendants and CSS.

232.     Each of the Individual Defendants, by virtue of his or her control, ownership, offices, directorship, and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of DLJMC, CSMSCo and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  Each of the Individual Defendants had the power to influence, and exercised that power and influence, to cause DLJMC, CSMSCo and the Issuing Trusts to engage in violations of the Securities Act, as described above.

233.     CSS, by virtue of its control, influence, participation and solicitation of offers to purchase the Certificates and specific acts set forth above were, at the time of the wrongs alleged herein, a controlling person of DLJMC, CSMSCo and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  CSS had the power to influence, and exercised that power and influence, to cause DLJMC, CSMSCo and the Issuing Trusts to engage in violations of the Securities Act, as described above.

234.     The Individual Defendants' and CSS' control, position and influence made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiff and the other Class members.

235.     Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration

236.    Individual Defendants prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

237.    Since the Defendants named herein controlled the ultimate decision of which mortgage loans would be included and excluded from the securitized pools of loans as well as the ultimate amount of credit enhancement required in order for the Certificates to be sold to investors, they controlled all material aspects relating to the acquisition, structure and sale of the Certificates and thus, the activities of the Issuing Trusts and Individual Defendants within the meaning Section 15 of the Securities Act.

238.    By virtue of the wrongful conduct alleged herein, the Individual Defendants and CSS are liable to plaintiffs and the other Class members for the damages sustained.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as Class representative;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.     Awarding such additional equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
        March 23, 2009

                              Respectfully submitted,

                              **SCHOENGOLD SPORN LAITMAN &**
                              **LOMETTI, P.C.**

                              By
                                 Joel P. Laitman (JL-8177)
                                 Christopher Lometti (CL-9124)
                                 Daniel B. Rehns (DR-5506)
                              19 Fulton Street, Suite 406
                              New York, New York 10038
                              Telephone: (212) 964-0046
                              Facsimile: (212) 267-8137

                              *Counsel for Lead Plaintiff and the Proposed Class*

## CERTIFICATION OF HEMT
## SECURITIES CLASS ACTION COMPLAINT

I, George R. Laufenberg, Jr., hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am the Administrative Manager of the New Jersey Carpenters Health Fund (the "Fund").

2.    I have reviewed the complaint filed in this case (the "Complaint"), and authorize the filing thereof.

3.    The Fund is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.    During the Class Period (as defined in the Complaint), the Fund purchased and/or sold the security that is the subject of the Complaint as set forth on the attached.

5.    The Fund did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.    During the three-year period preceding the date of my signing this Certification, the Fund has not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

7.    The Fund will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery except for an award, as ordered by the court, for reasonable costs and expenses directly relating to its representation of the Class.

Signed under the penalties of perjury this 3 0 day of September 2008.

George R. Laufenberg, Jr., on behalf of the
New Jersey Carpenters Health Fund

## SCHEDULE A

**Date**                          **Description**

10/31/2006                  Purchased 160,000 units Home Equity Mortgage
                                Trust Certificates, Series 2006-5, Class A-1

## CERTIFICATE OF SERVICE

I, Daniel B. Rehns, counsel for the Plaintiff, hereby certify that on March 23, 2009, I filed an original of the foregoing by hand with the Clerk of the Court and delivered a copy to all parties to the within action by hand or first-class mail.

Dated:   New York, New York
         March 23, 2009

Daniel B. Rehns

94