UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
NEW JERSEY CARPENTERS HEALTH FUND,
On Behalf of Itself and All Others Similarly Situated,

                  Plaintiff,

           - against -

DLJ MORTGAGE CAPITAL, INC., et al.,

                  Defendants.
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 16, 2011

08 Civ. 5653 (PAC)

ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

The facts of this case are fully set forth in New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., et al., No. 08 Civ. 5633, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010), and summarized in the Court's Order of December 15, 2010, see New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., et al., No. 08 Civ. 5633, 2010 WL 6508190 (S.D.N.Y. Dec. 15, 2010). In short, Lead Plaintiff New Jersey Carpenters Health Fund ("Lead Plaintiff") alleges violations of §§ 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77K, o, 77l(a)(2). Specifically, Lead Plaintiff alleges that it participated in the private-placement purchase of $2.39 billion of mortgage-backed securities, issued by trusts (the "Issuing Trusts") in the form of pass-through certificates (the "Certificates") and that, after purchasing the Certificates, the value of the Certificates plummeted. Lead Plaintiff alleges that the Offering Documents ("Offering Documents") relating to the private placements contained materially misleading statements and omissions.

Lead Plaintiff now moves to certify a class as:

All persons who purchased Home Equity Mortgage Trust, Series 2006-5 ("HEMT 2006-5 Bonds"), pursuant or traceable to the Registration Statement and accompanying Prospectus (collectively, the "Offering Documents") filed with the Securities and Exchange Commission ("SEC") by Credit Suisse First Boston Mortgage Securities Organization ("CSMSCo") on August 10, 2006 and who were damaged thereby;

to certify Lead Plaintiff as Class Representative; and to appoint Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Class Counsel. (Lead Pl. Mem. 1, 22.) For the reasons that follow, Lead Plaintiff's motion is GRANTED.

## LEGAL STANDARD

"In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of Rule 23(a) of numerosity, commonality, typicality, and adequacy. It may then consider granting class certification where it finds [under Rule 23(b)(3)] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 201-02 (2d Cir. 2008) (citation and internal quotation marks omitted). "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." Id. at 202.

## ANALYSIS

**I. Rule 23(a) Factors**

*A. Numerosity*

"Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable." Torres v. Gristedes Operating Corp. No. 04 Civ. 3316, 2006 U.S. Dist. LEXIS 74039, *38 (S.D.N.Y. Sept. 28, 2006) (internal quotation marks omitted). "Impracticable does not mean impossible," — it simply suggests inconvenience or difficulty. Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir.1993). The Second Circuit has held that a proposed class of more than forty members presumptively satisfies the numerosity requirement. Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 283 (2d Cir. 1995). "Plaintiffs may rely on reasonable inferences drawn from the available

facts in order to estimate the size of the class." In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 509 (S.D.N.Y. 1996).

Here, the parties conducted limited discovery aimed at estimating the number of members of the proposed class. (Lead Pl. Mem. 10.) Plaintiff obtained transaction data with respect to several dates for each of the HEMT 2006-5 Bonds and presented them to its expert witness, Professor Michael G. Ferri. (Id.) Professor Ferri first identified 236 different class members who purchased the HEMT 2006-5 Certificates during the relevant period, (id.), but eventually identified 330 unique entities based on additional data received and noted in his reply report, (Ferri Repl. Rep. ¶ 38). Professor Ferri also noted that there are likely more unique entities that would be identified if he had the opportunity to analyze additional data. (Id. ¶¶ 19, 69.)

Defendants argue that Professor Ferri made numerous errors in his calculations, arguing that he wrongfully included information regarding (1) brokers and dealers who acted as intermediaries for the account holders, (2) multiple accounts for single institutions, and (3) foreign purchasers. (Def. Mem. 20-21.) Defendants concede, however, that even after eliminating these alleged errors, there are still at least 103 potential class members — many more than the forty class members needed to satisfy the Second Circuit's presumption of numerosity. (Id. 21.) Defendants argue that because several of the class members are sophisticated, have large claims, and in theory, have the ability to bring an individual claim, the Court should decline to find numerosity. (Id. 22.) Sophistication and size of certain class members are not bars to a finding of numerosity. See Bd. of Trs. of the AFTRA Ret. Fund. V. JPMorgan Chase Bank, N.A., 269 F.R.D. 340, 342 (S.D.N.Y. 2010) ("AFTRA").

Accordingly, the Court finds that Lead Plaintiff has adequately established numerosity.

*B. Commonality*

"The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir.1997). "One question of law or fact is

sufficient to satisfy this prong." In re J.P. Morgan Chase Cash Balance Litigation, 242 F.R.D. 265, 272 (S.D.N.Y. 2007). Defendants do not challenge Lead Plaintiff's assertion that the commonality requirement is met, and the Court agrees. The members of the proposed class were all allegedly damaged by the same alleged misstatements and omissions in the Offering Documents, which related to the Certificates that all of the members of the proposed class purchased. As Lead Plaintiff notes in its opening brief, "the questions of law and fact common to the Class include: whether Defendants violated the Securities Act; and whether the Offering Documents issued by Defendants to the investing public omitted and/or misstated material facts." (Pl. Mem. 12.)

Accordingly, the Court finds that Lead Plaintiff has adequately established commonality.

*C. Typicality*

"The purpose of the typicality requirement is to ensure that maintenance of a class action is economical and that the named plaintff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." J.P. Morgan Chase, 242 F.R.D. at 273 (citation omitted). "Typicality . . . requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Marisol A., 126 F.3d at 376. "The focus of the typicality inquiry is not on the plaintiff['s] behavior, but rather on the defendant[s'] actions." Kottler v. Deutsche Bank AG, No. 05 Civ. 7773, 2010 WL 1221809, at *2 (S.D.N.Y. Mar. 29, 2010). "This prong of the test does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather it requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." J.P. Morgan Chase, 242 F.R.D.at 272-73 (citation and internal quotation marks omitted).

4

In its opening brief, Lead Plaintiff argues that "Defendants' actions . . . are the same towards Lead Plaintiff and all other putative class members and the proof that Lead Plaintiff will offer and the legal theories they will espouse are identical to those of the other members of the Class." (Pl. Mem. 13.) In support of this notion, Lead Plaintiff points out that all of the proposed class members purchased HEMT 2006-5 Bonds pursuant or traceable to the Offering Documents. (Id.) Anticipating Defendants' counterarguments, Lead Plaintiff also argues that the fact that class members purchased bonds in different tranches — which have a different level of priority with respect to cash flow and protection from losses — does not affect the typicality analysis. (Id.) Specifically, Lead Plaintiff claims (1) that the difference in priority does not change the fact that the damages to each proposed class member occurred due to the same series of events, and (2) that all of the tranches depended on the same collateral pool — comprised of securitized mortgage loans — "for their value." (Id. 14.)

Defendants vigorously dispute Lead Plaintiff's argument, arguing at length that "[a]t trial, the holders of any one particular tranche . . . will likely be making arguments and putting forth proof that differ from — and quite possibly are antagonistic to — those that would be offered by holders of the other tranches of Certificates with respect to fact of injury, materiality, and loss causation." (Def. Mem. 10.) Specifically, Defendants argue that potential plaintiffs in different tranches will have a "fundamental disagreement as to how the fact of injury should be established in this case," because class members in the higher tranches would likely prefer to establish their injury by showing that the bonds decreased in value, while those in the lower tranches would prefer to argue that there was a shortfall in the principal and interest due to such plaintiffs. (Id. 11.)  According to Defendants, the latter argument would "theoretically maximize any recovery by the lower tranche holders to the detriment of the holders of the senior tranches." (Id.) In addition, Defendants argue that there are potential conflicts within the proposed class with respect to loss causation and materiality. (Id. 11-12.)

In response, Lead Plaintiff argues that "differences between class members in terms of damages and the timing of purchases do not defeat typicality or class certification." (Pl. Repl. Mem. 2-3 (citing In

5

re Alstom SA Sec. Litig., 253 F.R.D. 266, 277 (S.D.N.Y. 2008)).) Lead Plaintiff points out that the claims of all proposed class members arise from the same alleged misstatements and omissions in the Offering Documents, and that no tranche or group of proposed class members benefitted from the alleged statements or omissions. (Id. 3.) Thus, argues Lead Plaintiff, there is no actual conflict between the proposed class members. In re Alstom SA Sec. Litig., 253 F.R.D. 266, 276 (S.D.N.Y. 2008) ("In the case of intra-class conflicts, class certification is defeated only if such conflicts are actual — as opposed to merely speculative — and relate to the very subject matter of the suit.").

Any potential conflicts between proposed class members are speculative and, therefore, do not defeat typicality. Indeed, it is not clear that Defendants' argument regarding theory of injury will cause any actual conflict at all. Defendants' arguments regarding loss causation and damages fail because "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." Seijas v. Republic of Arg., 606 F.3d 53, 58 (2d Cir. 2010). All of the potential class members were allegedly damaged by the same actions by Defendants, and all will make similar legal arguments to support their claims. The nature of Lead Plaintiff's claims is typical of the proposed class.

Accordingly, the Court finds that Lead Plaintiff has adequately established typicality.

*D. Fair and Adequate Representation*

"To determine whether a named plaintiff will be an adequate class representative, courts inquire whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." In re WorldCom Inc. Sec. Litig., 219 F.R.D. 267, 282 (S.D.N.Y. 2003). "To satisfy the first prong of the adequacy requirement, a proposed class representative must possess the same interest and suffer the same injury as the class members." Kottler, 2010 WL 1221809, at *2.

Defendants argue that Lead Plaintiff is an inadequate class representative because "it demonstrated an abject unfamiliarity with the facts of this matter at its deposition in this case, as well as a complete lack of participation in this litigation." (Def. Mem. 23.) To support its proposition, Defendants list several instances where Lead Plaintiff's Federal Rule of Civil Procedure 30(b)(6) representative, George Laufenberg, allegedly showed unfamiliarity with the facts of the case or lack of participation in the lawsuit during his deposition. (Id. 23-24.) In sum, Defendants claim (1) that Lead Plaintiff delegated decision making with respect to the Certificates to its investment manager and did not read the Offering Materials, and (2) that Lead Plaintiff's counsel was the impetus for the litigation and has drafted and edited all legal documents relating to this case. (Id.)

Lead Plaintiff replies that "almost all institutional investors rely on professional investment managers in making their investments and no court has ever held that this disqualifies them from being a class representative." (Pl. Repl. Mem. 14.) In addition, Lead Plaintiff argues that relying on counsel to draft legal documents is standard practice in a complex matter, and expressly disagrees with Defendants' characterization that Lead Plaintiff's representative was ignorant of the facts of the case during his deposition. (Id. 14-15.)

"Class representative status may properly be denied where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys. However, the Supreme Court has expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance." Casale v. Kelly, 257 F.R.D. 396, 406 (S.D.N.Y. 2009). Although Lead Plaintiff's representative might not have known or understood every detail about the instant litigation, it is clear from reviewing the transcript of Laufenberg's deposition that Lead Plaintiff is not so ignorant of the facts of this case that it is "unable or unwilling" to protect the interests of the class. (See, e.g., Laufenberg Dep. 135:12-138:23 (explaining his understanding of the Complaint and Defendant Credit Suisse's role in the allegations).) Indeed, "in complex actions named plaintiffs are not required to have

7

expert knowledge of all the details of the case . . . and a great deal of reliance on expert counsel is to be expected." In re TCW/DW N. Am. Gov't Income Trust Sec. Litig., 941 F. Supp. 326, 341 (S.D.N.Y. 1996); see In re Turkcell Iletisim Hizmetler, A.S. Securities Litigation, 209 F.R.D. 353 (S.D.N.Y. 2002) (approving class representative where proposed representative did not speak English, but understood "the basic nature of the lawsuit, and, while he d[id] not grasp the nuances of a class action, his interests are clearly aligned with the class members whom he represents").

Defendants do not dispute that Cohen Milstein is adequate class counsel. Cohen Milstein has prior experience with complex securities class actions and is qualified to represent the proposed class. Accordingly, the Court finds that Lead Plaintiff has adequately established that Lead Plaintiff is an adequate class representative and that Cohen Milstein is adequate class counsel.

**II. Rule 23(b)(3) Factors**

*A. Common Questions of Law or Fact Predominate*

"The predominance criterion is, in effect, a stricter version of the commonality requirement of Rule 23(a)(2)." Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81, 89 (S.D.N.Y. 2001). "To satisfy the predominance prong of Rule 23(b)(3), a plaintiff must show that common proof will predominate at trial with respect to the essential elements of liability of the underlying causes of action." Kottler, 2010 WL 1221809, at *3 (citation and internal quotation marks omitted). "[P]redominance does not require a plaintiff to show that there are no individual issues." In re NYSE Specialists Securities Litigation, 260 F.R.D. 55, 75 (S.D.N.Y. 2009). "[I]ndividual issues will likely arise in this as in all class action cases. But, to allow various secondary issues of plaintiffs' claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws." Dura–Bilt Corp. v. Chase Manhattan Corp., 89 F.R.D. 87, 99 (S.D.N.Y.1981). "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." Amchem Prods, Inc. v. Windsor, 521 U.S. 591, 625 (1997).

Lead Plaintiff simply claims that the element of material misstatement or omission by Defendants, the Defendants' participation in the Offering, and the Individual Defendants' liability under § 15 of the Securities Act are all subject to generalized proof. (Pl. Mem. 17-19.) In addition, Lead Plaintiff notes that the fact that damages will vary amongst class members does not defeat predominance. (Id. 19 (citing Mendoza v. Casa De Cambio Delgado, Inc., No. 07-cv-2579, 2008 U.S. Dist. LEXIS 61557, at *24 (S.D.N.Y. Aug. 12, 2008)).) Defendants however argue that Lead Plaintiff fails to adequately show predominance for three reasons: knowledge, reliance, and loss causation.

1. Knowledge

Defendants first argue that knowledge, an affirmative defense to a § 11 claim, is an individual issue, specifically with respect to purchases made on or after February 7, 2007, when "revelatory disclosures began to be made to the market regarding New Century's financial and accounting problems." (Def. Mem. 13.) This argument relies heavily on In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24 (2d Cir. 2006) ("IPO"), where the Second Circuit reversed the certification of a class, finding that § 11's knowledge requirement, an individual issue, would predominate over common issues. (Def. Mem. 13-14.) IPO held that "[t]he claim that lack of knowledge is common to the class is thoroughly undermined by the Plaintiffs' own allegations as to how widespread was knowledge of the alleged scheme." IPO, 471 F.3d at 43. Indeed, the pleadings in IPO discussed the fact that certain potential class members had knowledge of the scheme at issue. Id. In addition, the IPO court noted that

> Two cable television networks, MSNBC and CNBC, reported on the aftermarket purchase requirements in 1999, and in 2000 the practice was the subject of an SEC Staff Legal Bulletin and a report in Barron's discussing the bulletin. The Plaintiffs themselves refer to the "industry-wide understanding" that those who agreed to purchase in the aftermarket received allocations.

Id. In addition, Defendants point to In re Superior Offshore Int'l Sec. Litig., No. H-08-0687, 2010 WL 2305742 (S.D. Tex. June 8, 2010), which cited IPO, and found that

> Although the existence and materiality of any omission or misrepresentation are likely to be common issues, Plaintiffs have not satisfied their burden to demonstrate that those issues predominate over the knowledge issue — an issue that must be determined on an individualized

9

> basis as to each investor. This is particularly true where, as here, Plaintiffs allege misrepresentations and omissions in the Registration Statement concerning facts about which there appears to have been widespread knowledge from multiple public and private sources that would precipitate individual inquiries as to the knowledge of each member of the class.

Id. at *5. In coming to its conclusion, the court in Superior Offshore relied upon public records, analyst reports, and roadshow materials that revealed the alleged misstatements.

Defendants argue that this case is similar to both IPO and Superior Offshore, claiming that "sufficient information was publicly available to make knowledge an individualized inquiry by at least February, 2007." (Def. Mem. 14.) Specifically, Defendants point to rising delinquency and default rates, three trustee reports which discussed the delinquency rates of the collateral pool, and news reports regarding New Century's underwriting practices. (Id. 15.) According to Defendants, this combination "is more than sufficient to compel the conclusion that the question of what each purchaser knew regarding the alleged misrepresentations requires an individualized inquiry by at least February 7, 2007." (Id. 16.)

Lead Plaintiff argues, however, that this evidence "does not even resemble disclosure of the specific misrepresentations or omissions in the Offering Documents required under IPO to defeat the predominance." (Pl. Repl. Mem. 6.) Specifically, Lead Plaintiff notes that, while the trustee reports disclosed delinquency rates, it did not discuss systematic disregard of the underwriting guidelines. (Id.) In support, Lead Plaintiff notes that the Rating Agencies had not reduced the rating on any tranche of the Certificates to that point, and that none of the HEMT 2006-5 tranches rated AAA were downgraded to below investment grade until December 20, 2007. (Id. 6-7.) Lead Plaintiff also notes that the news articles referenced by Defendants did not reference the HEMT 2006-5 Offering or the mortgages at issue. (Id. 7.) As a result, claims Lead Plaintiff, Defendant has not shown sufficient evidence that class members could have acquired the requisite knowledge regarding the alleged misstatements and omissions. (Id. 7.)

10

The factual contentions here that some class members may have had knowledge of the misstatements or omissions do not rise to the level found in IPO or Superior Offshore.[1] Accordingly, the Court finds by a preponderance of the evidence that the potentially individual issue of knowledge does not predominate over the issues common to the potential class members.

2. Reliance

Defendants also note that if "the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement," the purchaser must prove reliance on the offering materials. (Def. Mem. 16 (quoting 15 U.S.C. § 77k(a)).) In view of this, Defendants argue that the trustee reports discussed above should be considered "earnings statements." (Def. Mem. 16.) Rule 158, however, specifically defines "earnings statements" to include certain required data, which Defendants admit the trustee reports do not contain. (Id. 16-17); 17 C.F.R. § 230.158. Defendants' argument that the trustee reports are "earnings statements" under Rule 158 rests on the propositions that (1) Rule 158 does not limit earning statements to the kinds of statements listed in Rule 158 and (2) that "it is squarely within the policy of section 11 to characterize the trustee reports as earnings statements." (Def. Mem. 16-17.) With respect to Defendants'

---

[1] The parties made several supplemental submissions to the Court regarding the opinion handed down by Judge Baer on January 18, 2011 in N.J. Carpenters Health Fund v. Residential Capital, LLC, No. 08 Civ. 8781, 2011 WL 147735 (S.D.N.Y. Jan. 18, 2011) ("Residential Capital"). The Second Circuit has since granted Plaintiff's petition for an interlocutory appeal pursuant to Federal Rule of Civil Procedure 23(f). Although Judge Baer handed down his decision on January 18, 2011, Defendants quite obviously waited until just before Lead Plaintiff filed its reply to submit their March 9, 2011 letter along with its several exhibits, presumably so that Lead Plaintiff would have limited ability to respond. In any case, Residential Capital does not change the Court's view on this case. In Residential Capital, the court found that there was a "good deal of documentary [and testimonial] evidence imputing knowledge" on the plaintiff's investment advisor. Residential Capital, 2011 WL 147735, at *9. This evidence included testimony from the investment advisor regarding its knowledge and reports and emails suggesting knowledge on the part of some potential class members. Id. Here, there is no such explicit evidence. The documents submitted with the March 9, 2011 letter do not relate directly to the Bonds at issue, and there is no testimonial or documentary evidence directly suggesting that a potential plaintiff had knowledge of the misstatements or omissions at issue. In addition, the fact that some of the potential class members are sophisticated financial institutions cannot, in itself, defeat class certification. See Rocco v. Nam Tai Elecs., Inc., 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (citation and internal quotation marks omitted) ("courts have held that sophistication of the class representative does not necessarily mean his claim arises any less from the same course of events and raises the same legal liabilities as every other member of the putative class"). Defendants' argument is ironic — the potential class includes unsophisticated investors and so the class should not be certified; in the alternative, the class should not be certified because the class includes very sophisticated investors. Defendants' view is apparently that, in order for a class to be certified, it must be like Baby Bear's porridge in the story of Goldilocks: just right. This suggestion is untenable.

first argument, they are mistaken. Defendants rely on 17 C.F.R. § 230.158(a)(2), which specifically makes an exception in situations where "[a] subsidiary [is] issuing debt securities guaranteed by its parent." This is not a general exception and, in fact, suggests that if Congress wanted to make a generalized exception, it knows how to do so. Although Defendants' policy argument — that the price of mortgage-backed securities "is likely to be predicated on trustee reports after the initial offering rather than on the Offering Materials" (Def. Mem. 17) — may make some logical sense, this is not the law. Because the trustee reports to not fulfill the requirements of Rule 158, they are not "earnings statements."

Accordingly, Defendants have not established that class members will be required to show reliance and, therefore, this potentially individual issue does not predominate over the issues common to the potential class members.

3. Loss Causation

Lastly, Defendants argue that, because the absence of loss causation is an affirmative defense in §§ 11 and 12(a)(2), they may later introduce evidence that the alleged misrepresentations and omissions did not cause the losses of the potential class members. (Def. Mem. 17-18.) As a result, Defendants claim that such evidence will make loss causation an individual issue which will predominate over the issues common to the potential class members. To bolster this argument, Defendants cite Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 187-90 (3d Cir. 2001), where the court denied a motion for class certification by investors who asserted § 10(b) claims against their broker-dealers, who allegedly breached their duty to execute trades on certain terms. The court found that the individual issue of loss causation predominated because the court would be required to assess each individual trade to determine whether the loss was caused by the alleged breach of fiduciary duty. Id. at 187.

In this case, however, loss causation is an affirmative defense, rather than a claim element that the class members will need to prove. See 15 U.S.C. § 77k(e). Defendants may limit their damages by establishing negative loss causation later, but, as in In re Oxford Health Plans, Inc. Sec. Litig. 191 F.R.D. 369, 377 (S.D.N.Y. 2000),

> [A]ll class members' claims arise from a common nucleus of facts . . . all plaintiffs' claims rely on common legal theories, specifically violations of federal securities laws. While damages may vary among class members, all share common questions of liability. Damage amounts can be calculated for each individual class member after a determination of liability.

As a result, this potentially individual issue does not predominate over the issues common to the proposed class.

Accordingly, the Court finds that issues common to the potential class members predominate over potentially individual issues and, therefore, that Lead Plaintiff has satisfied this Rule 23(b)(3) factor.

*B. A Class Action is Superior to Other Available Methods of Adjudication*

"The goal of class actions is to 'achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness.'" Kottler, 2010 WL 1221809, at *4 (quoting Amchem Prods, 521 U.S. at 615). "Rule 23(b)(3) sets forth the following factors that courts should consider in making a 'superiority' determination: (a) the interest of members of the class in individually controlling the prosecution of separate actions, (b) the extent and nature of any litigation concerning the controversy already commenced by members of the class, (c) the desirability of concentrating the litigation of the claims in the particular forum; and (d) the difficulties likely to be encountered in the management of a class action." Id. at *12-13. "Securities cases easily satisfy the superiority requirement of Rule 23." NYSE Specialists, 260 F.R.D. at 80.

Defendants argue that, in their view, there are only 103 proper members of the potential class and argue that this is a "relatively small number of potential plaintiffs, particularly given the significant amounts at stake and that they can adequately protect their interests without the certification of a class."

13

(Def. Mem. 21.) Specifically, Defendants point out that the mean investment in the initial offering was approximately $4 million, and that some of the purchasers are large, sophisticated financial institutions. (Id.) In addition, Defendants look to this Court's analysis in Kottler, where the Court denied a class certification motion where there were over 180 class members, in part because the class members were capable of bringing their own actions. (Id. (citing Kottler, 2010 WL 1221809, at *4-5).)

Lead Plaintiff, however, points out that Defendants' calculation of the investments of the potential class members is misleading, as (1) they did not count post-offering transactions and (2) they reported the mean investment instead of the median investment. (Pl. Repl. Mem. 12.) Specifically, Lead Plaintiff notes that the median investment was $60,000 and that, therefore, there were over 600 transactions of less than $60,000 which, according to Lead Plaintiff, is "far below the millions of dollars in fees and expenses necessary to litigate a complex securities action, thus making a lawsuit economically irrational for the majority of purchases included in the putative class." (Id. 12-13.)

Statistical arguments aside, Kottler cannot control. That case dealt with fraudulent tax shelters and breach of fiduciary duty where proof of reliance and scienter are required. Further, twenty-five individuals had already brought separate actions or settled their claims prior to the motion for class certification. (Id.) There are no individual actions pending here in this matter, and the misconduct that the potential class members must prove is identical for all class members. (Id.) Lastly, Lead Plaintiff cites AFTRA, where the court found that "the existence of large individual claims that are sufficient for individual suits is no bar to a class when the advantages of unitary adjudication exist to determine the defendant's liability." AFTRA, 269 F.R.D. at 355.

The amounts at stake for some potential class members is not enough to justify an individual action — as a result, such class members have an interest in moving forward as a class. In addition, neither party has identified any other pending litigation regarding this controversy, nor is there any reason to believe that the Southern District of New York is not a desirable forum for such a class action. Lastly, as securities actions such as this are commonly brought as class actions, there does not seem to

14

be any particular difficulty in administering such an action. Accordingly, the Court finds that a class action is a superior method for fairly and efficiently adjudicating this controversy.

## CONCLUSION

For the foregoing reasons, Lead Plaintiff's motion for class certification is GRANTED. Accordingly, the class is certified, Lead Plaintiff is appointed Class Representative, and Cohen Milstein is appointed Class Counsel.

Dated: New York, New York
August 16, 2011

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge