```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    NEW JERSEY CARPENTERS HEALTH
      FUND, ET AL.,
 4
                         Plaintiffs,
 5
                 v.                      08 CV 5653 (PAC)
 6
      DLJ MORTGAGE CAPITAL, INC.,
 7    CREDIT SUISSE, MANAGEMENT,
      LLC, f/k/a CREDIT SUISSE FIRST
 8    BOSTON MORTGAGE SECURITIES
      CORPORATION, ET AL.,,
 9
                         Defendants.
10
      ------------------------------x
11                                       New York, N.Y.
                                         November 8, 2012
12                                       3:00 p.m.

13    Before:

14                    HON. PAUL A. CROTTY,

15                                         District Judge

16                         APPEARANCES

17    COHEN MILSTEIN SELLER & TOLL, P.L.L.C.
           Attorneys for Plaintiffs
18    BY:  JOEL P. LAITMAN

19    BINGHAM MCCUTCHEN, LLP
           Attorneys for Defendants
20    BY:  SCOTT E. ECKAS

21

22

23

24

25
```

CB8AANJCA                         Argument

1          (Case called)

2          MR. LAITMAN:  Joel Laitman, for the plaintiff.

3          THE COURT:  Who is with you?

4          MR. LAITMAN:  Michael Eisenkraft and Kenneth Rehns.

5          THE COURT:  OK.  Mr. Eisenkraft, Mr. Rehns.

6          MR. ECKAS:  Scott Eckas, of Bingham McCutchen.  With

7   me at counsel table is my partner Susan Hoffman.  Also with me

8   at counsel table are my colleagues Colleen Loughlin and Jawad

9   Muaddi.

10          THE COURT:  Mr. Laitman, do you want to go first?

11          MR. LAITMAN:  Yes, your Honor.

12          As your Honor is aware, we've made a motion for

13   reconsideration to reinstate the three offerings that were

14   dismissed on standing grounds as a result of the Goldman

15   decision by the Second Circuit.  Just to cut very directly to

16   the ruling in Goldman and it's applicability to us, in our

17   complaint, just as in the Goldman complaint, we allege

18   Paragraphs 154 to 160 that the shelf registration which was the

19   registration that each of the four offerings was issued from

20   contained underwriting misstatements and that's the identical

21   facts that were in Goldman.

22          Also identical in Goldman is, as in this case, the

23   complaint alleges that has originator specific allegations that

24   unite the offering that our client brought on with the

25   offering -- with each the offerings, the three offerings at

CB8AANJCA                         Argument

1   issue.

2            So, for example, there are in the complaint specific

3   allegations pertaining to New Century.  New Century was the

4   originator in the 2006-5 that our client bought from and is

5   also an originator in 2007-2.  WMC is an originator in 2005-6

6   and also an originator in 2006-4 and accredited is an

7   originator in the 2006-5 and also in the 2006-6.  And the

8   complaint --

9            THE COURT:  So there's two with a common 2006-5 and

10  2007-2 have the same originator, right, and the others have

11  different originators?

12           MR. LAITMAN:  No.  No.  Each -- the 2006-5 has three

13  originators, New Century, WMC and accredited.  And what the

14  Second Circuit said is we have class standing to represent

15  offerings that emanated from the same shelf registration that

16  has a common originator with the 2006-5.  I think that has an

17  originator in common with those three.  So there are three

18  offerings at issue that we are seeking reinstatement.

19  2007-2 --

20           THE COURT:  Right.

21           MR. LAITMAN:  -- 2006-4 and 2006-6.  2007-2 has in

22  common with our offering, our plaintiff's offering New Century

23  as an originator.

24           THE COURT:  So 2006-5 and 2007-2 have New Century.

25           MR. LAITMAN:  Correct.

1          THE COURT:  New Century was the sole originator for

2    both?

3          MR. LAITMAN:  Not the sole.  They were one of the

4    originators in both offerings and that's what the Second

5    Circuit said.  It does not have to be sold.  In fact, in the

6    Second Circuit case the common originators were, the one the

7    plaintiff bought from was Green Point and Wells Fargo.

8          THE COURT:  Yeah, but it's also clear from the Second

9    Circuit's decision it was not Green Point and -- what was the

10   other one?

11         MR. LAITMAN:  Wells Fargo.

12         THE COURT:  Then not part of the class action.

13         MR. LAITMAN:  That's correct.  But no one is

14   disputing -- the defendants are not disputing that New Century

15   was an originator in 06-5 our clients' offering.  WMC and

16   accredited were originators in our client's offering and that

17   those are in common with each of these three other offerings.

18   So we have the common originator.

19         THE COURT:  I'll have to go back and check but my

20   recollection is that New Century was the sole originator.  And

21   you are telling me, Mr. Laitman, that, I am incorrect?

22         MR. LAITMAN:  You are incorrect.

23         THE COURT:  OK.

24         MR. LAITMAN:  It's one of the originators.

25         THE COURT:  I understand there to be more than one but

1    I thought it was the sole.  You are saying it's not the sole.

2             MR. LAITMAN:  It's one of the originators.

3             THE COURT:  Where do I find that in your complaint?

4             MR. LAITMAN:  We cite to the prospectus.  The

5    prospectus, actually, gives you the percentages of the

6    originators greater than ten percent and so it's, specifically,

7    laid out.  It's not a disputed fact.

8             THE COURT:  Right.

9             MR. LAITMAN:  I believe and my memory is that in the

10   06-5 New Century was, approximately, 33 percent of all the

11   loans in the offering.  And then you had other originators that

12   had lesser percentages but the percentages under the second

13   circuit decision is not an issue.  It could be as little as --

14            THE COURT:  One percent.

15            MR. LAITMAN:  -- one percent.  It's the commonalty of

16   originator.

17            THE COURT:  That's right.  I am reading -- I don't

18   know what the cite is on this, the ANICA against -- IPW against

19   Goldman Sacks.  I don't have the page but it says:

20            However to the extent certain offerings were backed by

21   loans originated by originators common to those backing 2007-5

22   and 2007-10 then that's sufficiently similar.  And the

23   percentages vary 29, 36, 9, 3 and so the percentages really

24   don't make my difference so longs as they're this common and

25   that's your point.

1           MR. LAITMAN:  That's exactly right.  And that is

2     undisputed.  It is undisputed in this case that we have common

3     originators.  And just like Goldman we have a shelf offering

4     that's responsible for emanating from which all four offerings

5     emanate from and that those guidelines are actually, in our

6     case, are reiterated identically in each of the prospectuses at

7     issue.  And I would just refer your Honor to Exhibit 9 in the

8     Eisenkraft Affidavit because what we did was --

9           THE COURT:  You pulled out all the common

10    statements --

11          MR. LAITMAN:  Right.

12          THE COURT:  -- and the shelf registration.

13          MR. LAITMAN:  And each of the three -- well, our

14    offering and then each of three offerings at issue.

15          THE COURT:  Tell me why it's not -- there's also an

16    argument about the statute of limations.

17          MR. LAITMAN:  OK.  The statute of limitations argument

18    breaks out into, actually, two pieces.  The defendants take the

19    position that with respect to the 200-6 and 2006-4, OK, with

20    respect to those two offerings the Court had already determined

21    using the inquiry notice standard that those claims were

22    time-barred.  That argument fails for two reasons.

23          First, what has happened in the Second Circuit since

24    your Honor made the ruling on the intervention motion that

25    they're referring to is that the Second Circuit and the city of

CB8AANJCA                          Argument

1    Pontiac has said that with respect to the Exchange Act claims

2    the accrual period for the Exchange Act is no longer determined

3    on inquiry notice.  It is no longer when a reasonable investor

4    should have known of the misstatement or omission.

5          What the new standard is in the Second Circuit

6    applying Merck is that it's no longer inquiry notice.  It's the

7    point in time that the claim would have survived the motion to

8    dismiss under 12(b)(6).  And what has happened in the Southern

9    District is eight district courts have ruled in the context of

10   these mortgage backed securities, have ruled that the city of

11   Pontiac case from the Second Circuit applies to the Securities

12   Act and that's the accrual period that should be used.

13         So the inquiry notice accrual period is no longer the

14   appropriate accrual period for purposes of the statute of

15   limitations.  And in our case the complaint that survived the

16   motion to dismiss relied heavily -- and your Honor's decision

17   focused on it -- on the collapse in the ratings from Triple A

18   to junk for most of these bonds.  The point is that that did

19   not occur until after one year prior to the filing of the

20   amended complaint.  That is, after March 23, 2008.  So the data

21   that's relied upon in the complaint that survived dismissal

22   which is now the new standard for the accrual of the statute of

23   limitations, the data is within one year.  It was 2009 data.

24         So for the two offerings that -- our first point is

25   that under the current standard for statute of limitations the

1    two offerings, 2006-4 and the 2006-6, the notice did not accrue

2    until well after the date that was in the intervention

3    decision.  Your Honor used December 20, 2007.  Even more

4    importantly, your Honor didn't make a finding that that was --

5    we do not believe that your Honor made a finding that December

6    20, 2007 was the inquiry notice date.  Your Honor -- using your

7    Honor's language, assumed that that was the date based on a

8    statement that was made in the footnote in the movant's brief.

9         However, when you look at the downgrade evidence it

10   was very controverted as of that date.  So even if you didn't

11   accept the notion that the standard has changed in the Second

12   Circuit, under the inquiry notice standard it was controverted

13   because while Moody's downgraded the bonds in 2007 SMP and

14   other rating agencies on the very same bonds kept them at very

15   high Triple A ratings or Double A ratings.  And so there's no

16   basis to dismiss on statute of limitations grounds because

17   under the Stair case in the Second Circuit and it's been well

18   established in order to dismiss on statute of limitations

19   ground it's got to be uncontroverted.

20        Here that date that your Honor used in the

21   Intervention decision and we've now annexed as exhibits, the

22   evidence showing it was directly controverted while one rating

23   agency in 2007 downgraded to junk many other rating agencies

24   kept these at very high investment grade ratings.  And so that

25   cannot be -- the December 2007 inquiry notice date cannot be

1    the basis for dismissing on statue of limitations grounds those

2    two offerings.  So whether when you apply the correct standard,

3    that is the city of Pontiac standard, certainly, the claim

4    could not have been pled prior to one year from the filing the

5    amended complaint.  And even if you filed the old inquiry

6    notice standard for those two offerings, there was controverted

7    evidence that no reasonable investor would have begun to

8    investigate a misstatement with respect to these bonds while

9    SMP or Moody's or one of the other rating agencies maintained a

10   very high rating on the bonds.

11         The last point that I wanted to make, your, is with

12   respect to the 20078-2 offering there is, absolutely, no basis,

13   no argument even for dismissal on statue of limitations

14   grounds.  Your intervention decision didn't deal with that

15   offering.  That's number one.

16         Number two, the reason we put in a footnote the

17   December 20, 2007 inquiry notice date and that's the one your

18   Honor adopted, the reason we put in that is because that was

19   the first date that the Triple A bonds were downgraded to junk.

20         In the 2007-2 offering it is undisputed that the first

21   time that that happened was April 2008.  So it was within the

22   year prior to the filing of the complaint where the claims with

23   respect to that offering were first alleged.  So under any

24   analysis if you use the inquiry notice analysis, the exact

25   analysis that your Honor used in the intervention decision

1  which we don't think is appropriate for all the reasons I've

2  said, but if you apply that exact analysis this is not

3  time-barred by the statute of limitations.

4          THE COURT:  So your point then, Mr. Laitman, is sum up

5  in 25 words or less, what is it?  We should amend the pleadings

6  to allow in light of ANICA, the Goldman Sacks decision and the

7  city of Pontiac decision, we should amend the -- allow you to

8  amend the pleadings so that you have standing under Rule 23 to

9  bring the claims on behalf of purchasers of all of 2006-5,

10  2007-2, 2006-6 and 2006-2.

11          MR. LAITMAN:  That's correct.

12          THE COURT:  And there is no impediment in the statute

13  of limitations.

14          MR. LAITMAN:  There is no impediment in the statute of

15  limitation.

16          THE COURT:  Why don't you save five minutes for

17  rebuttal.

18          Mr. Eckas.  Thank you, Mr. Laitman.

19          MR. ECKAS:  Thank you, your Honor.  May I stand here?

20          THE COURT:  Whatever is most convenient for you.

21          MR. ECKAS:  Thank you.  I have a stack of papers in

22  front of me so that is very helpful.

23          Your Honor, we're here today on the plaintiff's motion

24  for reconsideration of the Court's motion to dismiss on the

25  basis of standing three transactions.  Plaintiff has not moved,

1    at least at this time, for the Court to reconsider its decision

2    in the intervention motion which is where the Court made its

3    rulings on statute of limitations.  I bring that up at the

4    beginning and I'll explain a little bit more in just a moment,

5    your Honor, to highlight the fact that in our view there is a

6    difference between whether someone has standing and whether the

7    statute of limitations has run.

8             THE COURT:  All right.

9             MR. ECKAS:  We will explain why we think that the

10   Goldman case in fact, when properly understood does not provide

11   standing.

12            THE COURT:  Let's take that one up first.

13            MR. ECKAS:  Certainly, your Honor.

14            As we understand the Goldman case, your Honor, it

15   certainly recognizes and approves of the generally accepted

16   meaning of standing, that being someone must have a personal

17   injury in order to bring suit.

18            THE COURT:  OK.  Now, let's go over the basics.  You

19   agree that the plaintiffs have Article III standing?

20            MR. ECKAS:  For 2006-5, yes, we do, your Honor.

21            THE COURT:  Not for the others?

22            MR. ECKAS:  We do not, that's correct, your Honor.

23            THE COURT:  That's just what -- isn't that what the

24   Court held, even if you had Article III standing then you had

25   statutory standing, then the issue was whether or not you had

CB8AANJCA                          Argument

```
 1   standing for Rule 23 purposes.  And if you had Article III
 2   standing, and they do, with at least they had been injured,
 3   right, as to 2006-5, then they have statutory standing as to
 4   that as well.  So they have standing.  They belong here in the
 5   courthouse.
 6           MR. ECKAS:  Against the 2006-5 we would concur with
 7   that, your Honor.  As your Honor knows they did not purchase in
 8   the other deals.
 9           THE COURT:  Yes, I understand.
10           MR. ECKAS:  The issue then becomes --
11           THE COURT:  Under the Second Circuit they only
12   purchased ANICA IBPEW purchased 2007-5 and 2007-10 and yet,
13   they were allowed to proceed on a number of our trusts simply
14   because they were common originators.
15           MR. ECKAS:  We don't --
16           THE COURT:  They had not purchased 2007-3 or 2007-4
17   and 2007-6 but there are Article III standing under statutory
18   standing was enough to get over those hurdles as I understand
19   the decision.
20           MR. ECKAS:  If I may, your Honor, I believe we read
21   the decisions slightly different.  In particular, I am focusing
22   on the end of the second paragraph in the decision which is the
23   introduction to the decision.  And in this the Second Circuit
24   points to the fact that there must be similar or identical
25   misrepresentations in the offering documents.  I am associated
```

1   with certificates originated about the same lenders.  So it's

2   not enough that there just happens to be overlapping

3   originators which is not unlikely because there often are

4   hundreds but there needs to be overlapping originators relating

5   to the disclosures that were allegedly incorrect.

6          THE COURT:  Well, it's an interesting thing about how

7   you read Second Circuit opinions.  They start out one way but

8   when they came to the conclusion at the end and found out and

9   they disclosed to us for the first time why Judge Cedarbaum was

10  in error, they point to the common originators.  That is what's

11  important, not the language with the shelf registration, not

12  the language in the supplemental prospectus but the fact that

13  there were common originators.  That's the way I read it,

14  Mr. Eckas.

15         MR. ECKAS:  OK.  Your Honor, I guess we're focusing on

16  the similar set of concerns language and as we had read that

17  and interpreted it and had tried to make a chart that we'd

18  hoped would be of assistance it seemed to us that what the

19  Court's focused on is if someone had standing was injured and

20  the basis of their injury i.e. the alleged misrepresentation

21  also formed the basis for the other person's injury, then it

22  could proceed on behalf of other person as well.

23         So, for example --

24         THE COURT:  Even though they hadn't purchased that?

25         MR. ECKAS:  Yes.  So we would agree, your Honor, that

1    under a reading of the Second Circuit's opinion there are

2    situations where a plaintiff can represent purchasers of

3    securities in which the plaintiff did not itself purchase.  We

4    just do not reed it nearly as broadly as plaintiffs do.  For

5    us, your Honor, there has to be identical misrepresentations.

6    And there has to be overlapping originators.

7             If it's any help to your Honor in our memorandum of

8    law --

9             THE COURT:  Yes.

10            MR. ECKAS:  -- we have done a chart on page five where

11   we've attempted to set forth that information.

12            THE COURT:  Yes.

13            MR. ECKAS:  And what we have put in there, your Honor,

14   is the cases in which --

15            THE COURT:  On page five in the third column, the one

16   that says HEMT 2006-6?

17            MR. ECKAS:  It's a chart such as this, your Honor.

18   Yes, that is correct, your Honor.

19            THE COURT:  The date you say is 12/29/2007.  It should

20   be 2006, correct?

21            MR. ECKAS:  Yes, it should be, your Honor.

22            THE COURT:  Just to show you, Mr. Eckas, that I read

23   these.

24            MR. ECKAS:  I read this too, your Honor.

25            THE COURT:  I hope you voted.

1          MR. ECKAS:  Anyway this sets forth what we believe

2     matters in terms of overlap, your Honor, and that we believe is

3     when the originators are disclosed and when the alleged

4     misstatements are disclosed, that then you are allowed to

5     represent people even if you didn't personally buy the

6     certificate because then in the Second Circuit's language a

7     common sense concern is raised.  The concern as we understand

8     them would be the alleged misrepresentation as opposed to

9     concerns being the fact that there may have been originator

10     that originated a loan in each of the two transactions.

11          THE COURT:  What do you say about Mr. Laitman's

12     Exhibit 9 where the representations seemed to be highly

13     similar?

14          MR. ECKAS:  There are three levels of disclosure here,

15     your Honor.

16          THE COURT:  This is the shelf registration?

17          MR. ECKAS:  Yes.  There's the shelf registration

18     statement which as your Honor knows contains as many blanks as

19     it does words.  It's in essence a model of what will come.  The

20     next level down, of course, is the base prospectus.  And that,

21     basically, says we're going do a series of transactions that

22     have the following general characteristics in common.  It

23     discloses nothing about each individual specific transaction

24     such that an investor really could evaluate.  For example, it

25     really doesn't disclose the average FICO scores or where the

1    properties are located, the loan to value ratios, anything like

2    that.

3            So the next level down, your Honor, is what's often

4    called a supplemental prospectus and that's where the real meat

5    and potatoes of the disclosure is.  That is about each

6    individual specific deal.  So, for example, it's been one of

7    those for 2006-5, a separate one for 2007-2, a separate one for

8    2006-4.  While all of these share the same base prospectus and

9    so, of course, the plaintiff is correct on what the base

10   prospectus says -- it is at such a general level and a general

11   nature that we don't believe that is really what the Court

12   should be looking at.  The real disclosures are in the

13   prospectus supplement where it really tells you what the deal

14   is about.  And those you will see, your Honor, are quite

15   different from deal to deal.

16           THE COURT:  Where does the Second Circuit in the

17   Goldman or the ANICA case focus in on the different language in

18   the supplemental prospectus?

19           MR. ECKAS:  If I could just have a second, your Honor?

20           THE COURT:  Yes.

21           (Pause)

22           MR. ECKAS:  I am reading on page 20 now, your Honor.

23   My colleagues was able to find it more quickly than I was.

24   It's on star 12 of the Westlaw cite and the quotation talks

25   about whether the same set of concerns standard and it says:

1          In the context of claims alleging injury based on

2    misrepresentations, the misconduct alleged will almost always

3    be the same, the making of a false or misleading statement.

4    But whether that implicates the same set of concerns depends on

5    the nature and content of the specific misrepresentation

6    alleged.  So at some very general level, your Honor, we do

7    agree that the Exhibit 9 does show that, yes, there are

8    allegedly false or misleading statements but it doesn't go to

9    the nature or content of what really is behind the deals.  We

10   believe you have to look to the prospectus supplement for that.

11         THE COURT:  But you'd agree with me that the Second

12   Circuit when they came around to making the decision in

13   deciding which of the 17 trusts could be sued on or which the

14   ANICA IPEW had standing, they didn't look at the prospecti so

15   much as they looked at the common originators.  At least that's

16   the way I read it.

17         MR. ECKAS:  Your Honor, our analysis was there's one

18   exception but other than that they looked at common

19   misrepresentations.

20         THE COURT:  All right.

21         MR. ECKAS:  And we have a list of those.  Let me just

22   quickly find out for your Honor.

23         THE COURT:  Sure.

24         (Pause)

25         MR. ECKAS:  It's in Footnote 12, your Honor, on page

1    21.

2            THE COURT:  Yes.  However, plaintiff lacks standing to

3    assert claims on behalf of purchasers from some certificates

4    from the other ten trusts because the only way you can explain

5    is because they didn't have Greenpoint or Wells Fargo as the

6    originators.  So footnote 12 identifies the ten trusts if we

7    have the same footnote.  Do we have the same footnote?  The ten

8    trusts as to which they don't have standing.

9            (Pause)

10           MR. ECKAS:  The one that they didn't arrive according.

11           To us, your Honor, is 2007-4F and 2007-AT1.

12           THE COURT:  There's ten of them including those two.

13           MR. ECKAS:  Right.  They had the same originator but

14   not the same representation.

15           THE COURT:  OK.  All right.  But do you agree with

16   Mr. Laitman that all four of these the issues here have the

17   same originators?

18           MR. ECKAS:  We would agree that there is at least one

19   overlapping originator between each of the transactions.  Those

20   are not disclosed in the prospectus or prospectus supplements

21   because often they are in very small amounts but, yes, we do

22   agree it is factually correct that you can find one, at least

23   one loan that overlaps in each transaction.

24           THE COURT:  Well, with respect to 2006-5 which is the

25   one that I allowed to proceed, is there any originator other

1   than New Century?

2            MR. ECKAS:  Yes, your Honor.  There are hundreds.  New

3   Century originated, approximately, 33 percent of the loans

4   underlying that transaction.  The rest were originated from a

5   very large variety of sources.

6            THE COURT:  Did New Century participate in the

7   underwriting for 2006-6 or 2006-4?  Is it the chart on page

8   five?

9            MR. ECKAS:  That is the one.  We know that they were

10  in 2007-2.

11           THE COURT:  Correct.

12           MR. ECKAS:  Four and six, I do not know the answer to

13  that, your Honor.

14           THE COURT:  Mr. Laitman, what's the answer?

15           MR. ECKAS:  They were not disclosed but there is an

16  answer to your question.  I just don't know.

17           THE COURT:  Mr. Laitman, do you know?

18           MR. LAITMAN:  No.  As of what we know now because we

19  didn't get discovery New Century was not.

20           THE COURT:  New Century was not involved in 20006-4

21  and 2006-6, correct?

22           MR. LAITMAN:  We don't know that right now.

23           THE COURT:  OK.

24           MR. LAITMAN:  I am not trying to be evasive but when

25  we get the discovery like we did I know 6-5 we see the complete

1   list but until we get that we just know what's in the public

2   filing.

3         THE COURT:  All right.  So you want me to focus then,

4   Mr. Eckas, in your argument on the disclosures?

5         MR. ECKAS:  Yes, your Honor.  We believe what is meant

6   by the same common concerns really is if the same alleged

7   misrepresentations were made.  Even if you didn't buy in this

8   that offering if the misrepresentations are the same by the

9   same originators you should be allowed to represent that class

10  anyway.

11        THE COURT:  Well, let me ask you, the

12  misrepresentations is as the Second Circuit found across all 17

13  trusts were pretty much the same and yet they allowed them only

14  to go forward with regard to seven of the ten.  So why were ten

15  excluded if the language, the misrepresented language was all

16  the same?

17        MR. ECKAS:  I don't think, your Honor, that the

18  language about originators, one, will -- correct me if I am

19  wrong -- was the same.  For instance, in our case, your Honor,

20  we focused, there's language about New Century's underwriting

21  guidelines in one of the deals.  There is allegations -- I am

22  sorry -- there's disclosure about New Century's bankruptcy

23  filing in another one of the deals.  Another deal there's no

24  disclosure about underwriting guidelines but there is a list of

25  certain of the originators.  There is a variety of different

CB8AANJCA                    Argument

1   disclosures from deal to deal.  In this set of cases, your

2   Honor, of the disclosure are not all the same.

3           THE COURT:  OK.  I don't want to cut you off then.

4   You want to say something about the statute of limitations?

5           MR. ECKAS:  Yes, if I may, your Honor?

6           THE COURT:  Yes, please.

7           MR. ECKAS:  As your Honor knows this case was filed in

8   2008.

9           THE COURT:  Yes.

10          MR. ECKAS:  At that time it was about one transaction

11  2006-5.

12          THE COURT:  Correct, the one they purchased.

13          MR. ECKAS:  Yes.  And that is correct, your Honor.

14  The second -- I'm sorry -- the first amended complaint was

15  filed in 2009.  And in this complaint the three additional

16  transactions were added, your Honor.  No motion to dismiss was

17  made as to the original complaint because that was filed in

18  state court.

19          THE COURT:  It was removed?

20          MR. ECKAS:  Correct, your Honor.  And then plaintiffs

21  filed an amended complaint.  It was agreed we wouldn't answer

22  or move and we would do it with respect to the amended

23  complaint.  We did that, your Honor.  We made our standing

24  argument, the one that people generally made and accepted.

25  Your Honor accepted that argument and dismissed it.

CB8AANJCA                          Argument

1          THE COURT:  Yes.

2          MR. ECKAS:  Time then --

3          THE COURT:  Time passed.

4          MR. ECKAS:  -- passed.

5          THE COURT:  Judge Parker came to a different view of

6    what "standing" means.

7          MR. ECKAS:  Yes.  And while that time was passing

8    there was a motion to intervene as I am sure your Honor

9    recalls.

10          THE COURT:  Correct.

11          MR. ECKAS:  And the motion to intervene --

12          THE COURT:  It was the Mississippi Carpenters.

13          MR. ECKAS:  Correct.  And it would have cured the

14    standing issue with respect to two of the three transactions

15    that were made.  Your Honor, we briefed it fully and your Honor

16    did --

17          THE COURT:  That's my December ruling.

18          MR. ECKAS:  It is, your Honor.  Give you the exact

19    date if that would be helpful.  December 15, 2010.

20          THE COURT:  Correct.

21          MR. ECKAS:  And in essence, what this comes down to,

22    your Honor, is those claims were untimely unless they were

23    entitled to relation back because the time had passed.  Now,

24    you found that there was no relation back because the new

25    transactions that were sought to be added were no where

1     mentioned, discussed, alluded to, etc., in the first complaint.

2     The first complaint was just about the transaction.

3          THE COURT:  But they proceeded on the error that's now

4     apparent after Judge Parker that Mr. Laitman and his client

5     needed standing and he had to purchase and I wasn't going to

6     allow Mr. Laitman to bring in a new group to cure the

7     deficiency that existed as of that time.  But if we had the

8     decision from the Second Circuit of 2012 back in 2010 the

9     result may very well have been different.  I guess that's

10    Mr. Laitman's argument.  You are supposed to put time back in

11    the bottle and allow us to recalculate.

12         MR. ECKAS:  Maybe I'm misunderstanding but as I as I

13    understand plaintiff's reply brief, your Honor, I don't think

14    they took issue with everything I've said but they said, but,

15    the fact that I am overlooking is they say the law changed,

16    right.  So the law changed that there is a different standard

17    now for when the statute of limitations begins running.

18         I think people would agree that assuming it's inquiry

19    notice, that the time had run.  If it is the standard, however,

20    that was announced in Merck and Pontiac then it may not have

21    run.  And the issue for us, your Honor, comes down to whether

22    Merck and Pontiac extend to 33 Act cases, as well as 34 Act

23    cases.  We believe they do not.

24         Merck, of course, was a 1934 Act case.  And the

25    Court's primary discussion in Merck was about scienter and

1    about the additional things one must allege and prove for 34

2    Act cases

3             THE COURT:  What do you think about Mr. Laitman's

4    argument that eight district court judges can't be wrong?

5             MR. ECKAS:  I believe your Honor, in fact, took the

6    opposite view and your Honor found that there was a difference

7    between 33 Act and 34 Act cases and that your Honor --

8             THE COURT:  And not one of the eight?

9             MR. ECKAS:  It is not one of the eight.  Your Honor is

10   not alone in that regard.  There are a number of other courts

11   that have done that as well.  I understand your Honor's

12   decision is currently on appeal.  I have looked at the

13   decisions by these eight other district judges.  Often they

14   have not much analysis behind it.  We believe the thinking and

15   analysis of putting the 33 Act and the 34 Act into two

16   different buckets makes sense primarily because the pleading

17   standards are so different.  34 Act is much harder to plead.

18   You know you have to plead and prove scienter, reliance, loss

19   causation and you have Rule 9B.

20             And to our way of thinking, your Honor, is makes sense

21   to have a somewhat more relaxed view about when the statute of

22   limitations would begin to run when there's a much higher

23   pleading standard.  When you only have notice pleading as you

24   do for Section 11 we believe that the standard inquiry notice

25   should continue to apply.

CB8AANJCA                          Argument

1              THE COURT:  OK.

2              MR. ECKAS:  The only other thing I would ask your

3    Honor is assuming that the new standard set forth in Merck and

4    Pontiac does apply another way I guess of saying is, should

5    your Honor's decision be overruled, we think the plaintiff's

6    knew plenty at that time that they could have made the

7    necessary allegations and we say that based on the complaint

8    that they filed.

9              In that complaint, your Honor, among other things they

10   say and again this was in 2008, that disclosures had emerged

11   that New Century routinely disregarded the underwriting

12   guidelines and caused the defendant agent, rating agencies not

13   to recognize the true value of the collateral.  They go on and

14   say at several other points throughout the brief that it had

15   come to light that New Century had deficient lending practices

16   that it caused it to shut down and to go into bankruptcy.  It

17   says, we now know that the underwriting standards were,

18   actually, lucent prior to and during the periods in which the

19   offerings took place.  There are a number of places.  They

20   point to local newspapers articles where they interviewed

21   employees of New Century who said they were under pressure to

22   approve more loan rather than not.

23             In the complaint originally filed, your Honor, the

24   plaintiffs say that they have plenty of material that they

25   believe proves what was going on at New Century at that time.

CB8AANJCA                          Argument

1   So while it may, indeed, be true that between 2008 and 2009

2   more information became available and that's, certainly, the

3   case, more did become available but that doesn't mean there

4   wasn't enough available --

5          THE COURT:  From an earlier time?

6          MR. ECKAS:  Yes.

7          THE COURT:  Let me ask -- are you finished now,

8   Mr. Eckas?

9          MR. ECKAS:  Yes.

10          THE COURT:  Let me ask you one question.  If New

11   Century is the originator for both 2006-5 and 2007-2, tell me

12   again why you say that 2007-2 should not be included in the

13   amended pleading.

14          MR. ECKAS:  Yes, your Honor.  First I should say they

15   are one of the originators for each of those transactions.

16   There are many other originators as well but they are one of

17   them.  And the reason we think they shouldn't be included is

18   the discloses about New Century are not similar to each other

19   at all.

20          THE COURT:  And the supplemental prospectus?

21          MR. ECKAS:  Correct, your Honor.  2007 focuses on the

22   fact that New Century had been placed into bankruptcy and on

23   the general downturn in the housing market.  Whereas, 2006-5

24   focused on the underwriting standards in place and the various

25   exceptions that may be made to those.

1            THE COURT:  Anything else you want to say?

2            MR. ECKAS:  Not at this time, your Honor.

3            THE COURT:  Thank you, Mr. Eckas.

4            Mr. Laitman, before you go --

5            Mr. Eckas, you said one of my decisions was on appeal.

6       I suppose I should pay more attention to this but where is it

7       on appeal and what's the status of the appeal?

8            MR. ECKAS:  It's fully briefed and argued.  It was

9       argued in October.  It's the Marshall Freidus decision against

10      Thompson.  I'm sorry.  Excuse me.  It's the Barclay Bank

11      decision, your Honor.  And, yes, it's been appealed, your

12      Honor.

13           THE COURT:  Thank you very much.

14           OK.  Mr. Laitman.

15           MR. LAITMAN:  Your Honor, I just want to go to this

16      issue that inquiry notice was applied these would be

17      time-barred and I think it would be just, make it much clearer

18      if I would just refer your Honor first to Exhibit Number 3 in

19      the affidavit of Mr. Eisenkraft.  I am sorry.  Exhibit Number

20      1.

21           THE COURT:  OK.

22           MR. LAITMAN:  Exhibit Number One shows the right of

23      all of the Triple A tranches.  And what the significance of

24      that is the Triple A tranches made up 93 percent of the entire

25      offering.  That's 766 million of the total 825 million bonds

1    sold.  Under inquiry notice for them to prevail and to have the

2    claims dismissed on statue of limitation ground on a motion to

3    dismiss, there must be uncontroverted evidence of the

4    misstatements and omissions as of March 23, 2008 because the

5    amended complaint that asserted claims on this offering 2007-2

6    was March 23, 2009.  So for them to prevail you have to have

7    uncontroverted evidence on March 23, 2008 that a reasonable

8    investor would have known the misstatements.

9         The downgrade, there are only rating agencies, Moody's

10   and SMP that rated these bonds.  As of March 23, 2008, both of

11   them had the highest, maintained the highest Triple A rating on

12   all of the Triple A bonds.  That's 93 percent of the offering.

13   No reasonable investor -- and Mr. Eckas cited general events

14   about New Century but a bond holder would never begin to think

15   that those events impact their bonds if 93 percent of the bonds

16   are still Triple A by both Moody's and SMP.

17        THE COURT:  So the rating agencies then control when

18   people that have more -- have inquiry notice, is that it?

19        MR. ECKAS:  Well, for these bonds -- and your Honor on

20   the motion to dismiss it was critical for the claim to survive

21   the motion to dismiss that the bonds were downgraded

22   dramatically to junk but if you look at Exhibit 1, look at the

23   difference.  On March 23, 2009 one year later, one year later,

24   look at the bonds.  They've collapsed.

25        THE COURT:  March 23, 2008?

1          MR. LAITMAN:  Yes, March 23, 2008, both Moody's and

2     SMP were 93 percent of the offering 80 -- 766 of the 820

3     million bonds, these were the highest rated bonds maximum

4     safety.

5          THE COURT:  When did the ratings change.

6          MR. LAITMAN:  It's not until you get to March 23, 2009

7     a year later, well within the period that year that they've

8     collapsed to junk level bonds.  So no reasonable investor --

9     forget about uncontroverted evidence.  There is no evidence

10    that a reasonable investor would have known that the bonds,

11    that there was a potential misstatement because they're sitting

12    with bonds that are Triple A.

13         THE COURT:  That was when you brought your initial

14    lawsuit too, wasn't it?

15         MR. LAITMAN:  Well, the ratings were different for the

16    06-5.  This is the 07-2 and one of the reasons --

17         THE COURT:  What were the ratings when you brought the

18    lawsuit on the 06-5?

19         MR. LAITMAN:  They were different.

20         THE COURT:  What were they?

21         MR. LAITMAN:  I don't have them but they were lower.

22    You didn't have all the Triple As at the highest maximum safety

23    level.  And so under inquiry notice -- and, your Honor, as I

24    said your intervention decision you adopted that December 20,

25    2007 date based on the date that the bonds in those two

CB8AANJCA                         Argument

1    offerings which is not this one, dropped to junk.  And my only

2    point to you with Exhibit Number One is that didn't occur for

3    the 07-2.  So under inquiry notice using the exact same

4    analysis there is no way that the statute of limitation defeats

5    the 2007-2 claims.

6              THE COURT:  Right.  OK.  Mr. Laitman, thank you.

7              Mr. Eckas, you wanted to say --

8              MR. LAITMAN:  Your Honor, I just wanted to make one

9    other point going on the other point about Goldman if I could?

10             THE COURT:  Very briefly.

11             MR. LAITMAN:  OK.  The Goldman complaint and I would

12   just cite, we annexed the Goldman complaint as Exhibit 8 to the

13   Eisenkraft affidavit.  And if you go to paragraph 35, it's a

14   very instructive paragraph because it defeats this argument

15   that you have to have pro-sups that New Century has to have the

16   exact same disclosures.  And by the way, the underwriting

17   standards were virtually the same.  This additional point about

18   bankruptcy has nothing to do with the underwriting.  It's

19   another -- it's in a different section of the prospectus.

20             But paragraph 35 is important because it identifies in

21   the Goldman complaint three prospectuses where there was an

22   explicit pro-sup disclosure of the guidelines and one where

23   there was not and but what the Second Circuit said that all of

24   them, all of them, there's standing to represent all of them

25   because --

1            THE COURT:  You cite that at page nine of your rely

2    brief, correct?

3            MR. LAITMAN:  Correct.  OK.  Mr. Eckas.

4            MR. ECKAS:  Yes, your Honor.  I would just like to

5    address the point of whether or not people know when bonds are

6    downgraded.  Obviously, we can't know what everyone in the

7    class knew but I can tell you at least with respect to 2006-5

8    New Jersey Carpenters Funds knew on February 13, 2008.

9            THE COURT:  That's when they filed their lawsuit?

10           MR. ECKAS:  It was before they filed their lawsuit,

11   your Honor.  They were informed in writing by their investment

12   advisor that their holdings in 2006-5 and they held senior

13   tranche, were downgraded from Triple A to B and that they no

14   longer meet the minimum credit quality standard of the fund.

15   So, obviously, I don't know what everyone in the class knew,

16   your Honor, but at least with respect to 2006-5 we have

17   testimony from Mr. Laughenberg and we have a document that

18   they've produced.

19           THE COURT:  How does that help you?  Doesn't that make

20   Mr. Laitman's point?  You got the information the bonds were

21   downgraded from Triple A to B.  They sold the bonds.  I don't

22   know whether they sold the bonds but they filed the lawsuit but

23   none of the other trusts were downgraded at that time.

24           MR. ECKAS:  Well, the ones in the other -- were in the

25   same time period, your Honor.

1          THE COURT:  They were?  So Chart One Exhibit One is in

2     error?

3          MR. ECKAS:  Just so you understand, your Honor,

4     obviously, Alliance Bernstein didn't alert them to transactions

5     in which they didn't hold them investment, so this letter only

6     addresses that one.

7          THE COURT:  Yes.

8          MR. ECKAS:  Their exhibit one is correct, your Honor,

9     but it only addresses 2007-2 we agree is its own animal.  It

10    occurred in a different space and time.  The 2006 ratings, they

11    largely happened in the same time period.

12         THE COURT:  Thank you very much.  I appreciate it.

13         MR. ECKAS:  You are welcome.

14         THE COURT:  I'll get to this as quickly as I can.

15                         (Adjourned)