UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEW JERSEY CARPENTERS HEALTH
FUND, on Behalf of Itself and All Others
Similarly Situated,

                Plaintiff,

         v.

DLJ MORTGAGE CAPITAL, INC., CREDIT
SUISSE MANAGEMENT, LLC, f/k/a CREDIT
SUISSE FIRST BOSTON MORTGAGE
SECURITIES CORPORATION, ANDREW A.
KIMURA, THOMAS ZINGALLI, JEFFREY
A. ALTABEF, MICHAEL A. MARRIOTT,
EVELYN ECHEVARRIA, and CREDIT
SUISSE SECURITIES (USA) LLC,

                Defendants.

---

U.S.D.C. S.D.N.Y.
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 23, 2013

No. 08 Civ. 5653 (PAC)

**OPINION AND ORDER**

---

HONORABLE PAUL A. CROTTY, United States District Judge:

        Plaintiff New Jersey Carpenters Health Fund ("Plaintiff") moves for reconsideration of the Court's March 29, 2010 Order in light of the Second Circuit's recent decision in NECA-IBEW Health and Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145 (2d Cir. 2012) ("NECA").  (See ECF No. 139.)  For the reasons stated below, Plaintiff's motion is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

    A.     Prior Proceedings

        The Court assumes familiarity with its previous rulings in this matter.  See N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., 2010 WL 1473288 (Mar. 29, 2010) ("N.J. Carpenters I"); N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., 2010 WL 6508190 (Dec. 15, 2010) ("N.J. Carpenters II").  Briefly stated, Plaintiff's initial complaint alleged that it was a purchaser of mortgage-backed certificates ("Certificates") arranged by Credit Suisse and issued by Home Equity Mortgage Trust ("HEMT") 2006-5.  ("Initial Compl.," ECF No. 1)

Plaintiff asserted class claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), 77o, based on material misstatements and omissions in the shelf registration statement and prospectus supplement for this deal regarding the underwriting standards of mortgage originator New Century Mortgage Corporation ("New Century"), which originated a portion of the loans that backed the HEMT 2006-5 certificates.  Thereafter, Plaintiff filed a First Amended Complaint asserting the same class claims for three other offerings pursuant to the same shelf registration statement as the HEMT 2006-5 offering, but in which Plaintiff did not purchase Certificates: HEMT 2006-4, HEMT 2006-6, and HEMT 2007-2.[1]  ("FAC," ECF No. 44.)

In N.J. Carpenters I, the Court granted Defendants' motion to dismiss the claims relating to the three offerings in which Plaintiff had not purchased Certificates on the grounds that Plaintiff lacked standing to bring these claims. See 2010 WL 1473288.  As a result, Plaintiff attempted to have the Public Employees Retirement System of Mississippi ("Miss. PERS") intervene as a purchaser of HEMT 2006-4 and 2006-6 Certificates in order to revive the claims relating to these two offerings.  The Court rejected this attempt in N.J. Carpenters II.  See 2010 WL 6508190.  The parties have been engaged in discovery on Plaintiff's claims relating to the 2006-5 Certificates since these rulings.

---

[1]  These offerings were all executed pursuant to the shelf registration process, which allows issuers to file a "shelf" registration statement that includes a "base" prospectus providing an overview of the proposed offerings, including the types of securities to be offered and the general risk factors of the offerings. See 17 C.F.R. §§ 230.415; 230.430B; NECA, 693 F.3d at 150.  Each offering also had its own prospectus supplement, which set out the details for the individual offering (including the origination history of the collateral for the specific deal), and which was incorporated into the registration statement, resulting in a "new registration statement" for that offering. See 17 C.F.R. §§ 229.512(a)(1–2); NECA, 693 F.3d at 150–51.  As such, the offering materials for each of the four offerings at issue consisted of the information in the common registration statement and the unique prospectus supplement for each respective deal. See NECA, 693 F.3d at 151.

### B.     The Second Circuit's NECA Decision

The Second Circuit's NECA decision reversed a district court that had dismissed for lack of standing Securities Act class claims by a purchaser of certificates from two trusts who sought to represent purchasers of all mortgage-backed certificates issued by all the trusts in multiple offerings pursuant to a common shelf registration statement.  See NECA, 693 F.3d 145.

NECA had purchased certificates that were sold as part of 17 separate offerings by 17 separate trusts with 17 different prospectus supplements, respectively, but one common shelf registration statement.  Id. at 149.  The 17 trusts were backed by pools of residential real estate loans acquired, in part, from at least one of six major mortgage originators.  Id.  NECA purchased certificates in only 2 of the 17 offerings, but sought to bring Securities Act class claims under Sections 11, 12(a)(2), and 15 on behalf of all purchasers of certificates in any of the offerings.  Id.  NECA alleged that the common registration statement contained false and misleading statements, which were repeated in the individual offering prospectuses.  Id.

The district court had held that NECA lacked standing to bring claims on behalf of purchasers of certificates in the 15 offerings it did not purchase, stating that NECA did not show that the injuries it alleged based on its purchases of certificates from two of the trusts were the same as those suffered by purchasers of other certificates backed by different sets of loans.  Id. at 154.  The district court held that NECA could only represent the class of persons who purchased the same certificates that NECA purchased.  Id. at 155.

The Second Circuit reversed these rulings, holding that "the district court erred in concluding, based on the fact that NECA purchased just two particular certificates . . . from

particular trusts that it necessarily lacked standing to assert claims *on behalf of* purchasers of certificates from other trusts." Id. at 158 (internal quotations and alterations omitted).[2]

The Second Circuit separated its standing analysis into three parts—Article III, statutory, and class standing—and addressed each in turn. Id. First, the Second Circuit held that NECA had Article III standing because it sufficiently alleged a diminution in value of the certificates it held as a result of the defendants' allegedly false and misleading statements in the registration statement and associated prospectuses, which was redressable through its claims under Sections 11 and 12(a)(2). Id. The Second Circuit also held that NECA had statutory standing because it purchased its certificates in their respective offerings. Id.

The Second Circuit, however, held that "the class standing analysis is different" from the Article III and statutory standing analyses. Id. "[W]hether NECA has class standing—that is standing to assert claims *on behalf of* purchasers of certificates from other offerings . . .—does not turn on whether NECA would have statutory or Article III standing[.]" Id. After surveying Supreme Court case law, the Second Circuit held that the "broad standard for class standing . . . in a putative class action [is that] a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." Id. at 162 (internal citations and alterations omitted).

The Second Circuit held that the district court erred by requiring NECA to show that its "injuries [were] the same" as those allegedly suffered by purchasers of certificates from different trusts backed by different sets of loans, instead of whether the conduct alleged raised the "same

---

[2] To avoid confusion with the Certificates at issue in this case, the Court has altered some of the capitalization in the quotations from the NECA opinion throughout this order.

set of concerns" as the conduct alleged to have caused injury to other members of the putative class. Id. (quotation omitted). The Second Circuit noted that "in the context of claims alleging injury based on misrepresentations, the misconduct alleged will almost always be the same: the making of a false or misleading statement," but held that "[w]hether that conduct implicates the same set of concerns for distinct sets of plaintiffs . . . will depend on the nature and content of the specific misrepresentations alleged." Id.

NECA had alleged that the defendants "inserted nearly identical misrepresentations into the offering documents associated with all of the certificates, whose purchasers plaintiff seeks to represent." Id. at 163. The Second Circuit held that "[t]he fact that those representations appeared in separate offering documents . . . does not by itself raise a number of fundamentally different concerns." Id. (quotations omitted).

The Second Circuit also noted that the purchasers whom NECA sought to represent bought "certificates issued through 17 separate offerings, each backed by a distinct set of loans issued by a distinct set of originators." Id. The Second Circuit held that "[i]n the context of §§ 11 and 12(a)(2) claims alleging misrepresentations about *origination guidelines* . . . differences in the identity of the originators backing the certificates matters for the purposes of assessing whether those claims raise the same set of concerns." Id. This is the case because the "originator-specific allegations provide the necessary link between (1) the offering documents' representations in a vacuum and (2) the *falsity* of those representations." Id.

Applying the two-part class standing test to the facts at issue, the Second Circuit held that the first part was met because NECA alleged injury as a result of the defendants' misleading statements in the offering materials associated with the certificates it purchased. Id. at 162. Regarding the second part, the Second Circuit held that "to the extent certain offerings were

backed by loans originated by originators common to those backing the [offerings from which NECA purchased], NECA's claims raise a sufficiently similar set of concerns to permit it to purport to represent certificate-holders from those offerings." Id. at 164.  The Second Circuit also held that NECA "lack[ed] standing to assert claims on behalf of purchasers of certificates from the other" trusts pursuant to the common registration statement because such claims did not give rise to a sufficiently similar set of concerns.  Id.

## DISCUSSION

### I. STANDARD FOR RECONSIDERATION

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment[.]"  The Second Circuit has "limited district courts' reconsideration of earlier decisions under Rule 54(b) . . . . [T]hose decisions may not usually be changed unless there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice."  Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Cooper & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003) (quotations omitted).  The party moving for reconsideration bears the burden of demonstrating an intervening change of controlling law.  In re Rezulin Prods. Liability Litig., 224 F.R.D. 346, 350 (S.D.N.Y. 2004) (Kaplan, J.).

Whether to grant a motion for reconsideration is within the discretion of the district court, see Color Tile, 322 F.3d at 167, but to justify reconsideration the "court must . . . have a 'clear conviction of error with respect to a point of law on which its previous decision was predicated.'"  Green v. Beer, No. 06 Civ. 4156 (KMW), 2009 3401256, at *2 (S.D.N.Y. Oct. 22, 2009) (quoting Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir. 1981)).

In the March 29, 2010 Order, the Court held that "[a] lead plaintiff asserting Section 11 claims concerning mortgage-backed securities from an issuing trust lacks standing to sue on claims arising from trust offerings which he did not purchase." N.J. Carpenters I, 2010 WL 1473288, at *3. It is clear that NECA constitutes a change in controlling law that requires the Court to reanalyze its prior decisions.

## II. PLAINTIFF'S STANDING UNDER NECA

Under NECA, Plaintiff has Article III standing in its own right because it has alleged a diminution in value of its 2006-5 Certificates as a result of Defendants' allegedly false and misleading statements in the offering materials for the 2006-5 Certificates, which is redressable through its claims. N.J. Carpenters I, 2010 WL 1473288, at *5; see NECA, 693 F.3d at 158. Plaintiff also has statutory standing because it (now) alleges that it purchased its Certificates in their initial offerings. (Second Am. Compl. ¶ 19, ECF No. 87.) See NECA, 693 F.3d at 158. Plaintiff has thus satisfied NECA's first requirement—it sufficiently alleged it "personally has suffered some actual injury as a result of the putatively illegal conduct of [Defendants]." NECA, 693 F.3d at 162 (quotations omitted).

Defendants, however, argue that Plaintiff has failed to satisfy the second requirement—"that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." Id. (quotations omitted). Defendants emphasize that for the 2006-5 Certificates the only originator identified and the only originator whose specific underwriting guidelines are set forth in the prospectus supplement is New Century. (See Def.'s Mem. in Opp'n at 4, ECF No. 143.) Defendants argue that because the FAC did not allege a common originator and common misstatements relating to that specific originator's underwriting guidelines between the 2006-5 Certificates and the 2006-4 and 2006-6

Certificates, Plaintiff has not alleged conduct that implicates the "same set of concerns" among these offerings sufficient to sustain class standing.  (Id. at 23–24.)  Defendants also argue that while New Century was the primary originator of mortgages backing the 2007-2 Certificates as well, the FAC does not allege misstatements regarding New Century's underwriting guidelines with respect to this offering because, unlike the 2006-5 Certificates, the prospectus supplement for the 2007-2 Certificates did not describe any New Century-specific underwriting guidelines.  (Id. at 23.)  Absent allegations of similar misstatements regarding New Century's underwriting guidelines in the 2007-2 prospectus supplement, Defendants argue Plaintiff has not alleged conduct that implicates the "same set of concerns" as the alleged conduct regarding the 2006-5 Certificates.  (Id.)

Plaintiff argues it satisfied the second NECA prong because it now asserts that the 2006-5 Certificates shared at least one common originator with each of the Dismissed Offerings, because the common registration statement contains alleged misstatements regarding the underwriting practices of the mortgage originators generally for all the offerings, and because these alleged misstatements are incorporated in the effective offering materials for each offering.  (See Pl.'s Mem. of Law at 6, ECF No. 140; Pl.'s Reply Mem. at 8, ECF No. 147; Ex. 9, ECF No. 148-9.)

Plaintiff's argument is not supported by NECA.  If it were, the plaintiff in NECA would have been allowed to assert class claims regarding all 17 offerings pursuant to the common shelf registration statement there.  But, it was not the statements of origination guidelines for the originators generally in the shelf registration statement that created "the same set of concerns."  As the Second Circuit noted, the defendants were "alleged to have inserted nearly identical misrepresentations into the offering documents associated with *all* of the certificates." NECA, 693 F.3d at 162.

> [T]he shelf registration statement common to every certificate's registration statement represent[ed] that, for loans purchased under the conduit program, "the originating lender makes a determination about whether the borrower's monthly income . . . will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property." It similarly represented that, for mortgage loans generally, "[t]he lender . . . applies the underwriting standards to evaluate the borrower's credit standing and repayment ability" and "makes a determination as to whether the prospective borrower has sufficient monthly income available (as to meet the borrower's monthly obligations . . . )." Id.

Analogizing to a hypothetical "series of corporate debt offerings . . . all of which contained an identical misrepresentation about the issuing company's impending insolvency," the Second Circuit noted that "claims brought by a purchaser of debt from one offering would raise a 'set of concerns' nearly identical to that of a purchaser from another offering" because the common misrepresentation related to "the same company whose solvency has been called into question." Id. at 162–63. But, the facts in NECA were "not this case," and the Second Circuit held that because each offering was "backed by a distinct set of loans issued by a distinct set of originators," the identity of the originators was key to "assessing whether [the] claims raise the same set of concerns." Id.

While there are common alleged misstatements regarding originator underwriting guidelines generally among the offering materials (as in NECA and the Second Circuit's hypothetical), "to the extent the representations in the offering documents were misleading with respect to one certificate, they were not necessarily misleading with respect to others," even though the "alleged injury suffered by each offering's certificate-holder may 'flow from' the same shelf registration statement or from nearly identical misstatements contained in distinct prospectus supplements." Id. The key is "whether the particular originators of the loans backing the particular offering from which a certificate-holder purchased a security had in fact abandoned [their] underwriting guidelines, rendering [D]efendants' *offering documents* false or misleading."

9

Id. (emphasis added).  In NECA, the Second Circuit held that "[w]hether that conduct [the making of a false or misleading statement] implicates the same set of concerns for distinct sets of plaintiffs . . . will depend on the nature and content of *the specific misrepresentations alleged*." Id. at 162 (emphasis added).  The Second Circuit recognized that while NECA and purchasers of certificates backed by loans from originators not alleged to have backed NECA's certificates "may both have suffered injuries, those suffered due to misstatements in the latter group of offerings were sufficiently different in character and origin" as to preclude class standing for those certificates.  Id. at 164.  Such is the case here for the 2006-4 and 2006-6 Certificates.

Plaintiff does not have class standing to assert claims relating to the 2006-4 Certificates because the FAC alleges (and the prospectus supplement discloses) these Certificates are backed by Aames, Accredited, and WMC-originated loans, but not by New Century-originated loans. (See FAC ¶¶ 6 n.3, 77, 95, 170 n.9; Home Equity Mortgage Trust 2006-4 Form 424(b)(5) at S-4.)  The FAC does not allege that Aames, Accredited, or WMC originated loans that backed the 2006-5 Certificates,[3] nor does the prospectus for the 2006-5 Certificates disclose any of these companies as originators for that deal.  (See Home Equity Mortgage Trust 2006-5 Form 424(b)(5) at S-4, S-27.)  In comparison, for the transactions for which the Second Circuit found NECA had class standing, NECA provided "originator-specific allegations" that the originators who underwrote the underlying loans also underwrote loans backing the certificates NECA owned, which together with the common disclosures regarding origination guidelines of the originators generally, raised a similar set of concerns. (Second Am. Compl. ¶ 35, ECF No. 71, NECA-IBEW Health & Welfare Trust Fund v. Goldman Sachs & Co., No. 08 Civ. 10783

---

[3] (See FAC ¶ 170 n.9 (alleging HEMT 2006-4 and 2006-6 was backed by Accredited-originated loans); id. ¶ 6 n.3 (alleging HEMT 2006-4 was backed by Aames-originated loans); id. ¶ 77 (alleging HEMT 2006-4 was backed by WMC-originated loans).)

("NECA Second Am. Compl.") (alleging that GreenPoint originated loans for GSAA Home Equity Trusts 2007-3, 2007-4, 2007-6, 2007-7, and "Group I" of 2007-5); id. ¶ 36 (alleging that Wells Fargo originated loans for GSAA Home Equity Trust 2007-7 and GSR Home Mortgage Loan Trust 2007-3F).[4]) See NECA, 693 F.3d at 164. In the absence of "originator-specific allegations" that the originators of loans backing the 2006-5 Certificates also originated loans backing the 2006-4 Certificates, the FAC lacks the "necessary link between (1) the offering documents' representations in a vacuum and (2) the *falsity* of those representations" sufficient to give rise to a "similar set of concerns" between these Certificates. NECA, 693 F.3d at 163. The underlying conduct alleged is the making of false or misleading statements in the offering materials, and "[w]hether that conduct implicates the same set of concerns for distinct sets of plaintiffs . . . depend[s] on the nature and content of *the specific misrepresentations alleged*." Id. at 162 (emphasis added). Alleged misrepresentations about mortgage originators generally do not give rise to a similar set of concerns absent a disclosure of a common originator between the

---

[4] The Second Circuit held that "Plaintiff also has standing to assert claims on behalf of purchasers of Certificates from Group 2 of the GSAA Home Equity Trust 2007-5 because, according to the 2007-5 prospectus, those Certificates contained at least some loans originated by Wells Fargo." NECA, 693 F.3d at 164. (See GSAA Home Equity Trust 2007-5 Form 424(b)(5) at S-10, S-55.) The Second Circuit held as such despite the fact that the NECA Second Amended Complaint did not allege that Wells Fargo originated loans for Group 2 of 2007-5. (See NECA Second Am. Compl. ¶ 36.) As Plaintiff highlights, the Second Circuit found class standing for this deal even though the prospectus supplement did not disclose any Wells Fargo underwriting guidelines. (See GSAA Home Equity Trust 2007-5 Form 424(b)(5) at S-55–S-56, S-61–S-73.) However, Wells Fargo was identified as an originator in the prospectus supplement. (Id. at S-10, S-55.)

This appears inconsistent with the Second Circuit's holding that NECA did not have class standing to assert claims relating to GSR Mortgage Loan Trust 2007-4F even though Wells Fargo was disclosed in the prospectus supplement as an originator of loans for that deal. NECA, 693 F.3d at 164 n.12. (See GSR Mortgage Loan Trust 2007-4F Form 424(b)(5) at S-8, S-45.) Although not clear from the Second Circuit's opinion, this inconsistency may be due to the fact that the materials submitted in that case appear to omit the pages from the GSR Mortgage Loan Trust 2007-4F prospectus supplement that identify Wells Fargo's role as an originator in that deal. (See NECA, No. 08 Civ. 10783 (MGC), ECF No. 61-14 (omitting pages S-8 and S-45).)

Certificates Plaintiff purchased and the Certificates for which Plaintiff seeks to assert class claims.

A similar conclusion was reached by another court in this Circuit to address this issue after the Second Circuit's NECA decision. In Plumbers' & Pipefitters Local # 562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp. I ("Local 562"), No. 08 Civ. 1713 (ERK), Judge Korman held that the plaintiff had standing under NECA to represent holders of certificates issued by trusts from which the plaintiff did not own certificates, but only for those certificates for which the plaintiff alleged loan originators that also originated loans backing the certificates plaintiff owned. See 2012 WL 4053716 (E.D.N.Y. Sept. 14, 2012).[5] Judge Korman did not reinstate claims relating to certificates for which the plaintiff did not make such allegations. Id.

For the same reasons, since the FAC does not allege (nor do the prospectus supplements disclose) that Accredited originated loans backing the 2006-5 Certificates or that New Century originated loans backing the 2006-6 Certificates, Plaintiff does not have class standing to assert claims relating to the 2006-6 Certificates. (See Home Equity Mortgage Trust 2006-5 Form 424(b)(5) at S-4, S-27; Home Equity Mortgage Trust 2006-6 Form 424(b)(5) at S-4, S-32.)

Although Plaintiff did not plead in the FAC that Aames, Accredited, or WMC originated any loans that backed the 2006-5 Certificates, Plaintiff seeks to correct that deficiency by making statements in its reply papers on this motion regarding these originators' roles in the 2006-5 offering or, alternatively, leave to amend its complaint to allege that these companies originated loans backing the 2006-5 Certificates. (See Pl.'s Reply Mem. at 9–10 n.13 (stating that the FAC "did not plead these originators underwrote loans in the 2006-5 Offering" because Plaintiff only

---

[5] The plaintiff had alleged and the offering materials disclosed that the certificates it owned were backed by loans originated by Chase, Countrywide, PHH, ResMAE, WMC, and Wells Fargo. (See Local 562, No. 08 Civ. 1713 (ERK), Consolidated Class Action Compl. ¶¶ 13, 34, ECF No. 47; Ltr. (Sept. 19, 2012), ECF No. 160.)

discovered this fact through post-complaint discovery).)  It is not entirely clear whether the Court can or should consider assertions regarding class standing not made in the Complaint.  Compare Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 87–88 (2d Cir. 2006), with Friedl v. City of New York, 210 F.3d 79, 83–84 (2d Cir. 2000).  But even if the Court were to do so (i.e., to consider Plaintiff's assertions that Aames, Accredited, and WMC originated loans backing the 2006-5 Certificates) or grant leave to do so, such allegations would be insufficient to establish class standing under NECA.  The offering materials for the transactions for which the Second Circuit found NECA had class standing disclosed, at a minimum, the originators that NECA claimed did not follow the general underwriting guidelines as stated in the offering materials, thus creating a "similar set of concerns."  NECA, 693 F.3d at 164.  (See GSAA Home Equity Trust 2007-3 Form 424(b)(5) at S-50 (GreenPoint); GSAA Home Equity Trust 2007-4 Form 424(b)(5) at S-42 (GreenPoint); Group 2 of GSAA Home Equity Trust 2007-5 Form 424(b)(5) at S-55 (Wells Fargo); GSAA Home Equity Trust 2007-6 Form 424(b)(5) at S-50 (GreenPoint and Wells Fargo); GSAA Home Equity Trust 2007-7 Form 424(b)(5) at S-49 (GreenPoint and Wells Fargo); GSR Mortgage Loan Trust 2007-3F Form 424(b)(5) at S-41 (Wells Fargo).)[6]  Even if Plaintiff were to amend and allege (based on its discovery) that Aames, Accredited, and WMC originated loans backing the 2006-5 Certificates, such a role is not disclosed in the 2006-5 prospectus.  (See Home Equity Mortgage Trust 2006-5 Form 424(b)(5) at S-4, S-27.)  Where the alleged misstatements regard the underwriting guidelines generally of originators of loans backing several transactions, there must at least be a common originator disclosed for there to be a "similar set of concerns" regarding the underwriting guidelines

---

[6] In Local 562, the operative complaint identified the originators—as disclosed in the prospectus supplement—for each transaction that the plaintiff sought to represent.  See 2012 WL 4053716.  (ECF No. 47 ¶ 34; Ltr. (Sept. 19, 2012), ECF No. 160.)

13

disclosures in the offering materials.  There is no "similar set of concerns" about alleged misstatements regarding underwriting guidelines of originators generally where no common originator is disclosed in the relevant offering materials.  Again, it is the making of false or misleading statements in the offering materials that is the actionable conduct here, and "[w]hether that conduct implicates the same set of concerns for distinct sets of plaintiffs . . . depend[s] on the nature and content of *the specific misrepresentations alleged*."  See NECA, 693 F.3d at 162 (emphasis added).  If the offering materials do not disclose a common originator, alleged misrepresentations in the shelf registration statement about the guidelines of originators generally do not give rise to a similar set of concerns sufficient to sustain class standing.

Plaintiff also argues that it has class standing to assert claims relating to the 2006-6 Certificates based on the DLJ Mortgage conduit program as a source of collateral for the 2006-5 and 2006-6 Certificates even though the FAC does not allege that the DLJ Mortgage conduit program was a source of collateral for the 2006-6 Certificates.[7]  Even if the Court were to consider this argument based on assertions in Plaintiff's motion papers, where the alleged misconduct is the making of false or misleading statements regarding origination guidelines, a common mortgage conduit program is not sufficient on its own to establish class standing under NECA.  The operative complaint in NECA, like the FAC here, alleged that the representations in the offering materials regarding the arranging bank's conduit program were misleading because no one confirmed that loans acquired from originators met the underwriting guidelines set forth.  (See NECA Second Am. Compl. ¶¶ 29–33, 41, 42; FAC ¶¶ 154–61.)  But, while the Second

---

[7]  While the Initial Complaint alleges that DLJ was an originator of mortgages backing the 2006-5 Certificates (¶¶ 2, 21), the FAC states that DLJ "did not engage in the business of mortgage loan origination," but rather "purchase[d] a substantial amount of mortgage loan collateral from other originators . . . and securitized the collateral" (¶ 102).  This is consistent with the description of DLJ in the 2006-5 prospectus supplement.  (See Home Equity Mortgage Trust 2006-5 Form 424(b)(5) at S-27.)

14

Circuit reinstated claims based on allegations specific to common *originators* among the offerings (i.e., GreenPoint and Wells Fargo), it did not reinstate claims relating to several other offerings backed by loans acquired through Goldman Sachs' conduit program, even though (1) the conduit program was a disclosed source of some of the loans backing the certificates NECA did purchase (see GSAA Home Equity Trust 2007-5 Form 424(b)(5) at S-55; GSAA Home Equity Trust 2007-10 Form 424(b)(5) at S-50); and (2) the underwriting guidelines for the conduit program were disclosed in the offering materials for these deals (see GSAA Home Equity Trust 2007-5 Form 424(b)(5) at S-70–S-73; GSAA Home Equity Trust 2007-10 Form 424(b)(5) at S-50–S-53). NECA, 693 F.3d at 164 & n.12.[8]

The FAC here also includes assertions that several originators that were generally sources of collateral for the DLJ conduit program did not comply with the stated underwriting guidelines. (FAC ¶¶ 101–05.) But again, these originators were not disclosed in the offering materials for the 2006-5 (or any other) Certificates. There is no "similar set of concerns" about alleged misstatements regarding underwriting guidelines of originators generally where the common originator is not disclosed in the relevant offering materials. See NECA, 693 F.3d at 163.

Under NECA, Plaintiff does have class standing, however, to assert claims relating to the 2007-2 Certificates. The FAC alleges that New Century originated loans backing both the 2006-5 and 2007-2 Certificates (see ¶ 162 n.8). While the alleged misrepresentations regarding

---

[8] The underwriting guidelines for the Goldman Sachs conduit program were disclosed in the common registration statement and the unique prospectus supplements for several of the certificates for which the Second Circuit held NECA lacked standing to assert claims, and the role of the Goldman Sachs conduit program as a source of loans was also disclosed in these prospectus supplements. See NECA, 693 F.3d at 162. (See, e.g., GSAA Home Equity Trust 2007-8 Form 424(b)(5) at S-47, S-59–S-62; GSR Mortgage Loan Trust 2007-4F Form 424(b)(5) at S-46–S-50; GSR Mortgage Loan Trust 2007-5F Form 424(b)(5) at S-36–S-40; GSR Mortgage Loan Trust 2007-OA1 Form 424(b)(5) at S-54, S-58 (referencing base prospectus); GSR Mortgage Loan Trust 2007-OA2 Form 424(b)(5) at S-50, S-53–S-54 (same); GSAMP Trust 2007-HE1 Form 424(b)(5) at S-36 (referencing sponsor's underwriting guidelines); GSAMP Trust 2007-HE2 Form 424(b)(5) at S-38 (same).)

New Century's specific underwriting guidelines are all contained in the 2006-5 prospectus supplement (see id. ¶¶ 162, 164, 166, 168), and the FAC does not allege any New Century-specific statements of underwriting guidelines contained in the 2007-2 prospectus supplement, this is not enough to defeat class standing under NECA. There, the Second Circuit reinstated claims relating to GSAA Home Equity Trust 2007-6 in light of the statements of origination guidelines of originators generally when GreenPoint's role as originator was disclosed in the prospectus supplement (see GSAA Home Equity Trust 2007-6 Form 424(b)(5) at S-50), even though GreenPoint's specific origination guidelines were not disclosed in the prospectus supplement (see id. at S-57–S-68). NECA, 693 F.3d at 164. In addition, the Second Circuit reinstated claims relating to Group 2 of GSAA Home Equity Trust 2007-5 where Wells Fargo's role as originator was disclosed in the prospectus supplement (see GSAA Home Equity Trust 2007-5 Form 424(b)(5) at S-55), even though the prospectus supplement did not disclose Wells Fargo's underwriting guidelines (see id. at S-60–S-73). NECA, 693 F.3d at 164.

For the 2006-5 and 2007-2 Certificates, the common disclosures in the shared shelf registration statement regarding underwriting guidelines of originators generally, the common originator New Century (which was identified as such in the FAC and the 2006-5 and 2007-2 prospectus supplements), and the FAC's "originator-specific allegations" regarding New Century's abandonment of its underwriting guidelines establish class standing under NECA.

### III.   THE TIMELINESS OF PLAINTIFF'S CLAIMS

Since the Court holds that Plaintiff has class standing to assert claims relating to the 2007-2 Certificates, it must also determine whether Plaintiff's attempt to raise such claims in the FAC was timely. Defendants point to the December 15, 2010 Order in which the Court denied the attempt to revive claims related to the 2006-4 and 2006-6 Certificates via Miss. PERS's

proposed intervention as a purchaser of those Certificates, holding that relation back was inappropriate where the proposed intervenor was not a member of the then-class and the Initial Complaint did not mention the 2006-4 and 2006-6 offerings.  See N.J. Carpenters II, 2010 WL 6508190.  Assuming a December 20, 2007 inquiry date, the Court held that no tolling or relation back to the Initial Complaint applied to the claims of a proposed intervenor, and the proposed intevenor's claims were thus untimely under 15 U.S.C. § 77m.  Id.

Rule 15(c) provides that "amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the same conduct, transaction, or occurrence set out . . . in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  While addressing the standing issue, the Second Circuit stated that "in the context of claims alleging injury based on misrepresentations, the misconduct alleged will almost always be the same: the making of a false or misleading statement," and held that "[w]hether that conduct implicates the same set of concerns for distinct sets of plaintiffs . . . will depend on the nature and content of the specific misrepresentations alleged."  NECA, 693 F.3d at 162.  Since the Court finds that the common disclosures about the underwriting guidelines of originators generally, common originator (New Century), and "originator-specific allegations" relating to the 2007-2 Certificates "raise the same set of concerns" as those relating to the 2006-5 Certificates, Plaintiff's claims "ar[ise] out of the same conduct, transaction, or occurrence" as set out in the Initial Complaint to justify relation back to the Initial Complaint.  Cf. N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC, 720 F. Supp. 2d 254, 266–67 (S.D.N.Y. 2010) (finding amended claims related back where "[a]lthough Plaintiffs included more [certificate-issuing] Trusts that had Offering Documents that allegedly contained material misstatements and omissions, [the amended complaint] share[d] the same core factual allegations

contained in the initial, state court complaint with regard to the central issues of the claim, [including] misstatements about the underwriting guidelines"); Plumbers' & Pipefitters Local # 562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp. I, No. 08 Civ. 1713 (ERK), 2012 WL 601448, at **11–12 (E.D.N.Y. Feb. 23, 2012) (same); see also Slayton v. Am. Exp. Co., 640 F.3d 215, 228 (2d Cir. 2006) ("Under Rule 15, the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." (quotations omitted)).

In addition, unlike in N.J. Carpenters II, where Plaintiff had conceded an earliest possible date from which the statute of limitation could run for the intervenor's 2006-4 and 2006-6 claims under the "inquiry notice" standard, see 2010 WL 6508190, at *2, Plaintiff here disputes when any such date accrued (see Pl.'s Reply Mem. at 3–4).[9]  The Second Circuit has noted that "whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss." LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 156 (2d Cir. 2003) (quotation omitted).  Since this question can be addressed on a more complete record at a future stage in the proceedings, see Local 562, 2012 WL 601448, at *11, the Court declines to dismiss Plaintiff's claims as untimely at this point, without prejudice to Defendants renewing this argument in the future.

## **CONCLUSION**

For the forgoing reasons, Plaintiff's motion for reconsideration of the Court's March 29, 2010 Order is GRANTED IN PART and DENIED IN PART.  The Court holds that under NECA

---

[9] Whether recent Supreme Court and Second Circuit decisions have altered the "inquiry notice" standard for claims under the Securities Act is thus besides the point.  See In re Barclays Bank PLC Sec. Litig., No. 09 Civ. 1989 (PAC), 2011 WL 31548, at *6 (S.D.N.Y. Jan. 5, 2011), appeal docketed 11-2665 (2d Cir. June 29, 2011).

Plaintiff has class standing to assert claims relating to the 2007-2 Certificates, but not the 2006-4 and 2006-6 Certificates.[10] The Court further holds that Plaintiff's claims relating to the 2007-2 Certificates are timely, but this is without prejudice to Defendants raising this argument in any motion for summary judgment. The Clerk of the Court is directed to close the motion at docket number 139.

Dated: New York, New York
January 23, 2013

SO ORDERED

PAUL A. CROTTY
United States District Judge

---

[10] The Court is aware that a petition for *certiorari* in NECA is currently pending before the Supreme Court. See Goldman, Sachs & Co. v. NECA-IBEW Health & Welfare Fund, Dkt. 12-528 (filed Oct. 26, 2012). Should the Supreme Court decide to grant *certiorari* in that matter, the parties are hereby ordered to inform the Court.