UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 17, 2014
```

----------------------------------------------------------X
                                                    :

NEW JERSEY CARPENTERS HEALTH      :
FUND, On Behalf of Itself and All Others  :
Similarly Situated,                      :
                                             :

                Plaintiff,        :
                                           :

      -against-             :
                                           :       No. 08 Civ. 5653 (PAC)

DLJ MORTGAGE CAPITAL, INC., CREDIT  :
SUISSE MANAGEMENT, LLC, f/k/a     :
CREDIT SUISSE FIRST BOSTON      :       **OPINION & ORDER**
MORTGAGE SECURITIES             :
CORPORATION, ANDREW A. KIMURA, :
THOMAS ZINGALLI, JEFFREY A.     :
ALTABEF, MICHAEL A. MARRIOTT,   :
EVELYN ECHEVARRIA, and CREDIT   :
SUISSE SECURITIES (USA) LLC,     :
                                           :

                Defendants.     :
                                           :
----------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

In this Securities Act case, Lead Plaintiff New Jersey Carpenters Health Fund moves to

modify the previously certified class of plaintiffs by adding purchasers of Home Equity

Mortgage Trust ("HEMT") Series 2007–2 Certificates.  Defendants object on the grounds that

the 2007–2 Offering[1] was a "fundamentally different deal" from the one already certified, and

because individual questions such as investor knowledge and loss causation would predominate

---

[1]This Opinion refers to the shelf registration statement, base prospectus, and prospectus supplement ("Offering Documents") for the HEMT Series 2007–2 Certificates as the "2007–2 Offering."  Likewise, the Opinion refers to the Offering Documents for the HEMT Series 2006–5 Certificates as the "2006–5 Offering."

over common questions.  For the reasons below, the Court GRANTS the motion to modify the certified class.

## BACKGROUND

Lead Plaintiff asserts claims under the Securities Act of 1933 ("1933 Act") against certain entities and individuals involved in two offerings of mortgage-backed certificates, namely HEMT Series 2006–5 and 2007–2.  More specifically, Lead Plaintiff alleges that the Offering Documents contained material misstatements and misleading omissions regarding the mortgage originators' compliance with their own underwriting guidelines, in violation of Sections 11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o.  The Court presumes familiarity with the underlying dispute, which is explained at length in its prior decisions.  The procedural history of those decisions is briefly summarized as follows.

### A.  Procedural History

Lead Plaintiff's initial Complaint asserted claims on behalf of investors who purchased or acquired HEMT Series 2006–5 Certificates.  After Lead Plaintiff amended its Complaint to add claims regarding the 2007–2 Offering and two other 2006 offerings,[2] the Court granted Defendants' motion to dismiss those claims for lack of standing, on the grounds that Lead Plaintiff had not purchased those securities.  *See* 2010 WL 1473288, at *8 (Mar. 29, 2010) ("Dismissal Decision").[3]  Next, the Public Employees' Retirement System of Mississippi moved to intervene with respect to the two dismissed 2006 offerings, but the Court denied the motion as time-barred.  *See* 2010 WL 6508190, at *3 (Dec. 15, 2010) ("Intervention Decision").  The Court

---

[2] Those offerings involved HEMT Series 2006–4 Certificates and HEMT Series 2006–6 Certificates.

[3] The Court also granted Lead Plaintiff leave to file a Second Amended Complaint to allege that it was a "direct purchaser" of the 2006–5 Certificates to establish standing under Section 12(a).  2010 WL 1473288, at *4.

subsequently granted Lead Plaintiff's motion to certify the class of purchasers of 2006–5 Certificates (the "Certified Class").  *See* 2011 WL 3874821, at *9 (Aug. 16, 2011) ("Certification Decision").  Recently, the Court granted Lead Plaintiff's motion for reconsideration of the Dismissal Decision in part, reinstating previously dismissed claims regarding the 2007–2 Certificates in light of an intervening Second Circuit decision on class standing.  *See* 2013 WL 357615, at *10 (Jan. 23, 2013) ("Reconsideration Decision") (citing *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), *cert. denied,* 133 S. Ct. 1624 (2013)).

As the Reconsideration Decision explained, *NECA* "constitute[d] a change in controlling law" concerning class standing in securities cases, at least in this Circuit.  2013 WL 357615, at *4.  *NECA* held that:

> a plaintiff has class standing if he plausibly alleges (1) that he "personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant," and (2) that such ***conduct implicates "the same set of concerns"*** as the conduct alleged to have caused injury to other members of the putative class by the same defendants.

693 F.3d at 162 (citations omitted; emphasis added).  In particular, the Second Circuit concluded that "to the extent certain Offerings were backed by loans originated by originators common to those backing the [offerings from which NECA purchased], NECA's claims raise a sufficiently similar set of concerns to permit it to purport to represent Certificate-holders from those Offerings."  *Id.* at 164.

Applying these principles, this Court reinstated claims regarding the 2007–2 Offering, but adhered to its prior dismissal of claims regarding two other offerings.  *Reconsideration Decision*, 2013 WL 357615, at *5–9.  The Court determined that the 2007–2 and 2006–5 Offerings "implicate the same set of concerns" under *NECA* due to: (1) "the common disclosures

in the shared shelf registration statement regarding underwriting guidelines of originators generally," (2) "the common [disclosed] originator," New Century Mortgage Corporation ("New Century"); and (3) the "'originator-specific allegations' regarding New Century's abandonment of its underwriting guidelines." *Id.* at *9. These factual and legal overlaps were sufficient even though the 2006–5 Offering disclosed New Century's underwriting guidelines while the 2007–2 Offering did not. *Id.* at *8. In contrast, the other two 2006 offerings proposed for reinstatement did not share "the same set of concerns" as the 2006–5 Offering because they either did not share a mortgage originator in common with it, or because the offering documents did not disclose the identity of such a common originator. *Id.* at *5–8.

In light of the Court's reinstatement of the claims regarding the 2007–2 Offering, Lead Plaintiff filed a Third Amended Complaint ("TAC") on May 20, 2013 and now moves to modify the Certified Class to include investors who purchased the 2007–2 Certificates.

### B.  Similarities Between the Offerings

In support of its motion, Lead Plaintiff cites the facts underlying the Court's determination that the two offerings "implicate the same set of concerns," in addition to the following similarities:

1. The same entities were involved in making both offerings, "all of which are subsidiaries or affiliates of Credit Suisse":  the sponsor and seller, DLJ Mortgage Capital, Inc.; the depositor, Credit Suisse First Boston Mortgage Securities Corp.; and the underwriter, Credit Suisse Securities (USA), LLC.  (*See* Pl.s' Op. Br. at 5.)

2. The TAC alleges "the same wrongful course of conduct by the same Defendants, specifically the packaging of loans into the HEMT Certificates and the sale of the HEMT Certificates without ensuring that the underlying loans were actually originated in accordance with the underwriting guidelines described in the Offering Documents."  (*Id.* at 11.)

3. "Defendants used the same employees for each deal . . . . , which means that the witnesses will be essentially the same for both Offerings."  (*Id.* at 5.)

**C.  Differences Between the Offerings**

Defendants, on the other hand, contend that the two offerings are "fundamentally

different deals" for several reasons:

1.  The "top six tranches" of the 2007–2 Offering (*i.e.*, 92% of the offering) were covered by a financial guaranty known as an "insurance wrap" issued by MBIA Insurance Corporation ("MBIA"), which "guarantees the payment of principal and interest to holders of those securities."

2.  The offerings were made on different dates, and in the interim there were "considerable changes in the residential mortgage market."

3.  The offerings were backed by different loan pools, and the 2007–2 Offering has two sub-pools of loans, while the 2006–5 Offering has only one.

4.  The offerings had different (though concededly overlapping) sets of mortgage originators, and New Century in particular originated more than double the number of loans for HEMT 2006–5 as compared to HEMT 2007–2 (33% vs. 14%, respectively).

5.  the disclosures in the offering documents differed as follows:

| <u>2006–5 Offering</u> | <u>2007–2 Offering</u> |
|---|---|
| warned of a *possible* decline in the real estate market: "If the real estate market should experience an overall decline[], . . . delinquencies, foreclosures and losses could be higher . . . ."  (2006–5 Pros. at 26) | warned of an *actual* recent decline in the real estate market: "Delinquencies and losses with respect to residential mortgage loans generally have increased in recent months . . . . [, which] may result in additional delinquencies and losses . . . ." (2007–2 Pros. at 7) |
| *n/a* | disclosed that New Century had filed for bankruptcy, which "may have . . . adversely affected its ability to originate mortgage loans in accordance with its customary standards." (2007–2 Pros. Supp. at S-20) |
| disclosed New Century's underwriting guidelines (2006–5 Pros. Supp. at S-28–33) | did not specify what New Century's guidelines were[4] |

---

[4] Defendants note that the 2007–2 Offering did not disclose New Century's origination guidelines because New Century had not originated more than 20% of the mortgages in the loan pool for that offering, which is the threshold for such a duty to disclose under SEC regulations.  (Defs.' Br. at 7 n.8 (citing 17 C.F.R. § 229.1110(b)).)

(*See* Defs.' Br. at 4–8.)

Defendants contend that these differences preclude class certification because the case would likely be side-tracked by individualized determinations of issues such as loss causation and investor knowledge, rather than questions that are common to the entire proposed class.

## DISCUSSION

### I.  Standards for Class Certification

"In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of Rule 23(a)," *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008), namely that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "The requirements of commonality, typicality, and adequacy of representation are closely related."  *In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 233 (S.D.N.Y. 2012).  They "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

If these requirements are met, the court "may then consider granting class certification [under Rule 23(b)(3)] where it 'finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy.'"
*Teamsters*, 546 F.3d at 202.

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). A district court must conduct a "rigorous analysis" to make that determination. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 33 & n.3 (2d Cir. 2006) (quoting *Falcon*, 457 U.S. at 161 (1982)). Nonetheless, it has "broad discretion" in doing so. *NECA*, 693 F.3d at 165.

Therefore, "it is by no means a foregone conclusion that, because plaintiff has standing to assert §§ 11 and 12(a)(2) claims on behalf of Certificate-holders from different tranches of Offerings (or within Offerings) backed by loans originated by the same originators, a putative class comprised of such Certificate-holders should be certified." *Id.* Unlike the *pleading* standard for demonstrating class standing, Rule 23 requires "[a] party seeking class certification [to] affirmatively demonstrate . . . that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). As several courts have observed, however, "suits alleging violations of Sections 11, 12(a)(2), and 15 of the Securities Act [of 1933] are 'especially amenable' to class action certification and resolution." *In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 232 & n.40 (S.D.N.Y. 2012); *accord Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 101 (S.D.N.Y. 2011).

II.     **Rule 23(a) Requirements**

A.  **Numerosity**

There is no dispute that the numerosity requirement is satisfied here.  The Court previously determined that this element was satisfied with respect to the HEMT 2006–5 Offering.  *Certification Decision*, 2011 WL 3874821, at *1–2 (noting that "a proposed class of more than forty members presumptively satisfies the numerosity requirement").  Adding purchasers of HEMT 2007–2 would only increase the number, and therefore the numerosity requirement is satisfied.

B.  **Commonality**

"Commonality is satisfied where a single issue of law or fact is common to the class." *IndyMac*, 286 F.R.D. at 233 (citing *Wal-Mart*, 131 S. Ct. at 2256 ("[E]ven a single common question will do.")).  Nonetheless, class certification requires not only "common questions," but "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 131 S. Ct. at 2551.  In other words, the class claims "must depend upon a common contention . . . . [for which] determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

Here, the TAC raises at least one core question that is susceptible to a common answer for the entire putative class:  whether the Offering Documents' statement that all mortgage originators adhered to their underwriting guidelines was a material misrepresentation.  Indeed, this representation is identical in both prospectus supplements:  "each mortgage loan complies with all the terms, conditions, and requirements of the originator's underwriting standards in effect at the time of origination."  (2007–2 Pros. Supp. at S-83; 2006–5 Pros. Supp. at S-76.)

The alleged falsity of that statement is common to all putative class members at least with respect to whether New Century complied with its underwriting standards.  Since New Century originated a substantial percentage of the mortgages for both offerings, its compliance *vel non* is central to the allegations in the TAC (*see, e.g.*, ¶¶ 6, 13–14).  Accordingly, a determination of whether that representation was false is certainly "apt to drive the resolution of the litigation."  Likewise, that alleged misstatement's materiality is a common question for the putative class, because materiality is an objective determination based on what information "would have been viewed by [a] reasonable investor as having significantly altered the 'total mix' of information made available."  *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 126 (2d Cir. 2013); *see TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976) ("The question of materiality . . . is an objective one . . . .")  Thus, "[a]s is often the case in securities class actions, whether Defendants' statements were materially misleading to a reasonable investor is an issue 'subject to generalized proof, and thus applicable to the class as a whole.'"  *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 457 (S.D.N.Y. 2013).

### C.  Typicality

Typicality "is satisfied where 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'"  *IndyMac*, 286 F.R.D. at 233 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).  Courts have stated that this is "not [a] demanding" requirement.  *See, e.g.*, *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012); *In re Prestige Brands Holdings, Inc. Sec. Litig.*, No. 05-CV-6924, 2007 WL 2585088, at *3 (S.D.N.Y. Sept. 5, 2007).  Thus, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the

9

typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993).

Defendants contend that the typicality requirement's reference to "*defenses* of the representative parties" carries special weight in this case. *See* Fed. R. Civ. P. 23(a)(3) (emphasis added). That, they contend, is because the (1) time gap between the two offering raises disparate knowledge defenses and (2) the "insurance wrap" specific to the 2007–2 Offering raises a distinct loss causation defense as to its investors. These differences, they argue, subject Lead Plaintiff to "unique defenses which threaten to become the focus of the litigation." (Defs.' Br. at 11–12 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009)).)

Defendants' arguments are unpersuasive. The TAC's claims with respect to both offerings indeed arise from the same "course of events" and involve a similar "legal argument." As Lead Plaintiff explains, the TAC alleges that "the same defendants and witnesses engaged in the same course of conduct by falsely representing to *all* class members that the loans complied with underwriting guidelines and then concealing material adverse facts regarding common originators that would have revealed the falsity of those misstatements." (Pl.'s Reply at 5.)

Even if Lead Plaintiff is subject to affirmative defenses, those defenses would be far from "unique" to Lead Plaintiff. The Court has already determined that Lead Plaintiff's claims are typical of the Certified Class and therefore that any defenses against its claims could not be unique to it. *See Certification Decision*, 2011 WL 3874821, at *4. The addition of *more* class members to the Certified Class could not logically disturb the conclusion that Lead Plaintiff is not subject to unique defenses. Moreover, this is not a case where a putative class representative is disqualified as a matter of law from asserting claims due its particular circumstances. *Cf., e.g.*, *In re Flag Telecom*, 574 F.3d at 40 (putative class representative was an "in-and-out trader" who

10

was atypical because he could not "even 'conceivably' be able to prove loss causation as a matter of law"); *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (putative class representative "lacked standing because he was not a member of the class").  The Court has already determined that Lead Plaintiff has pleaded viable claims for both offerings.  In any event, even if such a unique defense became apparent later in the litigation, it would not defeat class certification unless it threatened to become the focus of the litigation.  *See Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 179 (S.D.N.Y. 2008) (collecting cases).

Nor are the differences between the 2006–5 and 2007–2 Offerings so fundamental that they render Plaintiff's claims atypical.  Those differences are more appropriately analyzed under the rubric of Rule 23(b)(3)'s predominance requirement than Rule 23(a)'s typicality requirement.[5]  *Cf. N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 168–70 (S.D.N.Y. 2011) ("*ResCap I*") (finding typicality satisfied, though individualized knowledge inquiries undermined predominance), *aff'd*, 477 F. App'x 809 (2d Cir. 2012).  Even if some putative class members are "unable to recover damages with respect to certain Certificates, this would be insufficient to preclude a finding of typicality," *Merrill Lynch*, 277 F.R.D. at 108, because "[t]he nature of [Lead Plaintiff's] claims, if not the specific facts from which they arise, is typical of the class," *ResCap I*, 272 F.R.D. at 166.

### D.  Adequate Representation

"Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *Baffa*, 222 F.3d at 60.  In addition,

---

[5] *See infra* Part III.A.

"[a] class representative must . . . possess the same interest and suffer the same injury as the class members." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997).

Defendants contend that Plaintiff has not suffered the "same injury" as investors in the HEMT 2007–2 Offering because Plaintiff did not purchase those certificates.  That argument does not withstand scrutiny under the circumstances.

As an initial matter, the "same injury" requirement must be understood in a post-*NECA* light.  The *NECA* court observed that "in the context of claims alleging injury based on misrepresentations, the misconduct alleged will almost always be the same: the making of a false or misleading statement."  693 F.3d at 162.  Thus, a proposed class representative may "adequately represent class members who purchased certificates in other offerings. . . . as long as conflicts or antagonism do not exist between class members and representatives."  *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08-CV-8781, 2013 WL 6839093, at *3 (S.D.N.Y. Dec. 27, 2013) ("*ResCap III*").

Here, there is no reason to suspect that Lead Plaintiff's interests will be antagonistic to those of the purchasers in the 2007–2 Offering.  As explained above, the core alleged misrepresentations in both offerings relate to whether the mortgage originators adhered to their own underwriting guidelines, and thus Lead Plaintiff appears to have every incentive to prove that those statements were material and misleading.  Defendants give no reasons to support their bald assertion that "it is inevitable that the interests of the HEMT 2007–2 purchasers will diverge from Plaintiff."  (Defs.' Br. 13.)  Although the proof regarding the falsity and materiality of those statements may differ somewhat in light of other statements in the respective Offering Documents, there is no apparent reason why they would raise conflicting theories.  Accordingly, the Court finds that Lead Plaintiff would adequately represent the proposed class.

**III.     Rule 23(b) Requirements**

The heart of Defendants' opposition to certifying the proposed class relates to Rule 23(b)'s requirement that common questions predominate over those affecting only individual class members.  Defendants contend that this requirement cannot be satisfied here because the terms and timing of the two offerings made them "fundamentally different."  In particular, Defendants assert that their loss-causation defense for the 2007–2 Offering will focus on the effect that MBIA's insurance had on the value of 92% of those certificates, while no such defense is applicable to the 2006–5 Offering.  Defendants also argue that issues of materiality and investor knowledge will differ significantly due to (1) well-known changes in the mortgage market between the offerings and (2) the disclosure in the 2007–2 Offering concerning New Century's bankruptcy.  As explained below, since these differing questions apply to broad segments of the proposed class rather than principally to individual members, they do not undermine the predominance of common questions in this case.

**A.  Predominance of Common Questions**

"The predominance criterion is, in effect, a stricter version of the commonality requirement of Rule 23(a)(2)."  *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 89 (S.D.N.Y. 2001).  "To satisfy the predominance prong of Rule 23(b)(3), a plaintiff must show that common proof will predominate at trial with respect to the essential elements of liability of the underlying causes of action."  *Kottler v. Deutsche Bank AG*, No. 08-CIV-7773, 2010 WL 1221809, at *3 (S.D.N.Y. Mar. 29, 2010).  "[P]redominance does not require a plaintiff to show that there are no individual issues."  *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 75 (S.D.N.Y. 2009).  "[I]ndividual issues will likely arise in . . . all class action cases.  But, to allow various secondary issues of plaintiffs' claim to preclude certification of a class would render the

rule an impotent tool for private enforcement of the securities laws." *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981).  Thus, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud . . . ." *Amchem*, 521 U.S. at 625.

Since Lead Plaintiff makes claims only under the 1933 Act, it has no burden to plead or prove the elements of fraud that are required for cases brought under Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act")—*i.e.*, scienter, loss causation, and reliance.  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).  On the other hand, Defendants may assert affirmative defenses under the 1933 Act, which are effectively the mirror images of those elements:  due diligence, the absence of loss causation ("negative causation"), and investors' knowledge of the alleged untruth or omission.  *See IndyMac*, 286 F.R.D. at 236–37 (discussing the affirmative defenses).  "[C]ourts have been reluctant to deny class action status because affirmative defenses might be available against different class members as long as the defenses do not overshadow the primary claims."  *Collins v. Olin Corp.*, 248 F.R.D. 95, 105 (D. Conn. 2008) (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001)).

Here, Plaintiffs have made a prima facie showing of predominance by citing evidence of the substantial factual and legal overlap between the two offerings:  identical alleged misrepresentations, the same entities and employees involved in making the offerings, the same "wrongful course of conduct" with regard to underwriting guidelines, and the overlap in mortgage originators (particularly New Century).  As explained below, Defendants have not shown that individualized issues are likely to arise that would predominate over these common ones.

### 1.  Knowledge

Although changes in the mortgage market may well distinguish investors' knowledge between the 2006–5 and 2007–2 Offerings, that does not mean that individualized knowledge determinations will predominate in this case.  As an initial matter, predominance is not defeated merely because investors in the latter offering knew about the "well-documented" problems in the housing market in general and with New Century and other loan originators in particular. (*See* Defs.' Br. at 19.)  Since the information was public, the knowledge inquiries for the investors in the 2006–5 and 2007–2 Offerings may be *different*, but they would not be *individualized*.  *See ResCap III*, 2013 WL 6839093, at *4 ("[P]ublicly available news stories do not create individualized knowledge.").

Inadvertently underscoring this point, Defendants point out that each of New Century's public disclosures starting in February 2007 and leading up to its bankruptcy filing on April 2, 2007 "occurred <u>prior</u> to the closing of the HEMT 2007–2 transaction on May 1, 2007."  (Defs.' Br. at 20)  Therefore, there would be no need to evaluate the knowledge of 2007–2 investors individually, because they *all* knew about these problems.  (*See* Feb. 26 Hr'g Tr. at 22 ("This was big news at the time.  Everybody knew that New Century had gone bankrupt.").)  As for the 2006–5 investors who purchased during this period, the Court has already rejected the argument that individualized knowledge issues would predominate.  *See Certification Decision*, 2011 WL 3874821, at *6.

Nonetheless, Defendants contend that additional disclosures following the 2007–2 Offering in May 2007 would create individualized knowledge issues.  The Court's prior reasoning regarding the 2006–5 investors remains fully applicable here: "there is no testimonial or documentary evidence directly suggesting that a potential plaintiff had knowledge of the

misstatements or omissions at issue." *Id.* at *7 n.1.  Thus, this case is unlike *In re Initial Public Offerings Securities Litigation*, 471 F.3d 24 (2d Cir. 2006), where certain investors had individual knowledge that others did not because they were directly involved in the misconduct alleged in the complaint.  *See* 471 F.3d at 43 ("Obviously, the initial IPO allocants, who were required to purchase in the aftermarket, were fully aware of th[is] obligation[, which] is alleged to have artificially inflated share prices.").  The only post-offering event Defendants identify as creating disparate knowledge inquiries is the ratings agencies' downgrade of the 2007–2 Certificates, which cited "aggressive underwriting."  (Defs.' Br. at 21.)  Aside from the fact that this is a single *public* event, it is not obvious that it disclosed any new facts about the quality of the underlying loans.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions.").

Nor does Defendants' speculation that certain sophisticated investors may have had special knowledge (Defs.' Br. at 19) undermine a finding of predominance.  *See Certification Decision*, 2011 WL 3874821, at *7 n.1 ("[T]he fact that some of the potential class members are sophisticated financial institutions cannot, in itself, defeat class certification.").  Defendants suggest in passing that "active participants in the RMBS industry" who purchased 2007–2 Certificates "will be subject to individualized inquiries" about their knowledge of origination practices.  (Defs.' Br. at 19.)  As Judge Rakoff explained in a similar case, however, such speculation, without more, is insufficient to defeat a finding of predominance.  *See Merrill*, 277 F.R.D. at 118 ("There is no allegation in this case that any class member actually participated in the conduct described in the Amended Complaint . . . .[, even though] some members of the class . . . have been sued in connection with their own MBS offerings . . . ."); *see also N.J. Carpenters*

16

*Health Fund v. Residential Capital, LLC*, No. 08-CV-8781, 2012 WL 4865174, at *3 (S.D.N.Y. Oct. 15, 2012) ("*ResCap II*") ("[E]ven the most sophisticated class members did not have access to the actual due diligence results and loan files for the certificates at issue and are therefore likely to be subject to the same knowledge and due diligence defense.").

Therefore, "[w]hile knowledge regarding MBS may have varied among class members, this Court is not persuaded that these variations will necessitate individualized inquiries sufficient to defeat a finding of predominance here." *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 214 (S.D.N.Y. 2012).

### 2.  Loss causation

Concerns about disparities in class members' damages are mitigated in 1933 Act cases because such "damages reflect liability by statutory formula." *ResCap III*, 2013 WL 6839093, at *5; *see* 15 U.S.C. §§ 77k(e), 77*l*(a).  Thus, "[d]amage amounts can be calculated for each individual class member after a determination of liability." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 377 (S.D.N.Y. 2000).  "Liability will turn first and primarily on whether the Offering Documents contained misstatements and omissions as plaintiff alleges—an issue clearly subject to 'generalized proof.'" *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 61 (S.D.N.Y. 2013).

As with their knowledge argument, Defendants' loss-causation argument rests on an assertion that applies *generally* to a broad segment of proposed class members:  that the value of 92% of the 2007–2 Certificates was determined by their insurer's financial condition, rather than any alleged misstatements in the Offering Documents.  There is no suggestion that this would require individualized determinations and indeed appears particularly susceptible to generalized proof for all purchasers who were covered by MBIA's insurance.  That there is a difference

17

between this group of investors and others in the proposed class does not undermine a determination of predominance.[6]

Nor do the cases that Defendants cited at oral argument conflict with a finding that common issues predominate here.  Although those decisions limited the scope of classes due to concerns about loss causation, the excluded members were "in-and-out traders" for whom loss causation was negated as a matter of law because they sold prior to any corrective disclosure that could have caused a loss.  *See In re Flag Telecom*, 574 F.3d at 41; *In re Smart Techs.*, 295 F.R.D. at 58; *In re Puda Coal Sec. Inc. Litig.*, No. 11-CV-2598, 2013 WL 5493007, at *17–18 (S.D.N.Y. Oct. 1, 2013); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11-CV-4209, 2013 WL 5815472, at *19 (S.D.N.Y. Oct. 29, 2013).  There is no such contention here that certain class members are legally precluded from recovery, but rather that Defendants are entitled to argue as a factual matter that the MBIA insurance severed the causal link. Accordingly, there is no need to exclude the purchasers of insured tranches from the proposed class.

### 3.  Materiality

While the prospectus supplements in the two offerings are not identical in all respects, that does not mean that individualized issues will predominate with respect to the materiality or falsity of the statements at issue.  As in *Merrill Lynch*, "Defendants' arguments grossly overstate the differences. . . . Although the Supplements contain some statements that are unique to the particular offering, it is the substantially similar statements common to each Prospectus and Supplement that are the clear focus of the [Third] Amended Complaint."  277 F.R.D. at 113–14.

---

[6] Of course, the Court retains the authority to implement any appropriate "management tools . . . to address any individualized damages issues that might arise . . . ."  *In re Visa*, 280 F.3d at 141.

As noted above, the core representations at issue are identical, and the determination of their materiality will be based on an objective assessment of the total mix of information available to investors.  To the extent that Defendants argue that the total mix was substantially changed for the 2007–2 Offering by the downturn in the mortgage market and disclosures about New Century's bankruptcy, that argument effectively collapses into the knowledge defense that, as explained above, does not raise individualized issues.  *See generally id.* at 114 (explaining that materiality is a common issue "even if, as seems doubtful, a misstatement that is material at the time of one offering is no longer material at the time of another offering, for this would still need to be determined by common evidence as to the objective state of affairs at a given time."). Likewise, any affirmative defense of due diligence is susceptible to generalized proof regarding whether it was "reasonable."  *See Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130, 139 (S.D.N.Y. 2012) ("[I]nformation that goes to the core of the misstatements alleged here to the effect that underwriting guidelines were actually followed or that the due diligence conducted by the Defendants was adequate. . . .[is] largely subject to generalized proof.").

Therefore, the Court finds pursuant to Rule 23(b)(3) that common questions of the falsity and materiality of the alleged misrepresentations regarding underwriting guidelines will "predominate over any questions affecting only individual class members."

### B.  Superiority of Class Adjudication

The superiority requirement reflects "[t]he goal of class actions . . .to 'achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness.'"  *Certification Decision*, 2011 WL 3874821, at *8. Under Rule 23(b)(3), the following factors are to be considered in making the "superiority"

19

determination: (a) the interest of members of the class in individually controlling the prosecution of separate actions, (b) the extent and nature of any litigation concerning the controversy already commenced by members of the class, (c) the desirability of concentrating the litigation of the claims in the particular forum; and (d) the difficulties likely to be encountered in the management of a class action.

"Securities cases easily satisfy the superiority requirement of Rule 23." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009) (quotation marks omitted). Accordingly, Defendants make virtually no objection to a determination of superiority, other than to repeat their conclusion that "HEMT 2007–2 investors are <u>not</u> similarly situated to HEMT 2006–5 investors given the fundamental differences between the two deals." (Defs.' Br. at 21.) The Court's prior analysis of superiority remains apt for this motion:

> The amounts at stake for some potential class members is not enough to justify an individual action—as a result, such class members have an interest in moving forward as a class. In addition, neither party has identified any other pending litigation regarding this controversy, nor is there any reason to believe that the Southern District of New York is not a desirable forum for such a class action. Lastly, as securities actions such as this are commonly brought as class actions, there does not seem to be any particular difficulty in administering such an action.

*Certification Decision*, 2011 WL 3874821, at *9. The addition of the claims regarding the 2007–2 Offering does not alter this analysis. Accordingly, the Court finds pursuant to Rule 23(b)(3) that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

## CONCLUSION

For the foregoing reasons, the Court GRANTS Lead Plaintiff's motion to amend the

definition of the certified class to include purchasers of HEMT 2007–2 Certificates, as set forth

in Paragraphs 224–25 of the TAC.


Dated: New York, New York                         SO ORDERED
      March 17, 2014

                                          PAUL A. CROTTY
                                          United States District Judge