**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW JERSEY CARPENTERS HEALTH FUND, *on Behalf of Itself and All Others Similarly Situated,*  <br><br> Plaintiff, <br><br> v. <br><br> DLJ MORTGAGE CAPITAL, INC., CREDIT SUISSE MANAGEMENT, LLC f/k/a CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORPORATION, ANDREW A. KIMURA, THOMAS ZINGALLI, JEFFREY A. ALTABEF, MICHAEL A. MARRIOTT, EVELYN ECHEVARRIA and CREDIT SUISSE SECURITIES (USA), LLC, <br><br> Defendants. | No.: 08-cv-5653-PAC |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION**

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     BACKGROUND OF THE LITIGATION......................................................... 3
        A.      Initial Ruling on Motion to Dismiss .............................................. 4
        B.      Joint Motion to Intervene Denied ................................................. 4
        C.      First Class Certification Motion Granted........................................ 4
        D.      Motion for Reconsideration in Light of Intervening Change in Controlling
                Law ......................................................................................... 5
        E.      Second Motion for Class Certification ........................................... 6
        F.      Summary Judgment and *Daubert* Fully Briefed .............................. 6
        G.      Motion to Strike Fully Briefed ..................................................... 6
        H.      Exhaustive Fact and Expert Discovery Completed ........................... 7
        I.      Settlement Negotiations .............................................................. 7

II.     ARGUMENT .......................................................................................... 8
        A.      The Settlement Was Reached After Arm's-Length Negotiations with the
                Assistance of an Experienced Mediator and Is Procedurally Fair ......... 9
        B.      Application of the *Grinnell* Factors Supports Approval of the Settlement
                as Fair, Reasonable, and Adequate ............................................... 10
                1.      The Complexity, Expense, and Likely Duration of the Litigation
                        Support Approval of the Settlement ..................................... 10
                2.      The Reaction of the Class Supports Approval ......................... 12
                3.      The Stage of the Proceedings and the Amount of Discovery
                        Completed Support Approval .............................................. 13
                4.      The Risks of Establishing Liability and Damages Support
                        Approval ....................................................................... 14
                5.      The Risks of Maintaining the Class Action through Trial Support
                        Approval ....................................................................... 16
                6.      The Ability of the Defendants to Withstand a Greater Judgment
                        Does Not Weigh Against Approval ....................................... 17
                7.      The Range of Reasonableness of the Settlement, in Light of the
                        Best Possible Recovery and All of the Attendant Risks of
                        Litigation, Supports Approval ............................................. 17
        C.      The Plan of Allocation is Fair and Reasonable and Should Be Approved ........... 19
        D.      Notice to the Class Satisfied the Requirements of Rule 23 and Due Process....... 23
        E.      The Class Should Be Certified for Settlement Purposes ..................... 25

III.    CONCLUSION........................................................................................ 25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

C<small>ASES</small>

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001) ...................................................................................16

*by Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000) ..................................................................................................8

*Charron v. Wiener*,
   731 F.3d 241 (2d Cir. 2013) ...............................................................................................16

*Chavarria v. N.Y. Airport Serv., LLC*,
   875 F. Supp. 2d 164 (E.D.N.Y. 2012) ........................................................................ *passim*

*Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ....................................................................................... *passim*

*In re Enron Corp. Sec.*,
   MDL No. 1446, 2008 U.S. Dist. LEXIS 84656 (S.D. Tex. Sept. 8, 2008) ...........................21

*Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*,
   No. 09-cv-3701 (S.D.N.Y.) ...............................................................................................18

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
   279 F.R.D. 151 (S.D.N.Y. 2011) .......................................................................................13

*In re Gilat Satellite Networks, Ltd.*,
   No. 02 CV-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ...........................................10

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) .......................................................................................10

*In re Lehman Brothers Mortgage-Backed Sec. Litig.*,
   799 F. Supp. 2d 258 (LAK) (S.D.N.Y. 2011) .....................................................................21

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) .......................................................................................10

*Maine State Ret.Sys. v. Countrywide Financial Corp.*,
   722 F. Supp. 2d 1157 (MRP) (C.D. Cal. 2010) ..................................................................21

*McReynolds v. Richards-Cantave*,
   588 F.3d 790 (2d Cir. 2009) ..............................................................................................10

*In re Metlife Demutualization Litig.*,
    689 F. Supp. 2d 297 (E.D.N.Y. 2010) ..................................................................16

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012)...................................................................................5

*New Jersey Carpenters Health Fund, et al. v. Residential Capital, LLC, et al.*
    No. 08-cv-8781 (S.D.N.Y.)............................................................................20, 22

*New Jersey Carpenters Vacation Fund et al. v. The Royal Bank of Scotland
    Group PLC, et al.*
    No. 08-cv-5093 (S.D.N.Y.)............................................................................20, 22

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)...................................................................................9

*Padro v. Astrue*,
    No. 11-CV-1788 (CBA)(RLM), 2013 WL 5719076 (E.D.N.Y. Oct. 18, 2013) ............ *passim*

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
    No. 05-MD-1720 (JG)(JO), 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013)..........................22

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)...................................................................20

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05-MDL-0165 (CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)................................19

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)...................................................................8, 9, 10, 23

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ....................................14

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
    No. 09-CV-1376-LHK (PSG) (N.D. Cal.) ...........................................................21, 22

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)...................................................................21

New Jersey Carpenters Health Fund ("Lead Plaintiff") respectfully submits this memorandum of law in support of its motion for final approval of the proposed $110 million cash settlement ("Settlement") in this securities class action (the "Action") against Credit Suisse Management, LLC f/k/a Credit Suisse First Boston Mortgage Securities Corporation, Andrew A. Kimura, Thomas Zingalli, Jeffrey A. Altabef, Michael A. Marriott, Evelyn Echevarria and Credit Suisse Securities (USA), LLC (collectively "Defendants"), and for approval of the proposed plan of allocation ("Plan of Allocation"). The Settlement should be approved because it is a substantively fair and reasonable settlement, achieved through a procedurally sound, arm's-length mediation conducted under the auspices of the Honorable Layn R. Phillips (ret.), reached by fully informed parties and counsel only after completing extensive discovery, and has received a favorable reaction from the Settlement Class.[1] Additionally, the Plan of Allocation should be approved because it fairly distributes the Settlement funds to Settlement Class Members, in a manner reflective of the Court's class certification rulings and in accord with other approved mortgage-backed securities ("MBS") class action settlements in this District.

## I.    PRELIMINARY STATEMENT

On November 3, 2015, after more than seven years of hard-fought litigation, the parties in this Action reached a $110 million Settlement, which the Court preliminarily approved on January 6, 2016. This result was only achieved after a significant amount of work by all parties, not to mention the Court, including: (1) the filing of an initial and two amended class action

---

[1] Unless otherwise noted, capitalized terms have the meanings set out in the Stipulation and Agreement of Settlement, dated December 21, 2015 (Dkt. No. 264) (the "Stipulation") or in the Declaration of Joel Laitman in Support of Motion for Final Approval of Settlement and Motion for Approval of Attorney's Fees ("Laitman Decl."), filed concurrently here. The Laitman Decl. is an integral part of this submission. For the sake of brevity, Lead Plaintiff respectfully refers the Court to it for a detailed description of: the history of the Action; the nature of the claims asserted in the Action; the negotiations leading to the Settlement; the value of the Settlement to the Class, as compared to the risks and uncertainties of continued litigation; the terms of the Plan of Allocation; and a description of the services Lead Counsel provided for the benefit of the Class.

1

complaints; (2) briefing and argument on an initial motion to dismiss; (3) briefing and argument on a motion to intervene upon the dismissal of certain claims for lack of standing; (4) briefing and argument on an initial motion for class certification; (5) class discovery, including the depositions of one class representative and two experts; (6) briefing and argument on a motion for reconsideration in light of a change in Second Circuit law pertaining to standing under the Securities Act; (7) briefing and argument on a second motion for class certification; (8) the completion of fact discovery, including the production of over 8.9 million pages of documents by Defendants and third parties, and a total of fifteen fact depositions (including the previously mentioned deposition of a class representative); (9) briefing and argument on several discovery motions; (10) service of eighteen initial, rebuttal, and supplemental expert reports by ten different experts in the areas of statistical sampling; mortgage loan underwriting; investment banking due diligence; loss causation; damages; the financial crisis; and class-certification issues; (11) eleven expert depositions (including the previously mentioned class-certification depositions); (12) cross-motions for summary judgment on numerous issues, including potentially case-dispositive issues; (13) cross-motions for exclusion of expert testimony under *Daubert*; and (14) briefing and argument on a motion to strike certain expert evidence.

As a result of this work, Lead Plaintiff and Lead Counsel possessed an excellent understanding of the strengths and weaknesses of the case. Further, at the time of the Settlement, numerous disputed issues in the case, including potentially case-dispositive issues such as loss causation, falsity, and materiality, as well as critical *Daubert* issues, were fully briefed and awaiting resolution. If even some of these issues were resolved in Defendants' favor, the prospect of a meaningful recovery for the Class would have been reduced, potentially even to zero. Moreover, even if Lead Plaintiff prevailed at summary judgment, there remained the risks

attendant to trial, followed by appeal. Thus, although Lead Plaintiff believes its claims to be meritorious, there were substantial obstacles that remained before any recovery was in sight, as well as a significant risk of no recovery at all. The Settlement, however, eliminates all those risks, and gives the Settlement Class a meaningful and definite recovery now.

## II.      BACKGROUND OF THE LITIGATION

This securities class action alleges that Defendants violated Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77o, in the offer and sale of HEMT mortgage-backed securities by issuing to investors materially false and misleading registration statements and prospectuses. Lead Plaintiff alleges, *inter alia*, that the offering materials (*i.e.*, the registration statements, prospectuses, and prospectus supplements) failed to disclose that Defendants had "systematically disregarded" the applicable underwriting guidelines in the origination of mortgage loans underlying the Certificates, contrary to the representations therein that the loans substantially complied with those guidelines. These material misstatements and omissions led to massive downgrades in the ratings for the Certificates and investors being damaged when the value of the Certificates they purchased collapsed.

The case commenced on June 3, 2008 when Lead Plaintiff New Jersey Carpenters Health Fund filed a Securities Class Action Complaint against Defendants in New York State Supreme Court. On June 23, 2008, Defendants removed the Action to the United States District Court for the Southern District of New York. Dkt. No. 1. On March 23, 2009, the Lead Plaintiff filed the Consolidated First Amended Securities Class Action Complaint ("First Amended Complaint" or "FAC") against Defendants on behalf of a class of purchasers of HEMT mortgage-backed securities. Dkt. No. 44. Specifically, the First Amended Complaint asserted claims on behalf of purchasers of the HEMT 2006-4, HEMT 2006-5, HEMT 2006-6, and HEMT 2007-2 Certificates. *Id.*

### A.      Initial Ruling on Motion to Dismiss

On June 24, 2009, Defendants moved to dismiss the First Amended Complaint. Dkt. No. 54-56. Lead Plaintiff opposed on September 10, 2009, Dkt. No. 69, and Defendants replied on October 30, 2009. Dkt. No. 77-78. On March 29, 2010, the Court granted in part and denied in part, Defendants' motion to dismiss. Dkt. No. 84 ("MTD Order."). The Court found that Lead Plaintiff adequately alleged violations of the Securities Act against the Defendants for the Offering in which the Lead Plaintiff purchased securities, namely the HEMT 2006-5 Offering, by alleging Defendants' failure to disclose that the mortgage originators systematically disregarded the applicable underwriting guidelines. The Court dismissed all other Offerings from the case on standing grounds. The Court also dismissed claims based on the allegations that credit rating models were outdated, that credit enhancements were inadequate, and that Defendants purportedly omitted disclosure of material conflicts of interest with the Rating Agencies. *See* MTD Order. The Court also dismissed with leave to amend Lead Plaintiff's Section 12 claims. On April 14, 2010, Lead Plaintiff filed the Second Amended Securities Class Action Complaint ("Second Amended Complaint") in accordance with the MTD Order. Dkt. No. 87.

### B.      Joint Motion to Intervene Denied

On June 18, 2010, a joint motion to intervene was filed by Lead Plaintiff and the Public Employees Retirement System of Mississippi ("Miss. PERS") seeking permission for Miss. PERS to intervene in the case to represent purchasers in HEMT 2006-4 and HEMT 2006-6. Dkt. No. 104-105. Defendants opposed on July 14, 2010, Dkt. No. 108-109, and Lead Plaintiff and Miss. PERS replied on July 26, 2010. Dkt. No. 114-115. On December 15, 2010, the Court denied the motion to intervene. Dkt. No. 121.

### C.      First Class Certification Motion Granted

Simultaneously, the parties commenced discovery in advance of Lead Plaintiff moving for class certification. On September 30, 2010, after subpoenaing dozens of entities for trading records, reviewing thousands of pages of documents produced by the Defendants, and employing an expert on mortgage-backed securities, Lead Plaintiff moved to certify a class of purchasers of the HEMT 2006-5 Offering, the only Offering remaining in the case at that time, to certify Lead Plaintiff as Class Representatives, and to appoint Cohen Milstein as Lead Counsel (the "First Class Certification Motion"). Dkt. No. 118.

On August 16, 2011, the Court granted the First Class Certification Motion in the first written decision certifying a Securities Act class of MBS purchasers in the country. Dkt. No. 125.

**D.     Motion for Reconsideration in Light of Intervening Change in Controlling Law**

On September 11, 2012, Lead Plaintiff sought reconsideration of the Court's prior decision dismissing claims as to those offerings in which no Lead Plaintiff purchased securities in light of *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012) ("*NECA-IBEW*"), which held, in part, that a plaintiff in certain circumstances had class standing to assert claims on behalf of purchasers that purchased securities in offerings in which the named plaintiff did not purchase securities. As a result, Lead Plaintiff's reconsideration motion sought to reinstate claims with respect to the three Offering that had been previously been dismissed, HEMT 2006-4, HEMT 2006-6, and HEMT 2007-2. Dkt. No. 140.

Defendants opposed on October 9, 2012, Dkt. No. 143-144, and Lead Plaintiff replied on October 25, 2012. Dkt. No. 151.

On January 23, 2013, the Court granted in part and denied in part Lead Plaintiff's motion for reconsideration. Dkt. No. 156. Specifically, the Court held that under *NECA-IBEW*, Lead

Plaintiff had standing to assert claims relating to HEMT 2007-2, but not to assert claims relating to HEMT 2006-4 or HEMT 2006-6.

On May 20, 2013, Lead Plaintiff filed the Consolidated Third Amended Securities Class Action Complaint ("Third Amended Complaint") under seal, which added allegations relating to the HEMT 2007-2 Offering. Dkt. No. 161. Defendants filed their Answer and Affirmative Defenses to the Third Amended Complaint under seal on July 2, 2013. Dkt. No. 166.

### E.      Second Motion for Class Certification

On July 1, 2013, Lead Plaintiff filed a motion to modify the certified class to encompass purchasers of the HEMT 2007-2 Certificates ("Second Class Certification Motion"). Dkt. Nos. 163-165. On March 17, 2014, the Court granted the Second Class Certification Motion. Dkt. No. 181.

### F.      Summary Judgment and *Daubert* Fully Briefed

On April 28, 2015, Lead Plaintiff filed motions for summary judgment on various of Defendants' affirmative defenses, including Defendants' due diligence defense. Lead Plaintiff also filed a *Daubert* motion to exclude certain expert testimony of Defendants' loss causation expert. Dkt. Nos. 211-212, 214-220.

That same day, Defendants filed motions for summary judgment on various issues, including falsity, materiality, and loss causation. Defendants also filed *Daubert* motions to exclude certain expert testimony by three of Lead Plaintiff's experts. Dkt. Nos. 221-222.

Opposition papers to the motions filed on April 28, 2015 were filed by Lead Plaintiff and Defendants on June 29, 2015. Dkt. Nos. 228-237. Reply papers were filed on July 29, 2015. Dkt. Nos. 239-249.

### G.      Motion to Strike Fully Briefed

On October 2, 2015, Defendants filed a motion to strike certain declarations submitted by Lead Plaintiff's expert in connection with Lead Plaintiff's motions to exclude and Lead Plaintiff's opposition to Defendants' motion for summary judgment on loss causation. Dkt. Nos. 257-258. On October 14, 2015, Lead Plaintiff filed an opposition to Defendants' motion to strike under seal. Dkt. No. 259.

### H.      Exhaustive Fact and Expert Discovery Completed

In addition to the extensive motion practice described above, for much of the past seven years, the parties engaged in exhaustive discovery relating to the claims and the underlying events alleged in the various Complaints. For example, Lead Counsel took or defended the depositions of fifteen fact witnesses in connection with merits and class discovery.

Document discovery was also extremely voluminous. For example, Lead Counsel reviewed over 860,000 documents spanning over 8.9 million pages produced by Defendants. Lead Counsel also closely examined thousands of individual loan files—a process that necessitated hiring multiple experts to review a statistically significant sample of the over 25,000 loans at issue.

Expert discovery was equally comprehensive. Lead Plaintiff submitted expert reports from five separate experts, relating to mortgage underwriting, securities underwriting due diligence, statistical sampling, damages, and loss causation. Defendants submitted expert reports from four experts, on the same subjects. In connection with expert discovery (relating to both merits and class-certification issues), Lead Counsel took or defended eleven expert depositions.

### I.      Settlement Negotiations

As noted, the settlement here was negotiated under the auspices of the Honorable Layn Phillips, a former Federal Judge and U.S. Attorney and one of the most experienced and respected mediators in the country. On or around December 2014, Lead Counsel began

mediation with Defendants. After the submission of mediation statements and supplemental mediation statements, a full day of in-person mediation (on December 4, 2014), and after numerous calls and emails facilitated by Judge Phillips, *see generally* Laitman Decl., Exhibit 1 (Declaration of Layn R. Phillips) ("Phillips Decl."), ¶¶ 5-7, the Settling Parties reached an agreement in principle and executed a term sheet memorializing the agreement on November 3, 2015 with respect to the Settlement Amount of $110 million and related terms. That same day, Lead Counsel and Defendants' Counsel notified the District Court of the agreement in principle to settle the Action. Dkt. No. 260.

## II.     ARGUMENT

Under Rule 23(e) of the Federal Rules of Civil Procedure, the Settlement should be approved if the Court finds it "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2). "A court determines a settlement's fairness by looking at both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005). Additionally, in this Circuit, public policy favors the settlement of disputed claims among private litigants, particularly in complex class actions such as this one. *See Walmart*, 396 F.3d at 116 ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'") (citation omitted); *Chavarria v. N.Y. Airport Serv., LLC*, 875 F. Supp. 2d 164, 171 (E.D.N.Y. 2012) ("[S]ettlement approval is within the Court's discretion, which 'should be exercised in light of the general judicial policy favoring settlement.'") (citation omitted).

Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that, while a court should not give "rubber stamp approval" to a proposed settlement, it should "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Detroit v. Grinnell*

*Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). Because "'[t]he very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation', the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial'." *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972) (citation omitted).

### A.   The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of an Experienced Mediator and Is Procedurally Fair

A strong initial presumption of fairness attaches when a proposed settlement is reached as a result of arm's-length negotiations between experienced counsel after meaningful discovery. *See Wal-Mart*, 396 F.3d at 116; *see also Padro v. Astrue*, No. 11-CV-1788 (CBA)(RLM), 2013 WL 5719076, at *3 (E.D.N.Y. Oct. 18, 2013) ("Where the integrity of the negotiation process is preserved, a strong initial presumption of fairness attaches to the proposed settlement.").

The Settlement here is entitled to this strong presumption of fairness, because all parties in the Action are represented by highly experienced counsel, Laitman Decl., ¶¶ 35, 59, 63; the Settlement was reached after arm's-length negotiations before an experienced mediator and former Judge, *id.*, ¶ 7, 32-33; *see also* Phillips Decl., ¶¶ 1-7; and the parties understood the strengths and weaknesses of the claims and defenses before settlement was reached. Laitman Decl., ¶ 5, 34-40. As described above and in more detail in the Laitman Declaration, by the time the Settlement was reached, Lead Counsel had been vigorously litigating the case for more than seven years, had completed fact and expert discovery, had reviewed nearly 9 million pages of documents, and had fully briefed numerous pivotal, potentially case-dispositive motions. Laitman Decl., ¶¶ 13-31. As a result of this work, Lead Counsel and Lead Plaintiff had meaningful insight into the strengths and weaknesses of the case. Because the Settlement was the

9

result of an arm's-length negotiation between experienced counsel after meaningful discovery, it is entitled to a strong initial presumption of fairness.

> **B.    Application of the *Grinnell* Factors Supports Approval of the Settlement as Fair, Reasonable, and Adequate**

The Settlement is also substantively fair, reasonable and adequate and in the best interests of the Class. The standards governing approval of class action settlements are well-established in this Circuit. In *Grinnell*, the Second Circuit held that the following were factors to be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d at 463 (internal citations omitted); *see also McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009); *Wal-Mart*, 396 F.3d at 117. "A court need not find that every factor militates in favor of a finding of fairness; rather, a court considers the totality of these factors in light of the particular circumstances." *Padro*, 2013 WL 5719076, at *4 (citation omitted). Here, the Settlement satisfies the criteria set forth in *Grinnell*.

> *1.    The Complexity, Expense, and Likely Duration of the Litigation Support Approval of the Settlement*

"[I]n evaluating the settlement of a securities class action, federal courts, including this [c]ourt, have long recognized that such litigation is notably difficult and notoriously uncertain." *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 189 (S.D.N.Y. 2012) (citation omitted). Indeed, courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute." *In re Gilat Satellite Networks, Ltd.*, No. 02 CV-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19,

2007). Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

Here, the complexity, expense, and likely duration of the litigation were extraordinarily high, and strongly favor approval of the settlement. If this case were to proceed, Lead Plaintiff would have had to overcome numerous hurdles in order to achieve a litigated verdict. Even assuming that none of the pending, potentially case-dispositive summary judgment motions were decided in Defendants' favor, the case would have proceeded to a jury trial, with all the attendant risks and uncertainties.

In particular, the subject matter of the Action is extremely complex. Lead Plaintiff and Lead Counsel would have had to marshal and present a great deal of information concerning, among other things, the design and structure of the Certificates; the disclosures in numerous prospectus supplements and the relevant details about the more than 27,000 loans underlying the two certified Offerings; expert analysis of those loans, including evidence relating to statistical sampling and compliance with underwriting guidelines; and sophisticated statistical and econometric evidence to rebut Defendants' loss-causation defense. Further, it cannot be disputed that achieving a favorable verdict was far from certain. The multiple defenses that Defendants would have presented, as previewed by Defendants' summary judgment motions, including falsity, materiality, and loss causation, would also have added significantly to the complexity of the case.

Further, whatever the outcome at trial, it is virtually certain that an appeal would have been taken. All of the foregoing would have posed considerable expense and risk and would

have delayed recovery for several years, assuming that Lead Plaintiff was ultimately successful on its claims.

In contrast to this complex, lengthy, and uncertain litigation, the Settlement here provides an immediate, significant and certain recovery of $110 million for members of the Settlement Class. Accordingly, this factor supports approval of the Settlement.

### 2.      *The Reaction of the Class Supports Approval*

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *See, e.g., Chavarria*, 875 F. Supp. 2d at 173; *see also Padro*, 2013 WL 5719076, at *5 ("The fact that a small number of objections were received weighs in favor of settlement," as does "the positive reaction of the class, particularly in light of its size."). Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator began mailing copies of the Notice and Claim Form to potential Settlement Class Members and nominees on January 20, 2016. *See* Laitman Decl., Exhibit 3 (Declaration of Stephanie A. Thurin Regarding (A) Mailing of the Settlement Notice and Proof of Claim and (B) Report on Opt-Out Requests Received to Date) ("Thurin Decl."), ¶¶ 5-7. As of April 11, 2016, 2,068 copies of the Notice and Claim Form had been disseminated to potential Settlement Class Members and their nominees. *Id*. ¶ 9. In addition, a Summary Notice was published in the national edition of *The Wall Street Journal* and on *PR Newswire* on January 20, 2016. *Id.*, ¶ 10. While the deadline set by the Court for Settlement Class Members to exclude themselves from the Settlement is today, to date, only 3 requests for exclusion have been received to date.[2]

---

[2] One request for exclusion was submitted by a purchaser who filed an individual action against the Defendants long before the Settlement was achieved and is thus clearly intended to preserve that existing action. *See* Thurin Decl., Exhibit C (exclusion request from the National Credit Union Administration Board, explaining that it "has brought

### 3. The Stage of the Proceedings and the Amount of Discovery Completed Support Approval

At the time of settlement, seven years after commencement of the lawsuit, fact discovery—which included reviewing nearly 9 million pages of documents, fifteen fact depositions (including the deposition of a class representative), and extensive motion practice— as well as expert discovery, which consisted of eighteen expert reports and eleven expert depositions (relating to class-certification and merits issues), had been completed. This is, of course, in addition to the multiple hotly contested motions, including a motion to dismiss and two class-certification motions, along with the pending summary judgment and *Daubert* motions. Accordingly, Lead Plaintiff and Lead Counsel had a strong grasp of the strengths and weaknesses of the case when negotiating and evaluating the proposed Settlement. Lead Plaintiff and Lead Counsel became thoroughly familiar with Defendants' defenses through briefing of the motion to dismiss, from their analysis of Defendants' documents, from their review of Defendants' expert reports, and from studying and responding to Defendants' summary judgment and *Daubert* motions along with Defendants' mediation statements.

Thus, at the time the Settlement was reached, Lead Plaintiff and Lead Counsel "obtained sufficient information to be able to intelligently assess the strengths and weaknesses of the case

---

legal claims against Credit Suisse for the HEMT 2007-2 certificates"). The other two were submitted by Cayman Island entities, and included numerous claims for purchases that were not eligible for recovery because they were made outside the class period, *i.e.*, after June 3, 2008 for HEMT 2006-5, and after March 23, 2009, for HEMT 2006-4, HEMT 2006-6, and HEMT 2007-2. *See* Thurin Decl., Exhibit C (exclusion requests from CQS Directional Opportunities Master Fund Limited and CQS ABS Master Fund Limited, including claims for purchases made from June 2009 through April 2012).

Another letter was received from MBIA, a bond insurer that insured certain certificates in the HEMT 2007-2 Offering. *See id.*, Exhibit D. It is clear, however, that MBIA is not part of the Settlement Class, which is limited to purchasers of the Certificates, because "MBIA has not purchased or otherwise acquired any Certificates in HEMT 2006-5, HEMT 2006-4, HEMT 2006-6 or HEMT 2007-2." *Id.* Indeed, MBIA itself agrees that it is not part of the Settlement Class. *See id.* Nevertheless, MBIA's letter purports to request exclusion "for the avoidance of doubt, to the extent MBIA is construed to be a member of the Settlement Class." *See id.* Because MBIA is not part of the Settlement Class, its letter is not a valid request for exclusion.

and appraise settlement proposals." *Padro*, 2013 WL 5719076, at *6. As a result, Lead Plaintiff

and Lead Counsel possessed a well-informed basis for their belief that the Settlement is a

favorable resolution of the Action for the Class and this factor strongly supports approval of the

Settlement. *See, e.g.*, *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 161

(S.D.N.Y. 2011) (this factor supported settlement where the action had proceeded through

substantial document production, five depositions, "a round of mediation submissions and

sessions, and expert consultations on damages and causation," and, thus, "the parties were able to

make an intelligent appraisal of the value of the case"); *In re Warner Commc'ns Sec. Litig.*, 618

F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) (settlement approved where

the parties "have a clear view of the strengths and weaknesses of their cases").

### 4.    *The Risks of Establishing Liability and Damages Support Approval*

*Grinnell* holds that, in assessing the fairness, reasonableness and adequacy of a

settlement, courts should consider such factors as the "risks of establishing liability [and] . . . the

risks of establishing damages." 495 F.2d at 463. Although Lead Plaintiff and Lead Counsel

believe that the claims asserted against Defendants have merit, they also recognize that there

were significant risks as to whether they would ultimately be able to prove liability and establish

damages on their claims in the Action, as well as with respect to the amount of damages that

Lead Plaintiff could establish. These risks included challenges in proving that there were

misstatements and omissions in the Offering Documents, which also contained risk disclosures

that Defendants argued negated liability. Further risks included, for example, overcoming

Defendants' arguments that whatever misstatements or omissions may have existed were

immaterial to investors; that some or all of the declines in the value of the Certificates were due

to causes other than the alleged misstatements or omissions ("negative causation" defenses); and

that that Defendants had conducted a "reasonable investigation" and thus could satisfy their "due diligence" defense. Laitman Decl. ¶ 38.

*Risks of Establishing Liability.* To avoid summary judgment and prevail at trial, Lead Plaintiff would need to present evidence that the Offering Documents contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein related to the underwriting of the loans underlying the MBS. Defendants argued and would continue to argue that the Offering Documents contained no untrue statements or omissions, that the Offering Document properly warned of the risks, and that any misstatements were immaterial in any event. Defendants also argued, and could be expected to argue, that they had conducted reasonable due diligence, which, if successful, would also have cut off liability for the underwriter defendants.

*Risks of Establishing Damages.* Defendants also contended that establishing damages under the Securities Act posed significant obstacles for Lead Plaintiff and the Settlement Class. Under § 11(e) of the Securities Act, damages may be reduced or eliminated if the defendant proves that a portion or all of the statutory damages are attributable to causes other than the misstatements or omissions. Defendants asserted throughout the litigation—and were expected to continue to assert through trial—that the overall economic downturn, housing price declines and reduced liquidity in the market for mortgage-backed securities, and not the alleged misstatements and omissions, were responsible for the declines in the Certificates' value. Defendants also asserted throughout the litigation that any damages amount must be offset by distributions made on the certificates.

Several of these contested issues, notably the "negative causation" defense and the "due diligence" defense would have required expert testimony before the jury. While Lead Plaintiff

expected to present persuasive expert testimony establishing causation and damages and opining that Defendants' investigation was not sufficient, Defendants had experts supporting their position as well. Defendants, moreover, have asserted *Daubert* challenges to a number of Lead Plaintiff's experts. Even assuming that Lead Plaintiff prevailed in these *Daubert* challenges, Lead Plaintiff could not be certain which experts' views the jury would credit, and who would prevail in this "battle of the experts." *See, e.g., In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 332 (E.D.N.Y. 2010) ("The proof on many disputed issues – which involve complex financial concepts – would likely have included a battle of experts, leaving the trier of fact with difficult questions to resolve."); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001) ("In such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants.").

In light of all these risks of establishing liability and damages in this Action, the proposed Settlement is fair, reasonable and adequate.

### 5. *The Risks of Maintaining the Class Action through Trial Support Approval*

After two attempts, Lead Plaintiff was able to certify a class covering two of the four Offerings initially sued on. However, there was no guarantee that it would have been able to maintain the class, because courts may always exercise their discretion to re-evaluate the appropriateness of class certification at any time. The Settlement avoids any uncertainty with respect to this issue, which militates in favor of approval. *See, e.g., Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013) ("[W]e cannot find that the district court abused its discretion in finding that the class faced significant risks of decertification, that decertification would drastically reduce the chances of any member of the class achieving meaningful relief, and that the litigation risks attendant to these possibilities weighed heavily in favor of the fairness of a settlement.").

Moreover, the Settlement provides a recovery, albeit a highly discounted one, to purchasers of two Offerings *not* covered by the Court's class-certification rulings, and whose prospects of recovering anything at all, absent a settlement, were highly remote. Thus, this factor also weights in favor of approval.

### 6. *The Ability of the Defendants to Withstand a Greater Judgment Does Not Weigh Against Approval*

Here, the Defendants include one of the world's biggest investment banks, its affiliates, and current and former senior employees, and they theoretically could have withstood paying a larger settlement. This fact, however, does not weigh against approval of the settlement. "[D]efendants' ability to withstand a higher judgment . . . standing alone, does not suggest that the settlement is unfair." *D'Amato*, 236 F.3d at 86.

### 7. *The Range of Reasonableness of the Settlement, in Light of the Best Possible Recovery and All of the Attendant Risks of Litigation, Supports Approval*

The last two substantive factors that courts consider are the range of reasonableness of the settlement fund in light of: (i) the best possible recovery and (ii) litigation risks. In analyzing these two factors, the issue for the court is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case. A court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell*, 495 F.2d at 462 (citations omitted). "The determination of a reasonable settlement 'is not susceptible of a mathematical equation yielding a particularized sum,' but turns on whether the settlement falls within a 'range of reasonableness.'" *Chavarria*, 875 F. Supp. 2d at 174 (citation omitted). Thus, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is

grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455. "In fact, there is no

reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even

a thousandth part of a single percent of the potential recovery." *Chavarria*, 875 F. Supp. 2d at

175 (citation omitted).

The Settlement here is well within the range of reasonableness in light of the substantial

risks presented by this litigation. Although the damages that might be recoverable in this case

were substantial, Defendants had formidable arguments with respect to those damages (as well as

liability in general) that, if successful, could have greatly reduced or eliminated altogether those

damages.[3] Lead Plaintiff and Lead Counsel have concluded that, in light of these risks, the

Settlement, which provides an immediate and substantial benefit to Settlement Class Members,

outweighs the benefits of continued litigation. Laitman Decl. ¶¶ 34-40. A court may not

"substitute its judgment for that of the parties who negotiated the settlement." *Chavarria*, 875 F.

Supp. 2d at 172.

Lead Counsel is intimately familiar with the facts in the case and has extensive

experience prosecuting comparable securities class actions. In these circumstances, Lead

Counsel's opinion that the Settlement is reasonable is entitled to "great weight." *Padro*, 2013

WL 5719076, at *7 ("Where, as here, settlement has been reached after an arms-length

---

[3] For example, under § 11, recoverable damages are based on the difference between the purchase price of the security and the value of the security on the date the lawsuit was filed, subject to reduction for "negative causation." As discussed above, Defendants here contended that any losses were caused by factors other than untrue statements in the Offering Documents, such as the downturn in the economy and the housing market. Given that the timing of the price declines at issue coincided with the national economic downturn, Defendants' "negative causation" defense was an argument that would have been resolved through expert testimony at trial, and a jury may well have found in Defendants' favor.

negotiation, 'great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.'") (citation omitted).[4]

The recommendation of Lead Plaintiff, a large, sophisticated institutional investor, also strongly supports the fairness of the Settlement. Representatives of Lead Plaintiff took an active role in supervising this litigation, as envisioned by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. 78u-4, and Lead Plaintiff "strongly endorse[s] . . . the Settlement." *see* Laitman Decl., Exhibit 2 (Declaration of George R. Laufenberg) ("Laufenberg Decl."), ¶¶ 5-7. A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness.'" *In re Veeco Instruments Inc. Sec. Litig.*, No. 05-MDL-0165 (CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) (citation omitted).

In sum, a review of the *Grinnell* factors, including the complexity, expense and delay of further litigation, discovery completed and the stage of the proceedings, and the substantial risks of the Action, strongly supports a finding that the Settlement is fair, reasonable and adequate.

**C.      The Plan of Allocation is Fair and Reasonable and Should Be Approved**

Lead Plaintiff has proposed a plan to allocate the proceeds of the Settlement among Settlement Class Members who submit valid Claim Forms that are approved for payment from the Net Settlement Fund ("Authorized Claimants"). The objective of the proposed Plan of Allocation is to equitably distribute the Settlement proceeds to those Settlement Class Members

---

[4] Moreover, the Settlement provides the certified class with the $64.94 per $1,000 of Original Bond Face Value—the metric required by the PSLRA to be included in the notice—which, to Lead Counsel's knowledge, is significantly higher than any MBS settlement to date. The next highest recovery of which Lead Counsel is aware was in *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, No. 09-cv-3701 (S.D.N.Y.) ("*JP Morgan II*"), which provided a recovery of $38.77 per $1,000 of Original Bond Face Value. *See id.* Dkt. No. 361-2.

who suffered economic losses as a result of the alleged misrepresentations and omissions, in proportion to the strength and viability of their claims in this case. *See* Laitman Decl. ¶ 46.

The Plan, as set forth in the Notice, allocates the settlement proceeds based principally on the statutory measure of damages set out in § 11(e) of the Securities Act, 15 U.S.C. § 77k(e) and on the strength of the claim of different categories of class members. Lead Plaintiff engaged Dr. Michael Hartzmark, an expert with a PhD in economics, to examine the Plan of Allocation. On December 21, 2015, Lead Plaintiff submitted a declaration from Dr. Hartzmark ("Hartzmark Declaration") setting forth the methodology for determining each Authorized Claimant's Recognized Claim under the Plan and the basis for the analysis. *See* Dkt. No. 263-1.[5] The Plan of Allocation also takes into account the strength of the claims of Settlement Class Members by dividing them into two groups. Specifically, as explained in the Notice, Settlement Group 1 consists of the "Certified Claimants," *i.e.*, Settlement Class Members who purchased from HEMT 2006-5 and HEMT 2007-2, the two Offerings covered by the Court's class certification rulings. Settlement Group 2 consists of the "Non-Certified Claimants," *i.e.*, Settlement Class Members who purchased from HEMT 2006-4 and HEMT 2006-6, the two Offerings which the Court repeatedly dismissed on standing grounds. The Plan of Allocation allocates 95% of the Settlement fund to the Certified Claimants, and 5% to the Non-Certified Claimants, for reasons discussed below.

---

[5] As explained more fully in the Notice, and in the Hartzmark Declaration, a "Recognized Loss or Gain Amount" should be calculated for each purchase or acquisition of a Certificate. The calculation of the Recognized Loss or Gain Amount will depend on several factors, including (i) which Certificate was purchased or acquired; (ii) when the Certificate was purchased or acquired; (iii) whether it was sold, and if so, when it was sold (*i.e.*, before or after suit) and for how much; and (iv) the value of the Certificate on its applicable "Date of First Suit." Although the formula possesses a degree of complexity necessary to allocate the settlement funds fairly among Authorized Claimants and based on the statutory damage calculations mandated by § 11 of the Securities Act, investors in mortgage-backed securities are typically highly sophisticated investors, and the language utilized in the Plan is consistent with industry terminology.

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized – namely, it must be fair and adequate." *See Chavarria*, 875 F. Supp. 2d at 175. A plan that allocates settlement funds to class members based on the extent of their injuries or the strengths of their claims is fair and reasonable. *See, e.g.*, *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 580 (S.D.N.Y. 2008) ("A reasonable plan may consider the relative strength and values of different categories of claims."); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) (approving plan of allocation that provided no recovery for certain class members who had purchased predating the Class Period); *In re Omnivision Tech.*, Inc., 559 F. Supp. 2d 1036, 1045 (C.D. Cal. 2008) ("It is reasonable to allocate the settlement funds to class members based on … strength of their claims on the merits."); *In re Enron Corp. Sec.*, MDL No. 1446, 2008 U.S. Dist. LEXIS 84656 (S.D. Tex. Sept. 8, 2008) (plan of allocation approved that provided only 10% of the settlement fund to claims that included weaker claims on the merits and securities not even asserted in the complaint but added to the settlement.). Plans of allocation which vary payouts based on strength of claims have been repeatedly approved in the MBS class action context. *See, e.g.*, *New Jersey Carpenters Vacation Fund et al. v. The Royal Bank of Scotland Group PLC, et al.* No. 08-cv-5093 (S.D.N.Y.) ("*Harborview*"), Dkt. Nos. 275-7 and 282 (approving plan of allocation in MBS case that provided smaller proportion of settlement fund to class members whose claims had been dismissed or were not granted class certification); *New Jersey Carpenters Health Fund, et al. v. Residential Capital, LLC, et al.* No. 08-cv-8781 (S.D.N.Y.) ("*RALI*"), Dkt. Nos. 349-6 and 354 (same); *In re Lehman Brothers Mortgage-Backed Sec. Litig.*, 799 F. Supp. 2d 258 (LAK) (S.D.N.Y. 2011) (21% of settlement fund to dismissed tranches at discounted rate); *Maine State Ret.Sys. v. Countrywide Financial Corp.*, 722 F. Supp. 2d 1157 (MRP)(MANx) (C.D. Cal. 2010) (approving settlement and

overruling class member who objected to plan of allocation which allocated money to class members in different buckets depending on the strength of their claims); *In re Wells Fargo Mortgage-Backed Certificates Litig.*, No. 09-CV-1376-LHK (PSG) (N.D. Cal.) (12% allocated to dismissed tranches).

Here, the group consisting of Certified Claimants and the group consisting of Non-Certified Claimants received different proportions of the Settlement Fund based on the strength of their claims. Specifically, because Certified Claimants' claims had been granted class certification, their claims were significantly more likely to result in a recovery if the case were litigated through trial and appeal. The Non-Certified Claimants' claims, by contrast, had consistently been dismissed despite the unflagging efforts of Lead Plaintiff and Lead Counsel to include those claims. Those claims would only have resulted in recovery if the Second Circuit reversed the Court's dismissal rulings, a highly uncertain prospect. Even then, recovering on those claims would have required a new round of discovery relating to those Offerings, and additional motions practice and litigation before those claims could proceed to trial. As a result, the viability of the Non-Certified Claimants' claims was much lower than those of the certified class, justifying a much lower recovery.

The plans of allocation in other MBS class action settlements have similarly provided discounted recoveries to class members whose claims were dismissed or were not granted class certification. For example, in the *Harborview* case, No. 08-cv-5093 (S.D.N.Y.), the plan of allocation provided class members who purchased from offerings that had been dismissed from the case, or who had not purchased within the certified time period, a smaller proportion of the settlement fund than the class members who were part of the class certified by the court. *See id.*, Dkt. No. 275-7. The same was true of the plan of allocation in the *RALI* case, No. 08-cv-8781

(S.D.N.Y.). *See id.*, Dkt. No. 349-6. Both plans of allocation were approved by the courts

presiding over those cases. *See Harborview*, Dkt. No. 282 and *RALI*, Dkt. No. 354.

In assessing a proposed plan of allocation, the Court may give great weight to the opinion

of informed counsel. *See, e.g., In re Payment Card Interchange Fee & Merchant Discount

Antitrust Litig.*, No. 05-MD-1720 (JG)(JO), 2013 WL 6510737, at *27 (E.D.N.Y. Dec. 13, 2013)

("An allocation formula need only have a reasonable, rational basis, particularly if recommended

by experienced and competent class counsel.") (citation omitted); *Chavarria*, 875 F. Supp. 2d at

175 ("In determining whether a plan of allocation is fair, courts look primarily to the opinion of

counsel. That is, as a general rule, the adequacy of an allocation plan turns on whether counsel

has properly apprised itself of the merits of all claims, and whether the proposed apportionment

is fair and reasonable in light of that information.") (citations and internal quotations omitted).

The proposed Plan of Allocation in this case is based on the statutory damages permitted under

§ 11 of the Securities Act as well as the varying strengths of Settlement Class Members' claims

and was fully explained in the Notice sent to Settlement Class Members. It was prepared in

consultation with Lead Plaintiff's damages consultant, tracks the theory of damages asserted by

Lead Plaintiff, and reflects Lead Counsel's assessment of the strengths of each group of claims—

an assessment made by experienced counsel after seven years of hard-fought litigation.

Accordingly, it is the opinion of Lead Counsel that the Plan of Allocation is fair, reasonable and

adequate to the Class as a whole. Laitman Decl., ¶¶ 46-49. Moreover, following dissemination of

2,068 Notices, to date, there are ***no*** objections to the Plan of Allocation. *Id.*, ¶ 49.

Accordingly, for all of the reasons set forth herein, in the Laitman Declaration, and in the

Hartzmark Declaration, the Plan of Allocation is fair and reasonable, and should be approved.

### D.    Notice to the Class Satisfied the Requirements of Rule 23 and Due Process

The Notice provided to the Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable." Fed. R. Civ. P. 23(e)(1). Notice of a settlement is reasonable if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart*, 396 F.3d at 114.

Both the substance of the Notice and the method of its dissemination to potential Class Members satisfied these standards. The Notice includes all the information required by Rule 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 77z-1(a)(7). As noted above, in accordance with the Court's Preliminary Approval Order, as of April 11, 2016, the Claims Administrator has disseminated 2,068 copies of the Notice to potential Class Members and their nominees. Thurin Decl. ¶ 9. In addition, Lead Plaintiff caused the Summary Notice to be published in the national edition of the *Wall Street Journal,* and on *PR Newswire* and copies of the Notice and Claim Form were made available on a dedicated website maintained by the Claims Administrator and on Lead Counsel's websites. *See* Thurin Decl. ¶¶ 10-14; Laitman Decl. ¶ 43.

This combination of individual mail to all potential Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely-circulated publication, and set forth on Internet websites, was "the best notice . . . practicable under the circumstances" and satisfies the requirements of due process and Rule 23. Fed. R. Civ. P. 23(c)(2)(B). *See, e.g., Padro*, 2013 WL 5719076, at *3 ("Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need

not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members.").

           **E.**     **The Class Should Be Certified for Settlement Purposes**

On January 6, 2016, the Court granted Lead Plaintiff's motion for preliminary approval of the Settlement and preliminarily certified the Class for settlement purposes only, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. *See* Dkt. No. 266 (Preliminary Approval Order). Nothing has changed to alter the propriety of certification and, for all the reasons stated in Lead Plaintiff's Memorandum of Law in Support of Preliminary Approval, Dkt. No. 263, incorporated herein by reference, Lead Plaintiff now requests that the Court grant final certification of the Class pursuant to Rules 23(a) and (b)(3).

**III.**    **CONCLUSION**

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable and adequate.

Dated: April 12, 2016          Respectfully submitted,

                       **COHEN MILSTEIN SELLERS & TOLL PLLC**

                       */s/ Joel P. Laitman*
                       Joel P. Laitman (JL-8177)
                       Christopher Lometti (CL-9124)
                       Michael B. Eisenkraft (ME-6974)
                       88 Pine Street, 14th Floor
                       New York, NY 10005
                       Telephone: (212) 838-7797

                       Steven J. Toll (pro hac vice)
                       Times Wang (pro hac vice)
                       1100 New York Avenue, N.W.
                       East Tower, Ste. 500
                       Washington, DC 20005
                       Telephone: (202) 408-4600

                       *Counsel for Lead Plaintiff and the Class*